No. 14-1933

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

### UNITED STATES OF AMERICA
*Appellee*

v.

### PABLO CASELLAS-TORO,
*Defendant- Appellant*

_____

**On Appeal from a Judgment of Conviction in the
United States District Court for the District of Puerto Rico**

_____

**BRIEF OF APPELLANT PABLO CASELLAS-TORO**
_____

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-8616 (Telephone)**
**(617) 338-9538 (Fax)**
**homanlaw@aol.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

**FRANCISCO REBOLLO-
CASALDUC**
**P.O. Box 195571**
**San Juan, Puerto Rico 00919**
**(787) 765-0505 (Telephone)**
**rebollolaw@gmail.com**

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . .    1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

    The Motion for Change of Venue . . . . . . . . . . . . . . . . . . . . . . . . . .    3

        (1) Media in Puerto Rico . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

        (2) Publicity Regarding the Murder of Casellas' Wife . . . . .    4

        (3) Publicity Involving Casellas' Father . . . . . . . . . . . . . . . .    6

        (4) Trial of the State Case . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

        (5) Verdict and Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . .    8

        (6) Additional Prejudicial Publicity . . . . . . . . . . . . . . . . . . .    9

    The Government's Response and the District Court's
    Preliminary Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

    The Hearing on the Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

    Pretrial Motions and Orders Relating to Admissibility of
    Evidence Relating to the Murder of Casellas' Wife . . . . . . . . . . . .    12

    Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

    The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

    Post-Trial and Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

I.   THE DENIAL OF CASELLAS' MOTION FOR CHANGE OF
     VENUE DENIED HIM A FAIR TRIAL BY AN IMPARTIAL
     JURY IN VIOLATION OF THE FIFTH AND SIXTH
     AMENDMENTS TO THE UNITED STATES CONSTITUTION
     AND FED. R. CRIM. P. 21(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

     A.   The Change of Venue Standard . . . . . . . . . . . . . . . . . . . . . . .   25

     B.   This Case Required A Presumption of Prejudice . . . . . . . . . .   27

     C.   *Skilling* Supports Applying a Presumption of Prejudice
          in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

     D.   The Presumption of Prejudice Cannot Be Rebutted . . . . . . . .   37

II.  THE JURY SELECTION PROCEDURES ADOPTED BY
     THE DISTRICT COURT DID NOT SUFFICE TO
     ENSURE THE SELECTION OF AN IMPARTIAL
     JURY OR TO SAFEGUARD THE PRESUMPTION OF
     INNOCENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

     A.   The District Court's Denial of Challenges for Cause
          of Jurors Who Knew That Casellas Had Been Convicted
          of Murdering his Wife Denied Casellas His Sixth
          Amendment Right to Trial By an Impartial Jury . . . . . . . .   39

          1.   Juror #5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

          2.   Juror #9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

          3.   Juror #27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

          4.   Juror #36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

          5.   Juror #56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

          6.   Juror #86 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

       7.     Juror #88 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

       8.     Juror #89 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

       9.     Juror #93 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

III.   THE DISTRICT COURT ERRED IN DENYING
      CASELLAS' MOTION TO SUPPRESS . . . . . . . . . . . . . . . . . . . 50

    A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    B.   The Warrantless Search of the Car Cannot Be Justified
        as a Consent Search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    C.   Absent the Information Gleaned During the Unlawful
        Warrantless Search, the Warrant Failed To Establish
        Probable Cause for the Search . . . . . . . . . . . . . . . . . . . . . . 55

    D.   The Error in Denying Casellas' Motion to Suppress
        Was Not Harmless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

ADDENDUM

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Bumper v. North Carolina*, 391 U.S. 543 (1968) . . . . . . . . . . . . . . . . . . . .   53

*Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952) . . . . . . . . . . . . . .   30

*Florida v. Jimeno*, 500 U.S. 248 (1991) . . . . . . . . . . . . . . . . . . . . . . . . .   51

*In re Tsarnaev*, 2015 WL 855777 (1st Cir. February 27, 2015) . . . . . . . . . *passim*

*Irvin v. Dowd*, 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25, 29

*Lee v. City of Chicago*, 330 F.3d 456 (7th Cir.  2003) . . . . . . . . . . . . . . .   53

*Marshall v. United States*, 360 U.S. 310 (1959) . . . . . . . . . . . . . . . . . . . .   29

*Mu'Min v. Virginia*, 500 U.S. 415 (1991) . . . . . . . . . . . . . . . . . . . . . . . . .   34

*Murphy v. Florida*, 421 U.S. 794 (1975) . . . . . . . . . . . . . . . . . . . . . . . . .   29

*Murray v. United States*, 487 U.S. 533 (1988) . . . . . . . . . . . . . . . . . . . . .   55

*Patterson v. Colorado*, 205 U.S. 454 (1907) . . . . . . . . . . . . . . . . . . . . . .   25

*Patton v. Yount*, 467 U.S. 1025 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . .   29, 30

*Real v. Hogan*, 828 F.2d 58 (1st Cir.1987) . . . . . . . . . . . . . . . . . . . . . . .   47

*Rideau v. Louisiana*, 373 U.S. 723 (1963) . . . . . . . . . . . . . . . . . . . . . . . .   35

*Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013) . . . . . . . . . . . . . .   49

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) . . . . . . . . . . . . . . . . . . . . . . .   25

*Skilling v. United States*, 561 U.S. 358, 377 (2010) . . . . . . . . . . . . . . . . . . . *passim*

iv

*Taylor v. Louisiana,* 419 U.S. 522, 528 (1975) . . . . . . . . . . . . . . . . . . . . .    38

*Turner v. Louisiana*, 379 U.S. 466 (1965) . . . . . . . . . . . . . . . . . . . . . . .    40

*United States v. $304,980 in U.S. Currency*, 732 F.3d 812
    (7th Cir.  2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52

*United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990) . . . . . . . . . . . . .    30, 36

*United States v. Brandon*, 17 F.3d 409 (1st Cir.1994) . . . . . . . . . . . . . . .    26

*United States v. Chaney*, 647 F.3d 401 (1st Cir. 2011) . . . . . . . . . . . . . .    50

*United States v. Delgado-Marrero*, 744 F.3d 167 (1st Cir. 2014) . . . . . . .    39

*United States v. Dessesaure*, 429 F.3d 359 (1st Cir. 2005) . . . . . . . . . . .    55

*United States v. Gonzalez,* 214 F.3d 1109 (9th Cir.2000) . . . . . . . . . . . .    42

*United States v. Green*, 698 F.3d 48 (1st Cir. 2012) . . . . . . . . . . . . . . . .    56

*United States v. Lanham*, 617 F.3d 873 (6th Cir. 2010) . . . . . . . . . . . . . .    42

*United States v. Lowe*, 145 F.3d 45 (1st Cir. 1998) . . . . . . . . . . . . . . . . .    39

*United States v. Marshall*, 348 F.3d 281 (1st Cir. 2003) . . . . . . . . . . . . .    51

*United States v. McVeigh*, 918 F.Supp.2d 1467 (W.D.Okla. 1996) . . . . . .    24, 40

*United States v. Misla-Aldarondo*, 478 F.3d 52 (1st Cir. 2007) . . . . . . . . 26, 30, 39,
                                                                                            47, 48

*United States v. Mitchell*, 690 F.3d 137 (3d Cir.  2012) . . . . . . . . . . . . . .    41

*United States v. Moreno Morales*, 815 F.2d 725 (1st Cir. 1987) . . . . . . . .    33

*United States v. Quiles-Olivo*, 684 F.3d 177 (1st Cir. 2012) . . . . . . . . . . 21, 25, 26

*United States v. Poulsen*, 655 F.3d 492 (6th Cir. 2011) . . . . . . . . . . . . . .    48

*United States v. Pratt*, 728 F.3d 463 (5th Cir. 2013) . . . . . . . . . . . . . . . .    48

*United States v. Robertson*, 736 F.3d 677 (4th Cir. 2013) . . . . . . . . . . . .    53

*United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) . . . . . . . . . . . .    48, 50

*United States v. Rodriguez-Cardona*, 924 F.2d 1148 (1st Cir. 1991) . . . .    26

*United States v. Rodriguez Perez*, 625 F.2d 1021 (1st Cir. 1980) . . . . . . .    52

*United States v. Silva*, 554 F.3d 13 (1st Cir. 2009) . . . . . . . . . . . . . . . . .    55

*United States v. Stierhoff*, 549 F.3d 19  (1st Cir. 2008) . . . . . . . . . . . . . .    52

*United States v. Turner*, 169 F.3d 84 (1st Cir. 1999) . . . . . . . . . . . . . . . .    51, 52

*United States v. Walker*, 665 F.3d 212 (1st Cir. 2011) . . . . . . . . . . . . . . .    25

*United States v. Worley*, 193 F.3d 380 (6th Cir. 1999) . . . . . . . . . . . . . . .    53

*United States v. Zavala*, 541 F.3d 562 (5th Cir. 2008) . . . . . . . . . . . . . . .    51

## **Constitutional Provisions**

Fourth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . .    52, 54

Fifth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . . .    25

Sixth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . . .    25, 39, 47

## **Statutes and Rules**

18 U.S.C. §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

Fed. R. Crim. P. 21(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

## Other Authorities

Nancy M. Steblay, *et al.*, The Effects of Pretrial Publicity on Juror
      Verdicts: A Meta-Analytic Review,
      23 LAW AND HUMAN BEHAVIOR 219 (1999) . . . . . . . . . . . . . . . .  31, 32

Christine L. Ruva and Cathy McEvoy, Negative and Positive
      Pretrial Publicity Affect Juror Memory and Decision Making,
      14 JOURNAL OF EXPERIMENTAL PSYCHOLOGY: APPLIED 226
      (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Tarika Daftary-Kapur, *et al.*, Examining Pretrial Publicity in a
      Shadow Jury Paradigm: Issues of Slant, Quantity,
      Persistence, and Generalizability,
      38 LAW AND HUMAN BEHAVIOR 462 (2014) . . . . . . . . . . . . . . . .  31-32, 40

Judge Mark W. Bennett, Unraveling the Gordian Knot of
      Implicit Bias in Jury Selection: The problems of Judge-
      Dominated Voir Dire, the Failed Promise of *Batson*,
      and Proposed Solutions,
      4 HARVARD LAW AND POLICY REVIEW 149 (2010) . . . . . . . . . . .  32

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This appeal arises from a judgment in a criminal case, of which the district court had jurisdiction under 18 U.S.C. §3231. Judgment entered on August 11, 2014, Add. 1, and appellant Pablo Casellas' timely notice of appeal was docketed on August 20, 2014. App:16. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1. Whether the district court erred in denying Casellas' motion for change of venue in this case in which virulent and sensationalistic publicity about Casellas had blanketed the island of Puerto Rico for almost two years prior to the trial of this case, and there was near-unanimous knowledge among jurors that Casellas had been convicted of murdering his wife.

2. Whether the district court erred in denying challenges for cause of jurors with knowledge of Casellas' conviction for the murder of his wife, thereby denying him of his constitutional right to trial by a fair and impartial jury.

3. Whether the jury selection procedures adopted by the district court sufficed to ensure that Casellas was accorded his constitutional right to trial by a fair and impartial jury.

4. Whether the district court erred in denying Casellas' motion to suppress evidence, where an objectively reasonable agent would not have believed that

Casellas' consent was still valid at the time of the search, and observations made during the unlawful warrantless search tainted the later search conducted pursuant to a warrant.

### STATEMENT OF THE CASE

Casellas' wife was murdered on July 14, 2012, and shortly thereafter he was charged in state court with her murder. There followed an extended period of sensationalistic saturation publicity throughout Puerto Rico – in newspapers, on television and radio, and in various forms of social media such as Facebook and Twitter – which made Casellas a name known to virtually everyone in Puerto Rico. Adding impetus for massive publicity was the fact that Casellas is the son of a prominent United States district court judge in Puerto Rico. So notorious had Casellas become and so incited were the emotions of the public that when news of Casellas' murder conviction was announced  at a major sporting event on the evening of the verdict, January 22, 2014, just two-and-a half months prior to the voir dire in this case, the game stopped while the stands erupted in a raucous celebration. App:37-38.

A week later, on January 30, 2014, the indictment in this case was unsealed. It charged Casellas with three counts of making false statements under 18 U.S.C. §1001, in conjunction with an allegedly fabricated report of a carjacking. App:3, 20. These alleged false statements had already been featured prominently at the state

murder trial, as the state's theory was that Casellas had faked the carjacking, and reported guns stolen, as part of his plan for his wife's murder, and, concomitantly, in media reports which blanketed all corners of the island.

On February 6, 2014, Casellas was sentenced in state court to 109 years in prison for the murder of his wife. So intense was the public interest and the media frenzy that media representatives sought and were granted permission to broadcast the sentencing live, and the ensuing broadcast, which featured Casellas in a yellow jumpsuit and shackles, was avidly watched throughout the island only two months prior to the voir dire in this case. App:38-39. The next day, February 7, 2014, Casellas had his initial appearance in this case, App:5, before Judge Goodwin of the Southern District of West Virginia, who was designated to sit on the case and who presided at all subsequent stages of the case. App:2-3.

### The Motion for Change of Venue

Casellas sought a change of venue of the trial of this case to a neutral location, App:25-46, which the government did not oppose. App:369. Based on the circumstances outlined in his motion, Casellas contended that he could not receive a fair trial and Puerto Rico and that venue should be changed to a neutral mainland jurisdiction.

### (1) Media in Puerto Rico

The motion first explained the nature of the island-wide media in Puerto Rico, where "local" media reaches the entire island. It explained the role of two daily hour-long tabloid news programs which consistently rank among the top-viewed television programs in Puerto Rico, both of which made Casellas the predominant feature of their programming, a focus which still continued at the time of the filing of the motion. In addition, Puerto Rico has five or six major television stations, four major daily papers of general circulation, all of which have websites which from the time of the murder and continuing to the time of the filing of the motion, had a separate link on the front pages of their websites devoted exclusively to coverage of the Casellas case, and dozens of 24-hour radio stations. In addition, social media like Facebook and Twitter, among others, have a heavy and active presence. All these media outlets had, since the time of the murder, continuously and intensely covered the Casellas case virtually on a daily basis. App:26.

### (2) Publicity Regarding the Murder of Casellas' Wife.

The motion then described the media circus and public outrage which began on the day of Casellas' wife's murder and continued unabated up to the time of the trial in this case, App:25-41, supported by more than three hundred pages of exhibits.

App:47-368.[1] Within days of the murder, the public and the press unofficially declared Casellas responsible and demanded his arrest. App:27. The official announcement that Casellas was the sole suspect in his wife's murder came a few weeks later. *Id.* Leaks about the investigation began almost immediately; while some of the reports were accurate, many contained only wild speculation and outright fabrication. *Id.* Among the earliest leaks was the substance of Casellas' interview with the police, which became the subject of entire television shows and was widely ridiculed by a disbelieving public. *Id.* Panels of "experts" – retired police officers, forensic experts, retired judges, defense attorneys, and prosecutors – appeared regularly on televised broadcasts and analyzed every detail of the case – whether true or not – and regaled the public with various interpretations of the evidence, all of which presupposed Casellas' guilt. *Id.*

The press was notified before state authorities executed search warrants at the homes of Casellas and his father and were on hand to film as state agents descended on the premises and towed away cars for further search, including that of Judge Casellas. Videos of the searches were played repeatedly and prominently in newscasts and, particularly, on the tabloid news programs. App:31. Speculation ran rampant that

---

[1] At the hearing on the motion, the government agreed that the factual assertions regarding the pretrial publicity contained in Casellas' motion and exhibits were accurate. App:409.

the victim's blood had been found inside the vehicles and on clothes found inside the homes, which was untrue. Casellas' very public arrest only fanned the frenzy, as it was choreographed to be a media event, with state agents intercepting Casellas, who had been summoned to appear at the courthouse, as he walked from the train to the courthouse, handcuffing him, and leading him to the courthouse, all of which was filmed by the waiting media, which had been alerted in advance, and broadcast and rebroadcast on countless occasions. *Id.* Further controversy flared when Casellas posted $4 million bail and was released to house arrest rather than remaining incarcerated pending trial as a less well-to-do defendant would have done. App:32. An April, 2013, study commissioned by the defense prior to the start of the state murder trial showed that fully 70% of the residents of the judicial district in which the trial was to be held openly believed Casellas guilty of murdering his wife. App:33-34. Because the most damaging onslaught of publicity occurred after the study was conducted – the daily coverage of the trial, the verdict, the sentencing, and the unsealing of the federal charges – the percentage of people who believed Casellas guilty can only have been substantially higher at the time of the trial of this case. App:34.

### (3) Publicity Involving Casellas' Father

The public obloquy was not confined to Casellas himself. Extensive criticism

6

was leveled at Judge Casellas, who had gone to Casellas' home while the police were still working the murder scene, and speculation ran rampant among press and public alike that Judge Casellas had interfered with the scene or obstructed the investigation.[2] There were widespread expressions of anger and concern that Judge Casellas would exert his influence to help his son and that, as a result, Casellas would, literally, get away with murder. App:29. Video taken the day of the murder, showing Judge Casellas walking around his son's home – the scene of the murder – was broadcast and analyzed over and over again. *Id.* Despite affirmations by state authorities that Judge Casellas had not acted improperly, calls for Judge Casellas' resignation continued unabated in both traditional media and social media outlets. *Id.* The truth, however, was powerless to compete with the ongoing and unfettered media circus.

### (4) Trial of the State Case.

Trial of the state case lasted from December 10, 2013, to January, 22, 2014,

---

[2] Similarly, in this case, the jury heard evidence regarding Judge Casellas: that Casellas' first call after the incident was to his father, App:1161-62, that Judge Casellas was present at the scene during the police investigation, App:1217, and that Judge Casellas had terminated Casellas' interview by the police on the day of the alleged carjacking. App:1230. While the voir dire did not reveal how many jurors had been exposed to the adverse publicity about Judge Casellas, this evidence certainly had the potential to recall to jurors' minds anything negative they had read or heard about Judge Casellas' involvement in his son's case.

App:35, ending only two-and-a-half months before the commencement of voir dire in this case. All local media outlets – television, print media, radio – covered every minute of every day of the trial. Reporters inside the courtroom tweeted every detail of the trial. *Id.* Witnesses were mobbed by reporters and television cameras as they left the courtroom after the completion of their testimony. App:35-36. Reporters were stationed outside the courthouse and approached the trial's main players for interviews every day. App:36. Competing tabloid news programs openly boasted that they had the most complete Casellas trial coverage. *Id.* During and after the trial, local news channels aired hour-long news programs focusing exclusively on the case, some of which ranked number one in local Nielsen ratings. *Id.*

### (5) Verdict and Sentencing.

On the day of the verdict, reporters from all radio and television stations were present throughout the day and even broadcast a live feed from the courthouse hallways which followed every move of Casellas, his family members and friends, the prosecutors, and the defense attorneys as they entered and exited the courtroom and moved about the courthouse building. App:37. Interviews and "expert" commentary continued throughout the day. On the night of the verdict, defense counsel were confronted by an angry mob which surrounded the building and screamed at them. That same mob had chanted, "Justice was done, justice was done," upon learning of

8

the verdict, App:38, a reflection of the widespread concern among the populace that Casellas would go free because of his social status and connections. Citizens were still celebrating the verdict in the streets near the courthouse at 2:00 am. *Id.* The verdict was even announced at a championship baseball game, which brought the game to a halt as the fans erupted in cheers. App:37-38.

Sentencing was broadcast live on every major channel, only two months before voir dire in this case, with the upcoming broadcast advertised in full-page newspaper ads of the type generally reserved for major public spectacles. A large audience watched as Casellas, shackled and wearing a yellow jumpsuit, was sentenced to 109 years in prison. The result of this incessant publicity was, as voir dire demonstrated, *see* pages 13-16, *infra*, that virtually everyone in Puerto Rico knew that Casellas had been convicted of murdering his wife.

### (6) Additional Prejudicial Publicity

The Casellas case also became embroiled in Puerto Rico politics, as it coincided with a fall 2012 plebiscite on whether the Commonwealth's Constitution should be amended to permit the denial of bail in criminal cases. Those favoring the constitutional amendment paraded Casellas as the prime example of why the Constitution should be amended. Politicians on both sides of the aisle were regularly asked to comment on the impact of the Casellas case on the referendum. App:30.

9

Front page articles accused Casellas of being a drug user and drug addict. Even more sensationally, Casellas was publicly alleged – by no less a personage than a former Speaker of the Puerto Rico House of Representatives and former judge of the Puerto Rico Court of Appeals – to have threatened the assassination of the then-Governor of Puerto Rico. *Id.* Media also reported that Casellas had used threats and/or violence involving firearms against numerous individuals, no evidence of which was introduced in either the state trial or this one. *Id.* The media also aired false allegations by persons claiming to have been victims of hit-and-run incidents in which Casellas was the perpetrator. App:28-29. These and other deeply damaging, but ultimately false or unproven, accusations became quickly enshrined in island folklore.

**The Government's Response and the District Court's Preliminary Order**

Notably, the government did not oppose the motion for change of venue. App:369. The district court, however, declined to presume prejudice, ruling that Casellas had "not, at this time, demonstrated that the public is so completely poisoned against [him] that he cannot receive a fair trial by an impartial jury." Add:15. The court reserved judgment on the motion and ordered the parties to file a joint proposed juror questionnaire. *Id.* The parties were unable to agree on a single questionnaire, and each side submitted separate proposals. App:383, 397-98.

10

## The Hearing on the Motion

At the March 24, 2014, hearing on the motion, the government reiterated that it did not oppose the change-of-venue motion, agreeing that it was a "sensational case." However, even though it did not know if Casellas could obtain a fair trial in Puerto Rico, it urged the court to proceed with the selection process and "see what happens." App:408-09, 415. Casellas' counsel stressed that media focus on Casellas had continued unabated, with every pleading filed in this case the subject of reportage, and that evidence relating to the carjacking been a major component of the murder case. App:406, 413, 426. The court expressed its opinion that this case was "sitting right on the razor's edge of the established law on change of venue," App:411, and further stated that it did not think "that you can get any further on the prejudicial publicity continuum than we are." App:412. *See* App:425 (court states that it was "having considerable difficulty in making the call").

The court proposed proceeding by summoning prospective jurors to the courthouse to complete a questionnaire which would probe their knowledge regarding Casellas, which the court would then review to determine whether attempting to seat an impartial jury would be futile. App:416-23. Shortly thereafter, however, the court abruptly announced that it intended to dispense with the questionnaire and "treat it like any other jury selection," App:429, because "the questionnaire would simply

11

prolong [the process] without having anything on record or under oath." App:430. It was, the court stated, the government's change of position – from agreeing that a change of venue was appropriate to encouraging the court to proceed with voir dire – which had "pushe[d it] over the edge to go to voir dire." *Id.*

### Pretrial Motions and Orders Relating to the Inadmissibility of Evidence Relating to the Murder of Casellas' Wife

When the government moved to introduce weapons and projectiles found in Casellas' home on the day of the murder, it argued that the evidence was inextricably intertwined with the charged false statements regarding the carjacking. *See* App:372 ("[Casellas] staged the carjacking and used one of the 'stolen' guns to kill his wife at their home a month later"); App:372-73 ("[P]roof that the 'carjackers' guns were in the defendant's home . . . is proof of guilt that the carjacking was staged"). In response, Casellas filed a motion *in limine* to exclude evidence relating to the murder under Fed. R. Evid. 403 and 404(b). Doc. 69. The court found that "evidence that the defendant murdered his wife would be unfairly prejudicial because it would invite the jury to render its verdict independent of the merits of this case." App:392. It also ruled that, while the government would be permitted to introduce evidence regarding the guns found at the defendant's house on July 14, 2012, it was required to do so "*without invoking the murder*." App:392-93 (emphasis added). This ruling was made

*two weeks before* the commencement of voir dire in this case, in which jurors virtually unanimously indicated that they *already* knew that Casellas had been convicted of murdering his wife. In fact, at least ten of the twelve jurors who sat on Casellas' case had factual knowledge that Casellas had been convicted of murdering his wife. The court never explained this anomaly: why reference to the murder was too prejudicial to be allowed at trial, but not so prejudicial that a juror who already knew of Casellas' conviction for murdering his wife would be disqualified for cause.

**Voir Dire**

The extent to which publicity about Casellas had permeated the entire island was borne out by voir dire. When the court asked the venire as a group whether they had heard of Casellas, there was "an almost unanimous show of hands." App:610. The district court then conducted individual voir dire of all those who had acknowledged knowledge of Casellas.[3] During that individual voir dire, juror after juror

---

[3] Prospective jurors confirmed the media onslaught that surrounded the case and the centrality of the role it assumed in public discourse. *See, e.g.*, App:580 ("everybody in this country have heard something about" Casellas); App:591 (One would hear about Casellas "[a]lmost wherever you went to in this country"); App:647 ("it's everywhere, radio, the politics, the public image, the public opinion. Everybody has an opinion"); App:710 ("There was a lot of talk. A lot of people arguing. Everybody had their own opinion"); App:715 ("every time you opened a newspaper, there'd be something there about it"); App:731 ("they said bad things . . . about him, that he's a snob, that he thinks that because his father's a judge, he can do whatever he wants. . . . they say that he's guilty, that he lied about a lot of stuff, that he got robbed, and then they said he didn't get robbed"); App:733 ("it's all over the TV for

acknowledged knowledge of the state murder case, often in some detail, and
knowledge that Casellas had been convicted of murdering his wife and sentenced to
109 years in prison. Some potential jurors knew of the connection between the
carjacking allegations and the murder. *See* pages 27-28 n.10, *infra.* While some
potential jurors said that they could put what they knew aside in favor of awaiting the
evidence in the case, Casellas' counsel pointed out that such instructions had been
part of the jurors' orientation, and jurors were parroting what they had been told,
which was not necessarily a reflection of their true feelings. App:622. *See also*
App:771. Counsel also pointed out that jurors' assertions that they could be impartial
were not dispositive of the inquiry, App:607, a contention with which the government
agreed. App:668. After questioning ten potential jurors, the court, having identified

---

more than a year"); App:749 ("Everywhere we stay we hear about this case");
App:756 ("on the news it was there . . . every day"); App:765 ("it's a notorious
case"); App:786 ("it has been a huge case in Puerto Rico. . . . [A]ll the news, the press
have been following this case"); App:805 ("Everybody was talking about" the case);
App:840 ("The news is all over the place"); App:884 ("Everyone talks about it");
App:891 ("In Puerto Rico everybody know for the case, because all the channel and
all the newspaper talking about. And everybody in the people talking about that");
App:996 ("it was a mass cover from the media. . . . [I]t was pumped with a lot of
information and data, in all news . . . . [T]he level of guiltiness behind that, it was
transferred to the audience in their home"); App:1004 ("Everywhere . . . they were
talking about his case"); App:1043 ("everybody is talking about that"); App:1047
(there was "continuous bombardment by the media").

two jurors whom it deemed qualified to sit, indicated that it would continue with voir dire before deciding the motion for change of venue. App:627. After hearing from three additional jurors, all of whom believed Casellas guilty, the court, although recognizing that it was "an uphill battle to keep the case here," decided to continue with voir dire. App:636. After seven additional jurors had been interviewed, the court indicated that it was prepared to rule on the motion. App:663. Casellas argued that voir dire had simply produced "the least bad among what's available" rather than "truly qualified jurors." "[W]hen you look at the facts that they know," he contended, "it is simply too much to ask of them to put that completely outside, as my client is entitled to receive completely neutral, detached jurors who can without any prior information about . . . the case, judge these facts solely on the facts and given the presumption of innocence." App:663-64. The court stated that it found "some merit" in these arguments, and asked the government: "Why strain to find a jury here which simply on paper says it can be fair but has such extensive knowledge of wrongdoing by the defendant that no one can say with certainty that they won't be heavily influenced by that bias when they make the evidentiary connection between the two cases, and why not go somewhere else where nobody ever heard of this fellow?" App:667. Ultimately, the court decided that there was a sufficient possibility of finding sufficient qualified jurors that the change-of-venue motion would be denied.

Add:25-26.

The defense continued to argue that, regardless of what the jurors said, what they knew about Casellas was not information which they would be able to put out of their minds and that jurors would inevitably connect the carjacking case with the murder case. *See, e.g.*, App:837, 862, 868. The court halted the voir dire process once it had found 35 jurors whom it deemed qualified to sit, App:1076, after interviewing 114 prospective jurors. When court reconvened on April 28, 2014, defense counsel once again objected to the voir dire process, moved to strike it, and, alternatively, renewed his request for additional peremptory challenges, all of which were denied by the district court. App:1087-91; *see* App:975. Thereafter, Casellas exercised all of his peremptory challenges.  At least ten of the twelve jurors who sat on the case knew that Casellas had been convicted of murdering his wife, as well as other information about the case. *See* App:591-94 (Juror #5), 617-18 (Juror #9), 701 (Juror #26), 705-06 (Juror #27), 738-40 (Juror #36), 865-67 (Juror #56), 956-60 (Juror #86), 777-78 (Juror #88), 967-69 (Juror #89), 984-85 (Juror #93).[4]

## The Trial

On the morning of Father's Day, June 17, 2012, Casellas reported that he had

---

[4] Jurors #67 and #84 were not questioned individually, and there is nothing in the record that shows that they did not in fact have any prior knowledge of Casellas.

been the victim of a carjacking, in which he suffered a bullet wound to the arm, outside the gates of a shooting club where he had gone that morning. In describing the carjacking, Casellas reported shots fired into his car and weapons stolen from the car. App:1217-20. Casellas was interviewed the next day by Rafael Diaz, a Puerto Rico police officer who had been deputized as an FBI agent, App:1397, 1416, during which interview he allegedly made the charged false statements. App:20-24, 1132-33. Casellas maintained his innocence of the carjacking throughout the trial and, through cross-examination and the presentation of defense evidence, sought to undermine the government's case at every turn.

While the murder of Casellas' wife was not mentioned during the course of the trial, facts related to the murder on July 14, 2012, and from which the jurors could have, and almost certainly did,[5] make a connection between the alleged carjacking and the murder permeated the trial from the government's opening statement through the government's closing arguments. *See, e.g.,* App:1145 (government tells jury in opening that the guns which Casellas reported stolen during the carjacking and the guns which fired the projectiles into Casellas' car were found in Casellas' home on

---

[5] For example, on two separate occasions when the murder weapon was displayed, jurors began talking among themselves. Casellas' counsel pointed out that the jurors' reactions demonstrated that they were making the connection between the murder case and the evidence in this case, just as he had warned during jury selection that they would. *See* App:1498-99, 1620.

July 14, 2012); App:1480-81 (state prosecutor testifies that he went to Casellas' home on July 14, 2012, to supervise a search); App:1490-92 (forensic investigator testifies that she went to Casellas' home on July 14, 2012, and recovered firearms); App:1623-27 (forensic firearms examiner testifies that guns recovered from Casellas' home on July 14, 2012, fired casings recovered from Casellas' car); App:1796 (government repeats in final argument that the guns Casellas reported stolen and the guns that fired the projectiles recovered from the carjacking were found in Casellas' home).

The jury convicted Casellas on all counts. App:1847.

## Post-Trial and Sentencing

After trial, the court granted Casellas' motion for judgment of acquittal on two of the three false statements charged. App:1853, 1862. Casellas was sentenced to a term of 21 months, to be served concurrently with the state sentence he was serving for the murder of his wife. Add:2.

## SUMMARY OF ARGUMENT

The failure to order a change of venue denied Casellas the fair trial by an impartial jury to which he is constitutionally entitled. Given the extensive and highly sensationalized publicity which blanketed the island from the murder of Casellas' wife through Casellas' arrest, trial, conviction, and sentencing for that murder, only two months prior to voir dire in this case, prejudice should have been presumed, and

18

a change of venue ordered. Voir dire showed that virtually all of the jurors summoned knew at least something about the murder case, and virtually all of those knew that Casellas had just been convicted of murdering his wife – a crime for which the carjacking was alleged to be part of the plan. Even before the commencement of voir dire in this case, and before the court denied the change-of-venue motion, the court excluded any mention of the murder of Casellas' wife during the trial as unduly prejudicial to Casellas' right to a fair trial, yet the court proceeded to seat a jury composed of at least ten jurors who knew that Casellas had been convicted of murdering his wife. This was not knowledge which jurors could reasonably be expected to be able to put entirely out of their minds as they considered Casellas' guilt or innocence of the closely connected offenses charged. Under the circumstances of this case, jurors' assurances that they could put such knowledge aside while deciding Casellas' fate could not be relied upon to ensure that Casellas was afforded his constitutionally-guaranteed right to trial by an impartial jury.

Even assuming *arguendo* that the court did not abuse its discretion in denying the change-of-venue motion, the court should, given its exclusion of any reference to the murder as unduly prejudicial,  have disqualified for cause jurors who already knew that Casellas had been convicted of murdering his wife. With jurors who knew of Casellas' conviction for murdering his wife sitting in judgment on him, Casellas

19

was denied his constitutionally-guaranteed right to a fair trial by an impartial jury.

Moreover, if the district court were going to deny the change-of-venue motion, as it did, then a concomitant obligation arose to provide Casellas with the protections against trial by a jury whose impartiality is compromised by jurors' knowledge that he had been convicted of murdering his wife which might have been afforded by a careful and painstaking voir dire process. Instead, the court inexplicably eschewed the use of any advance jury questionnaire and then conduced a relatively brief voir dire which produced a jury in only two days, a process which was insufficient to counteract the effect of the sensationalistic publicity which saturated Puerto Rico for almost two years prior to trial or to eliminate jurors with what should have been disqualifying knowledge of Casellas' conviction for the murder of his wife.

Finally, the court erred in denying Casellas' motion to suppress evidence obtained through searches of his car. The first, warrantless, search cannot be justified as a consent search, as Casellas had four times asked for the return of his car during the 21 days which elapsed between his signing the consent form and the search. Absent the observations made during the warrantless search, the affidavit in support of the warrant for the second search was not supported by probable cause.

## ARGUMENT

I. **THE DENIAL OF CASELLAS' MOTION FOR CHANGE OF VENUE DENIED HIM A FAIR TRIAL BY AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND FED. R. CRIM. P. 21(a).[6]**

This case differs profoundly from virtually all other change-of-venue cases, including this Court's recent decision in *In re Tsarnaev*, 2015 WL 855777 (1st Cir. February 27, 2015).[7] Unlike the typical case in which jurors will hear evidence regarding the information already known to them, the extrajudicial information known to the jurors in this case – that Casellas had been charged with, convicted of, and sentenced for murdering his wife – was information which the district court properly ruled altogether too prejudicial to be admitted, excluding from the trial any mention of the murder of Casellas' wife. Yet the court empaneled a jury, at least ten of twelve members of which *already knew* that Casellas had been convicted of murdering his wife. This was not information which it is reasonable to believe that

---

[6] This Court reviews denials of motions for change of venue for abuse of discretion. *See, e.g., United States v. Quiles-Olivo*, 684 F.3d 177, 181 (1st Cir. 2012).

[7] It is important to note at the outset that *Tsarnaev* was before the Court on a petition for a writ of mandamus – a "drastic remedy" with "stringent requirements" which employs "an extraordinarily deferential form of review" and which imposes on the petitioner a considerably more exacting burden than that applicable on direct appeal. *Tsarnaev*, 2015 WL 855777 at *2, *3, *4, *5. Tsarnaev would, the Court emphasized, have the opportunity to raise the issue on direct appeal in the event he is convicted, *see id.* at *4, *12, the type of review now sought by Casellas.

21

jurors could have or would have put out of their minds, and the jurors would have

known exactly why law enforcement officers went to Casellas' home on July 14,

2012, and why they seized guns for ballistics testing. *See* pages 16-17, *supra.* From

that knowledge, the connection between the carjacking and the murder would have

been swift and inevitable. If Casellas staged the carjacking as part of his plan to

murder his wife, of which another jury had already found him guilty, then anything

he said regarding the carjacking was necessarily false. And the jury's bias is reflected

in its verdicts: it convicted Casellas of making all three false statements charged even

though, as the court subsequently ruled, there was insufficient evidence to permit a

rational jury to find guilt beyond a reasonable doubt as to two of them.

Here, the district court accepted jurors who had an unacceptable level of

knowledge, given the court's prior ruling that evidence relating to the murder of

Casellas' wife was too prejudicial to be admitted, creating an untenable anomaly

between the court's quite proper Rule 403 ruling and its rejection of Casellas'

challenges for cause of jurors who knew about the murder case and Casellas'

conviction and sentencing.  For reasons that remain inscrutable, the district court

abandoned the idea of obtaining detailed information from prospective jurors by

means of a jury questionnaire and then excused some jurors, but accepted others, who

claimed that they could put aside their knowledge of Casellas' conviction for killing

his wife in this trial of what the government contended was an offense inextricably intertwined with the murder.

And the media firestorm that had surrounded Casellas for the better part of two years did not simply inform jurors that Casellas had been convicted of murdering his wife. The media coverage was incessant, virulent, and sensationalistic and blanketed the entire island. The case assumed a prominent and intensely emotional place in public and private discourse and became, in the minds of the citizens of Puerto Rico, a test of whether the justice system would be corrupted by wealth and influence. So high did feelings run – only 2 ½ months before the trial of this case – that a mob assembled outside the courthouse to await the verdict and angrily confronted defense counsel as they exited the building, crowds celebrated the guilty verdict in the streets into the early morning hours, and a standing ovation greeted the announcement of the verdict at a major local sporting event, bringing the game to a standstill. And only two months prior to voir dire, Casellas' sentencing was broadcast live – an almost unprecedented occurrence in Puerto Rico judicial history, announced in full-page newspaper ads of the type usually reserved for megastar rock concerts – and the public was treated to the spectacle of Casellas appearing in court in a yellow jumpsuit and shackles. App:427. Such was the atmosphere in which the trial of this case took place.

This case is extraordinary for another reason as well: unlike virtually all change-of-venue cases, the government did not oppose a change of venue, and in fact agreed that Casellas had made a prima facie case for change of venue which it did not have a good-faith basis to contradict. *See, e.g.,* App:411, 515, 670. 671.[8] Finally, this case is extraordinary because, instead of adopting protective measures to ensure the seating of an impartial jury, such as those adopted by Judge O'Toole in *Tsarnaev* and by district court judges in countless other cases involving prejudicial pretrial publicity and high-profile cases, the court decided to "treat it like any other jury selection." App:429. It abandoned the idea of using an advance jury questionnaire because a questionnaire would "simply prolong the process," App:430, when a prolonged process was exactly what was called for to ensure that jurors actually were impartial as opposed to simply professing impartiality even though they knew that Casellas had been convicted of murdering his wife and even though Casellas was one of the most reviled people in Puerto Rico.

---

[8] Research has disclosed no reported case in which the government did not oppose a change of venue, but the change-of-venue motion was nonetheless denied. In *Tsarnaev*, this Court, distinguishing this case from *McVeigh*, noted that in *McVeigh*, the parties had agreed to move the trial, pointing out that there was no such agreement in *Tsarnaev.* 2015 WL 855777 at *8.

## A.    The Change of Venue Standard.

A fundamental guarantee of the Sixth Amendment is "the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010). *See, e.g., United States v. Quiles-Olivo*, 684 F.3d 177, 181 (1st Cir. 2012)("It is a fundamental constitutional canon that criminal defendants have a right to trial by an impartial jury"). "The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Critically, "[t]he theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Skilling*, 561 U.S. at 378, *quoting Patterson v. Colorado*, 205 U.S. 454, 462 (1907). *See Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966).

The failure to order a change of venue denied Casellas the fair trial by an impartial jury guaranteed by the Fifth and Sixth Amendments to the United States Constitution.[9] Venue change is "appropriate where there is an ever-prevalent risk that

---

[9] In addition, Fed. R. Crim. P. 21(a) authorizes district courts to order a change of venue "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Under Rule 21(a), "a court must transfer a case to another district if an unacceptable level of prejudice against the defendant is likely to mar a trial in the original district." *United States v. Walker*, 665 F.3d 212, 223 (1st Cir. 2011).

the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial." *Quiles-Olivo*, 684 F.3d at 182. *See, e.g., Skilling* 561 U.S. at 378 (noting that "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district . . . if extraordinary local prejudice will prevent a fair trial"); *United States v. Brandon*, 17 F.3d 409, 441 (1st Cir.1994)("Change of venue is proper where the level of prejudice against a defendant precludes a fair and impartial trial because the community is saturated with inflammatory publicity about the case"). In making this determination, courts are to ask "whether the degree of inflammatory publicity had so saturated the community such as to make it 'virtually impossible to obtain an impartial jury.'" *United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007). "Prejudice may properly be presumed when . . . inflammatory publicity about a case has so saturated a community that it is almost impossible to draw an impartial jury from that community." *United States v. Rodriguez-Cardona*, 924 F.2d 1148, 1158 (1st Cir. 1991). A presumption of prejudice is called for "in extreme cases where publicity is both extensive and sensational in nature." *Quiles-Olivo*, 684 F.3d at 182. This is such an extreme case. Indeed, the government effectively conceded as much when it did not oppose the change-of-venue motion and agreed that Casellas had presented a prima facie case for venue change.

26

## B.     This Case Required A Presumption of Prejudice.

Out of jurors numbered 1 to 117 and juror number 153 – 118 jurors in all – only four were not questioned individually. Thus, at minimum, an extraordinary 96.6% of the jurors knew of Casellas, and *all* of those questioned from whom sufficient information could be gleaned[10] knew that Casellas had been charged with murdering his wife, and virtually all of those knew that he had been convicted; many had detailed knowledge of the matter, and others confirmed the general perception that Casellas was guilty, while still others made the connection between the murder and the carjacking.[11]

---

[10] A number of jurors were excused during the individual voir dire based on their lack of English-language ability.

[11] *See, e.g.,* App:588-89 (juror knew about carjacking and that guns were found in Casellas' home); App:595-96 (juror knew that Casellas had guns in his house and that he had said that guns were stolen and thought that there was a connection between the guns and the murder); App:602 ("generally everybody thinks that he's guilty"); App:613-15 (juror saw "a lot of strange stuff," such as Casellas having his father "in the way" at the murder scene; the juror knew about the guns and the ballistics matches and was inclined to believe Casellas guilty); App:623-24 (juror knew that Casellas had killed his wife in "a very, very ugly way" and lied to avoid prosecution; "I definitely say he's guilty"); App:626-27 (juror knew many details regarding the carjacking and believed Casellas guilty); App:629 (juror believed Casellas was lying about the carjacking); App:632-33 (juror would find it difficult to put what he knew out of his mind); App:634-35 (juror said Casellas lied about the carjacking and the guns); App:646-47 ("most of the people have a bad image about him;" Casellas said things that were perhaps untrue); App:731 ("they said bad things about him" such as "that he thinks that because his father's a judge, he can do

There are some things that jurors cannot reasonably be expected to erase from their minds when considering a defendant's guilt or innocence, and the fact that Casellas had just been convicted of the brutal murder of his wife is certainly one of them. Contrary to the opinion of the district court, the fact of that conviction and the media circus surrounding Casellas *were* "of the type that jurors cannot reasonably be

---

whatever he wants"); App:734-36 (among other things, juror had heard that Casellas lied about a carjacking, and he was not going to forget what he knew); App:742 (juror said that Casellas shot his wife in the face and said the gun was stolen in a carjacking). App:764 (juror thinks Casellas guilty); App:765-69 (juror said there were contradictions in what Casellas said); App:806-07 (juror knew details about carjacking; she had heard that what Casellas said about it was not true and would not be able to put what she knew out of her mind); App:816 (juror thought Casellas had lied about the carjacking); App:818 (juror's family, friends, and coworkers said Casellas was lying); App:825 (juror had heard " a lot of bad things" about Casellas); App:840-41 (juror had watched trial and heard news and would have difficulty putting it out of his mind); App:843-44 (juror exposed to media and had watched sentencing; would find it difficult to put it out of his mind); App:852-54 (juror knew details about carjacking, which he had learned from the media coverage of the murder trial); App:873 (juror would have difficulty being impartial because of previously-acquired information); App:881 (same); App:888-89 (juror knew about carjacking in some detail, including the model of one of the guns involved); App:891-92 (juror believed Casellas fabricated the carjacking); App:906 ("they caught him lying several times"); App:915-16 (juror read about lies to federal agents); App:935 (juror thought Casellas had lied about carjacking); App:939 (juror believed Casellas guilty); App:945 (juror linked carjacking and murder); App:954 (Casellas murdered his wife and lied to cover it up); App:989 (juror heard Casellas lied about the carjacking); App:1005-06 (juror thought issue was whether carjacking was part of the planning for the murder); App:1010 (media said Casellas was lying); App:1016 (juror thinks Casellas is guilty); App:1033 (juror thinks if Casellas lied about the murder, he lied about the carjacking); App:1051 (juror heard that Casellas made up the carjacking).

expected to put aside." Add:11.

> We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to a defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is part of the prosecution's evidence. . . . *It may indeed be greater for it is not then tempered by protective procedures.*

*Marshall v. United States*, 360 U.S. 310, 312-13 (1959)(emphasis added).

The Supreme Court has recognized that "the juror's assurances that he is equal to the task cannot be dispositive of the accused's rights." *Murphy v. Florida*, 421 U.S. 794, 800 (1975).[12] *See, e.g.*, *Irwin v. Dowd*, 366 U.S. at 728 ("Where so many, so many times, admitted prejudice, . . . statement[s] of impartiality can be given little weight"); *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)("adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they

---

[12] In *Murphy*, in which the Supreme Court rejected a claim of presumed prejudice, voir dire "revealed no great hostility" toward the defendant, some of the jurors had "a vague recollection" of the robbery with which he was charged, *none* of the prospective jurors believed there to be a connection between the crime charged and the defendant's past crime, *see Skilling*, 561 U.S. at 380 n.12, the publicity was largely factual, and only 20 of 78 potential jurors were excused for cause. *See Murphy*, 421 U.S. at 802-03. Here, in sharp contrast, voir dire revealed a great deal of animus against Casellas and a general belief that he was a murderer, some of the prospective jurors believed that the murder and the carjacking were linked (the very link which counsel, in advocating a change of venue, argued that jurors would inevitably make, *see* App:426, 666, 671), and fully two-thirds of the prospective jurors were excused for cause. *Murphy* provides no support for the denial of a change of venue in this case. *See* Add:12.

29

can be impartial should not be believed");[13] *see also Misla-Aldarondo*, 478 F.3d at 59 ("When a large percentage of the venire is disqualified, this evidence of prejudice in the community may lead a court to 'properly question the remaining jurors' avowals of impartiality,'" *quoting United States v. Angiulo*, 897 F.2d 1169, 1181-82 (1st Cir. 1990)); *Delaney v. United States*, 199 F.2d 107, 112-13 (1st Cir. 1952)("One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity"). This phenomenon was demonstrably at work in this case, as the court excused for cause a number of jurors who said they could be impartial because it simply did not believe them. *See, e.g.*, App:675-76, 677, 685, 716, 751, 837-38, 979, 1000. Casellas challenged a number of others who had avowed that they could set aside what they knew, *see, e.g.,* App:677-79, 690-91, 692-93, 745-46, 760, 771-72, 821-22, 855-56, 975-75, whom the court found indifferent, even though there was no reason to give their

---

[13] In *Patton*, "the extensive adverse publicity and the community's sense of outrage were at their height" four years prior to trial, and when the trial occurred, "prejudicial publicity was greatly diminished and community sentiment had softened." 467 U.S. at 1032. Here, of course, the prejudicial publicity continued unabated and had reached its crescendo only two short months earlier, with the media frenzy at the time of Casellas' murder trial and sentencing.

protestations of impartiality any more credence than those of jurors who had been excused.

Social science research has repeatedly confirmed the strong biasing effects of pretrial publicity on jurors, particularly where that publicity reflects negatively on the defendant's character and contains powerful inadmissible evidence. "More than three decades of research investigating the effects of [pretrial publicity] on juror bias demonstrates that [pretrial publicity] can bias juror decision-making by impeding jurors' ability to reach a verdict solely on the basis of evidence presented at trial." Christine L. Ruva and Cathy McEvoy, Negative and Positive Pretrial Publicity Affect Juror Memory and Decision Making, 14 JOURNAL OF EXPERIMENTAL PSYCHOLOGY: APPLIED 226 (2008). Critically, "negative publicity provides not just isolated fragments of information, but a belief framework about defendant culpability [which] directs the juror's attention and provides a filter through which subsequent evidence is perceived." Nancy M. Steblay, *et al.*, The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review, 23 LAW AND HUMAN BEHAVIOR 219, 231 (1999). Moreover, research has shown that the effect of negative pretrial publicity is not eliminated by the trial evidence and that "jury instructions, which have long been assumed by the court to act as a safeguard against [pretrial publicity] failed to protect against (indeed, did not reduce) [pretrial publicity's] influence." Tarika Daftary-

31

Kapur, *et al.*, Examining Pretrial Publicity in a Shadow Jury Paradigm: Issues of Slant, Quantity, Persistence, and Generalizability, 38 LAW AND HUMAN BEHAVIOR 462, 474 (2014). *See* Steblay, *supra* at 230 (data suggests that expanded voir dire, judicial instruction, trial evidence, and jury deliberation "do not provide an effective balance against the weight of" pretrial publicity); *see also* Judge Mark W. Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The problems of Judge-Dominated Voir Dire, the Failed Promise of *Batson*, and Proposed Solutions, 4 HARVARD LAW AND POLICY REVIEW 149 (2010)(discussing the inadequacy of traditional voir dire to address jurors' implicit biases).

This case amply fulfills the requirements for a presumption of prejudice, and the district court erred in concluding otherwise.

## C. *Skilling* Supports Applying a Presumption of Prejudice in this Case.

In declining to find a presumption of prejudice and deciding to proceed to voir dire, the district court relied heavily on *Skilling*. *See* Add:13; App:665. Contrary to the district court's conclusion, however, *Skilling* fully supports the finding of a presumption of prejudice in this case. In *Skilling*, the Supreme Court canvassed the factors which will give rise to a presumption of prejudice. First, it looked to the "the size and characteristics of the community in which the crime occurred." 561 U.S. at

32

382. As this Court has recognized, "[b]eing a compact, insular community, Puerto Rico is highly susceptible to the impact of local media." *United States v. Moreno Morales*, 815 F.2d 725, 734 (1st Cir. 1987). That impact is certainly present in this case, given the highly inflammatory nature of the publicity and its relentless dissemination throughout the island since July, 2012, and continuing up to the time of trial, and was confirmed by the extraordinary 96.6% of prospective jurors who knew about Casellas and the murder of his wife.[14] Unlike the Boston area, where "residents obtain their news from a vast array of sources," *Tsarnaev*, 2015 WL 855777 at *6, Puerto Rico is, as the district court recognized, "a very coherent media market." App:404.[15]

Second, the *Skilling* Court examined the nature of the publicity, which, in that case, contained "no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." 561 U.S. at

---

[14] In sharp contrast, in *Skilling*, only 12.3% of Houstonians believed Skilling guilty of crimes; 43% had either never heard of Skilling or nothing came to mind when they heard his name. 561 U.S. at 382 n.15. Here, the district court was plainly taken aback by the nearly unanimous show of hands. *See* App:610.

[15] Also in *Tsarnaev*, the Court pointed out that there was nowhere in the country to which the case could be transferred where jurors would not have been exposed to publicity regarding the bombing. *See Tsarnaev*, 2015 WL 855777 at *1. Here, in marked contrast, had the case been transferred anywhere in the continental United States, it is unlikely that any prospective jurors would have even heard of Casellas.

383.[16] *See Tsarnaev*, 2015 WL 855777 at *6 ("[M]uch of what petitioner calls 'publicity' consists of factual news media accounts of the events of that period"). Here, in sharp contrast, the massive publicity about Casellas was replete with highly prejudicial information which was not admissible at the trial of this false statements case but which jurors would be unable to "shut from sight." As addressed in the preceding section, jurors would never be able to put out of their minds the fact that Casellas had been convicted of murdering his wife – evidence which the district court deemed too prejudicial for the jurors to hear. This was, literally, "evidence of the smoking gun variety" which "invited prejudgment of his culpability." *Skilling*, 561 U.S. at 383. Moreover, in *Tsarnaev*, the Court noted that the district court "sitting in the 'locale where the publicity is said to have had its effect,' necessarily and properly under the law draws on its 'own perception of the depth and extent of news stories that might influence a juror.'" *Tsarnaev*, 2015 WL 855777 at *4, *quoting Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991).[17] Here, however, the presiding judge was from

_____

[16] The *Skilling* Court also pointed to the fact that only a "slim percentage" of the stories about Enron even mentioned Skilling, noting that "when publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact." 561 U.S. at 384 n.17. Here, in contrast, Casellas himself was the direct focus of the media's attention and the public reporting.

[17] The publicity in *Mu'Min*, on which the district court relied, Add:13, was considerably less extensive, less virulent, and, most importantly, considerably less widely disseminated in the metropolitan Washington area than was the case here, in

West Virginia, and thus did not have first-hand familiarity with the extent and virulence of the publicity which saturated the island for the almost two years prior to trial.

The district court found this case "easily distinguishable" from *Rideau v. Louisiana*, 373 U.S. 723 (1963), in which the defendant's confession to the murder with which he was charged was broadcast to the community. *See* Add:11, 13. And so it is – but in ways which make this an even more compelling case for a change of venue. Here, the jury knew that another jury just like them had found Casellas guilty of the heinous murder of his wife, information which the district court barred from the trial of this case as too likely to prejudice Casellas' right to a fair trial. Casellas may have denied his guilt of the murder, *see id.*, but, given his conviction and 109-year sentence, jurors would have believed that he was lying about his guilt of the murder and from lying about the murder would have readily assumed that he was lying about the carjacking as well, particularly given the connection between the two events. As one prospective juror put it: "If you lie, for me, once, that's my fault. If you lie to me twice, that's not going to happen." App:1033.

The blanket coverage here was "both extensive *and* sensational in nature,"

_____

which the publicity permeated every corner of the island.

*Angiulo*, 897 F.2d at 1181 (emphasis in original), and contained the kind of "vivid, unforgettable information [the Supreme Court has] recognized as particularly likely to produce prejudice." *Skilling*, 561 U.S. at 384. It was precisely the "type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." *Angiulo*, 897 F.2d at 1181.

Third, the *Skilling* Court pointed to the lapse of four years between Enron's bankruptcy and Skilling's trial, contrasting it with cases in which trial had followed soon after the offense and noting that the "decibel level of media attention" had diminished in the years following Enron's collapse. 561 U.S. at 383. Similarly, in *Tsarnaev*, the Court found that "[t]he nearly two years that have passed since the Marathon bombings has allowed the decibel level of publicity about the crimes themselves to drop and community passions to diminish." *Tsarnaev*, 2015 WL 855777 at *6. Here, there was no such abatement, and the saturation coverage continued to the time of trial, producing prejudicial effects that had not dissipated by the time of trial. The district court recognized that this factor weighed in favor of a change of venue. Add:13.

Finally, the *Skilling* Court also considered it of "prime significance" in its rejection of a presumption of prejudice that the jury acquitted Skilling on nine counts, which would undermine any supposition of juror bias. 561 U.S. at 561. Here, in

36

marked contrast, the jury's bias is reflected in its verdicts: it convicted Casellas of making all three false statements charged even though, as the court subsequently ruled, there was insufficient evidence to permit a rational jury to find guilt beyond a reasonable doubt as to two of them.

*Skilling* leaves no doubt that the presumption of prejudice concept remains valid, and if ever there were a case which cried out for the application of one, it is this case. Casellas could not, and, in the event, did not, receive the fair trial by an impartial jury to which he is constitutionally entitled.

## D. The Presumption of Prejudice Cannot Be Rebutted.[18]

Supreme Court jurisprudence has long and consistently established that when the community from which jurors are drawn has been sufficiently poisoned by sensational adverse publicity, a presumption of prejudice arises which requires a change of venue. Where such is the case, voir dire cannot perform its function to ensure a fair and impartial jury. Indeed, the Supreme Court has *never* indicated, much less held, that where pretrial publicity has been sufficiently virulent and extensive to raise doubts about the impartiality of jurors drawn from that community, those doubts can be overcome merely by trusting the answers given in voir dire. Such a conclusion

---

[18] The Supreme Court adverted to this issue in *Skilling*, but did not address it as it found a presumption of prejudice unwarranted. *See* 561 U.S. at 385 n.18.

would be completely at odds with the whole point of the presumption: that there are some circumstances in which jurors' affirmations of impartiality just cannot be relied upon to ensure the trial by an impartial jury which a criminal defendant is constitutionally guaranteed.

Even if, with a far more painstaking selection process than that conducted here, twelve jurors could have been found who did not know that Casellas had been convicted of murdering his wife, that panel would hardly have constituted a representative cross-section of the community. *See Taylor v. Louisiana,* 419 U.S. 522, 528 (1975)("the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial"). Instead, Casellas would be condemned to trial by jurors of such extreme reclusiveness that they did not read the papers, listen to the radio, watch television, or even talk to anyone for the two years prior to Casellas' trial.

## II. THE JURY SELECTION PROCEDURES ADOPTED BY THE DISTRICT COURT DID NOT SUFFICE TO ENSURE THE SELECTION OF AN IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AMENDMENT OR TO SAFEGUARD THE PRESUMPTION OF INNOCENCE.[19]

### A. The District Court's Denial of Challenges for Cause of Jurors Who Knew That Casellas Had Been Convicted of Murdering his Wife Denied Casellas His Sixth Amendment Right to Trial By an Impartial Jury.

There are some things that jurors cannot reasonably be expected to erase from their minds when considering a defendant's guilt or innocence, and the fact that the defendant had just been convicted of the brutal murder of his wife – evidence which the district court had excluded from the trial as unacceptably prejudicial – is certainly one of them. Yet at least ten of the twelve jurors who sat on Casellas' case knew that he had been convicted of murdering his wife, knowledge which, in the context of this case, could not be set aside as required to ensure Casellas the presumption of innocence and his constitutional right to a fair trial by an unbiased jury. The district court erred in denying Casellas' challenges for cause and thereby denied Casellas his Sixth Amendment right to trial by an impartial jury.

---

[19] This Court reviews the district court's voir dire process and decisions regarding additional peremptory challenges for abuse of discretion. *See, e.g., United States v. Delgado-Marrero*, 744 F.3d 167, 201 (1st Cir. 2014); *Misla-Aldarondo*, 478 F.3d at 58. It reviews the denial of challenges for cause for "clear abuse of discretion." *United States v. Lowe*, 145 F.3d 45, 48 (1st Cir. 1998).

While, as a general matter, "juror impartiality . . . does not require ignorance," *Tsarnaev*, 2015 WL 855777 at \*12, *quoting Skilling*, 561 U.S. at 381, here, what was centrally at issue was the jurors' knowledge that Casellas had been convicted of murdering his wife, information which the court had ruled should be excluded from the trial of this case because, if known to the jurors, it could fatally compromise his right to a fair trial.

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 772-73 (1965). Moreover, "the prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution of something not included in the evidence." *United States v. McVeigh*, 918 F.Supp. 1467, 1472 (W.D.Okla. 1996). *See* Daftary-Kapur, *supra* at 464 (exposure to pretrial publicity "will act as an anchor and people evaluate all subsequent information in light of this starting point"). Given the court's exclusion of any reference to the murder as unduly prejudicial, the court should have disqualified for cause jurors who already knew that Casellas had been convicted of

40

murdering his wife.

### 1. Juror #5.

Juror #5 knew about the murder case, even to the detail that Casellas had thrown something away after the murder. App:591. She gave inconsistent responses regarding her exposure to publicity, saying, on the one hand, that "[a]lmost everywhere you went to in this country," there were media reports about the case App:591, and that the case "was all over the place," App:592, but, on the other hand, protesting that she did not know that much about the case. *See* App:591-93. Casellas challenged the juror for cause, objecting that her responses demonstrated a "lack of candidness with the court." App:677. The district court had obvious misgivings about the juror, stating that she had said things that "made me wonder," and that it had found it "a little discouraging" that she knew about "throwing something into the bushes," which "bothered [it], because [it thought] she would know what that something was . . . ." App:678-79. "[T]hat something" was, of course, the murder weapon, creating an obvious link to the carjacking and Casellas' report that guns, including the murder weapon, had been stolen by the carjackers. "Because the right to an impartial jury is constitutive of the right to a fair trial, '[d]oubts regarding bias must be resolved against the juror.'" *United States v. Mitchell*, 690 F.3d 137, 143 (3d

41

Cir. 2012), *quoting United States v. Gonzalez,* 214 F.3d 1109, 1114 (9th Cir.2000). The district court erred in denying the challenge for cause.

### 2. Juror #9.

Juror #9, who knew that Casellas had been convicted of murdering his wife, never actually told the court that she could put aside that knowledge and decide the case based solely on the evidence. Instead, what she said, when asked, was that Casellas was entitled to an "opportunity to tell the story that he think is right." App:618. Even after the court instructed the juror on the presumption of innocence and the government's burden of proof, she said, "I feel that I don't know his story. We need to hear about it, you know." App:618-19. Casellas moved to disqualify her for cause based upon her burden-shifting responses. App:681. The district court denied the challenge because the juror said "she would have to see the evidence before she could convict anyone." App:682. But this is not what the juror said; she did not say that she would need to hear *the evidence*, but that she wanted to hear *Casellas' story*. At no time did the juror make "an affirmative promise of impartiality . . . [which is] believable in light of what the juror has revealed and the context of the case," *United States v. Lanham*, 617 F.3d 873, 882 (6th Cir. 2010), or commit to honoring Casellas' right to silence and the presumption of innocence. The challenge

for cause should have been granted.

### 3.    Juror #27.

Juror #27 knew that Casellas had been convicted of murdering his wife and given a long sentence; he read the daily posts on El Nuevo Dia and on Facebook.[20] App:705-07. Casellas moved to disqualify the juror because he knew about the conviction and sentence, and "it's too much to ask of this juror to give [him] the presumption of innocence that he's constitutionally entitled to." App:708. The court did not "think there was enough there" to support a cause challenge. *Id.* On the contrary, there was not enough there to ensure juror impartiality, and the juror should have been disqualified based on his knowledge of Casellas' murder conviction and sentence.

### 4.    Juror #36

Juror #36 knew that Casellas had been convicted of the murder of his wife, that he was the son of Judge Casellas, and that he had two daughters and had read newspaper articles about the case. App:738-40. While the juror volunteered that he was not biased against Casellas, App:738, he was never actually asked whether he

---

[20] Virulent, vicious, and angry attacks against Casellas featured prominently on Facebook. *See* App:868.

could put his knowledge of the murder case out of his mind. Once again, Casellas challenged the juror for cause based on his knowledge of the murder conviction, App:740, 744, but the court found insufficient basis for the challenge. On the contrary, the juror's knowledge of the murder conviction was, under the circumstances of this case, sufficient to warrant disqualification for cause.

### 5.     Juror #56.

Juror #56 read about Casellas on social media such as Facebook and Twitter and in newspapers, and heard about the case on television; he knew that Casellas had been convicted of murdering his wife and was alleged to have lied about the carjacking and knew about the missing weapons. App:865-67. Such knowledge was particularly problematic, as the state case included charges that Casellas had lied about the carjacking, on which Casellas was convicted. Among other reasons, Casellas cited in support of his cause challenge the inevitability of the juror's connecting the murder and the carjacking, as the realization struck that "[t]his is the carjacking which was . . . the plan for the murder of which another jury already found [him] guilty," which would destroy the presumption of innocence. App:869-70. That challenge should have been granted.

44

### 6. Juror #86.

Juror #86 read about the case in the newspaper and knew that Casellas was convicted of murdering his wife; the juror sitting next to her had also passed along additional information about Casellas of which she had been unaware, including Casellas' sentence, App:956-60. Casellas' challenge for cause on the ground of the juror's disqualifying knowledge was again rejected by the court. App:960. This, too, was error.

### 7. Juror #88.

Juror #88 knew that Casellas had killed his wife and had discussed the case with co-workers. App:777-78. Casellas again moved to disqualify based on the juror's knowledge of the murder case and her lack of forthrightness regarding the sources of her knowledge, which the district court denied. App:780-81. The court remarked that it was "hearing much more civic minded talk" from prospective jurors than it was accustomed to, App:781, a likely indication that jurors were saying what they believed they should rather than what they believed. The cause challenge should have been granted.

### 8. Juror #89.

Juror #89 read about the state case in the newspaper and watched programs

45

about it on television, including the gossip programs, and knew that Casellas had been convicted of murdering his wife and that there were allegations of destroying evidence and providing misleading information. App:967-69. When asked whether her knowledge of Casellas' murder conviction would "give [her] difficulty in deciding the case, the juror twice said, "I don't know." App:968. When asked whether that fact "[w]ould . . .be a part of [her] consideration of this case," she responded, "I think no." *Id.* Casellas challenged for cause, based on her knowledge of the case and the fact that she never gave "a clear cut, unequivocal answer" regarding whether she could put aside her knowledge of the murder case. App:970. Based on the juror's knowledge and the absence of affirmative assurance that she could put her knowledge out of her mind, the challenge for cause should have been granted.

### 9. Juror #93.

Juror #93 knew that Casellas had been convicted of murdering his wife and knew something about a carjacking and had discussed the case with his coworkers, all of whom thought Casellas was guilty. App:984-85. This cause challenge, too, should have been granted.

With these jurors who knew of Casellas' conviction for murdering his wife sitting in judgment on him, Casellas did not receive the fair trial by an impartial jury

which the Sixth Amendment guarantees him.

### B. The Jury Selection Procedures Adopted by the District Court Were Insufficient to Adequately Test Jurors' Assurances That They Could Put Aside Their Knowledge of Casellas' Conviction for Murdering his Wife.

This was not a process that should have been "treat[ed] . . . like any other jury selection." App:429. If the district court were going to deny the change-of-venue motion, as it did, then a concomitant obligation arose to provide Casellas with the protection against trial by a jury whose impartiality is compromised by jurors' knowledge that Casellas had been convicted of murdering his wife which might have been afforded by a careful and painstaking voir dire process. While trial courts have "broad discretion . . . in determining how to conduct voir dire," that discretion is subject to "the essential demands of fairness." *Misla-Aldarondo*, 478 F.3d at 60, *quoting Real v. Hogan*, 828 F.2d 58, 62 (1st Cir.1987). Here, the district court had already decided that "the essential demands of fairness" precluded permitting even so much as a mention of the murder of Casellas' wife at trial, yet it failed to conduct a voir dire that would produce a jury which did not already know of the information the district court deemed it too prejudicial to Casellas' right to a fair trial for them to know.

The court inexplicably eschewed the use of an advance jury questionnaire of

the sort routinely employed in high-profile cases, including *Tsarnaev*, in which the court required prospective jurors to complete "a long and detailed one-hundred-question questionnaire under oath," *Tsarnaev*, 2015 WL 855777 at *9,[21] and which would have almost certainly produced more honest, considered, and self-aware responses than jurors delivered when suddenly confronted with questions about their knowledge of, and attitude toward, Casellas following instructions regarding deciding the case solely on the evidence adduced in court.

Nor did the relatively brief individual voir dire ensure that jurors could, in fact, be impartial. For example, in *Misla-Aldarondo*, 478 F.3d at 58, the court's individual voir dire took 15-25 minutes with each juror, asking more than 50 questions of each juror. Here, the voir dire consumed only two days, in marked contrast to many cases involving extensive pretrial publicity. For example, in *Tsarnaev*, voir dire had already lasted more than seven weeks and was still ongoing at the time of this Court's ruling.

---

[21] *See, e.g., Skilling*, 561 U.S. at 384 (court employed an "extensive screening questionnaire"); *United States v. Poulsen*, 655 F.3d 492, 507 (6th Cir. 2011)(court used "detailed juror questionnaire that include[d] questions addressing the existence and extent of prospective jurors' media exposure and any opinions prospective jurors may have formed about the case"); *United States v. Pratt*, 728 F.3d 463, 471 (5th Cir. 2013)(jurors completed eight-page screening questionnaire); *United States v. Rodriguez*, 581 F.3d 775, 785 (8th Cir. 2009)(court "required jurors to answer a 121-question form, including detailed questions on their knowledge and beliefs about the case"); *Angiulo*, 897 F.2d at 1183 (court required prospective jurors to answer "comprehensive written questionnaires").

*See Tsarnaev*, 2015 WL 855777 at *2. Indeed, the *Tsarnaev* Court canvassed a number of high-profile cases in which voir dire had taken weeks. *See id.* at *10 & n.14. The considerably less probing voir dire conducted in this case – which, unlike the voir dire in *Tsarnaev*, did not include attorney-conducted voir dire, *see Tsarnaev*, 2015 WL 855777 at *9, was insufficient to counteract the effect of the sensationalistic publicity which saturated Puerto Rico for almost two years prior to trial or to eliminate jurors with what should have been disqualifying knowledge of Casellas' conviction for the murder of his wife.

> Voir dire is a singularly important means of safeguarding the right to an impartial jury. A probing voir dire examination is the best way to ensure that jurors do not harbor biases for or against the parties.

*Sampson v. United States*, 724 F.3d 150, 163-64 (1st Cir. 2013)(internal quotation marks omitted). Instead of conducting the necessary painstaking individual voir dire, the district court, once it had denied the change-of-venue motion, appears to have been determined to qualify a minimally sufficient number of jurors in short order.

In addition, the court denied Casellas' requests for additional peremptory challenges, terminating voir dire once it had qualified barely more jurors than would be needed to seat a jury of twelve plus two alternates in addition to the number that would be excused through exercise by both sides of the standard complement of

49

peremptory challenges.[22] Had the district court summoned more jurors, employed a screening questionnaire, and conducted a longer and more painstaking selection process, a jury might have been seated which did not possess a constitutionally unacceptable base of information about the murder of Casellas' wife. But it did not. Instead, it qualified jurors whom Casellas repeatedly challenged for cause based on the extent of their knowledge of the murder and the resulting conviction and sentence because they said that they could put out of their minds this knowledge which would be beyond human ability to disregard when evaluating the evidence relating to a crime that was the alleged precursor to the murder.

## III.  THE DISTRICT COURT ERRED IN DENYING CASELLAS' MOTION TO SUPPRESS.[23]

### A.  Background.

Casellas moved to suppress the fruits of two searches of the car he was driving at the time of the alleged carjacking. Doc. 72. The first such search was conducted by FBI agents on July 16, 2012, without a warrant, relying on a consent form signed by

---

[22] *See, e.g., Skilling*, 561 U.S. at 375 n.7 (court granted two extra peremptories); *Tsarnaev*, 2015 WL 855777 at *3 n.1 (court granted three additional peremptories); *Rodriguez*, 581 F.3d at 785 (court granted ten additional peremptories).

[23] In evaluating the denial of a suppression motion, this Court reviews the district court's findings of fact for clear error and its legal conclusions *de novo. See, e.g., United States v. Chaney*, 647 F.3d 401, 405 (1st Cir. 2011).

Casellas on June 25, 2012, twenty-one days earlier. *See* App:1871. Between the time Casellas executed the consent form and the time of the search, Casellas telephoned FBI Special Agent Gregory Gruel four times to request the return of his car. On each occasion, Casellas was told that he could not have his car back because the search had not yet been conducted. App:495-98, 500. Relying on observations made during the July 16, 2012, search, federal agents applied for and obtained a search warrant authorizing further search of the car on August 6, 2012. The probable cause averments of the supporting affidavit rested almost entirely on observations made by agents during the earlier warrantless search. *See* App:1873.

The district court found that Casellas had voluntarily consented to the search of his car, that he had not revoked his consent, and that his conversations with Agent Gruel "reaffirmed" his consent. Add:18-19.

## B. The Warrantless Search of the Car Cannot Be Justified as a Consent Search.

When the government relies upon consent as the basis for a warrantless search, . . . they have no more authority than they have apparently been given by the consent." *United States v. Zavala*, 541 F.3d 562, 576 (5th Cir. 2008). Because consent is an exception to the warrant requirement, "a consensual search may not exceed the scope of the consent given." *United States v. Turner*, 169 F.3d 84, 87 (1st

51

Cir. 1999). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). *See, e.g., United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003). Whether or not the search was within the scope of the defendant's consent "is a question of fact to be determined from the totality of all the circumstances." *United States v. $304,980 in U.S. Currency*, 732 F.3d 812, 819 (7th Cir. 2013). In assessing the scope of the defendant's consent, courts are to look to not just "the language of the consent itself" but also "the overall context." *Turner*, 169 F.3d at 87. *See, e.g., United States v. Stierhoff*, 549 F.3d 19, 23 (1st Cir. 2008)("courts look beyond the formal wording of the consent itself to the totality of circumstances that inform the meaning of those words in a given situation").

Clearly, however, "a person may limit or withdraw his consent to search, and the police must honor such limitations." *$304,980*, 732 F.3d at 819. It is the government's burden to prove that the defendant's consent was voluntary and that the search was within the scope of his consent. *See, e.g., Turner*, 169 F.3d at 87 n.3; *United States v. Rodriguez Perez*, 625 F.2d 1021, 1024 (1st Cir. 1980). That burden cannot, however, be "discharged by showing no more than acquiescence to a claim

52

of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968). *See, e.g.,*
*United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013)(consent not proven
where government shows "begrudging submission to a command"); *United States v.*
*Worley*, 193 F.3d 380, 386 (6th Cir. 1999)(government does not satisfy burden by
showing that defendant's statement was "merely a response conveying an expression
of futility in resistance to authority or acquiescing in the officer's request").

Here, Casellas does not contend that his consent was not voluntarily given on
June 25, 2012. What he does contend, however, is that by the time the warrantless
search of the car was conducted on July 16, 2012, an objectively reasonable agent
could not have believed that Casellas continued to consent to the search of his car.
That consent was withdrawn when Casellas requested the return of his car *four times*
before the search occurred. "Generally speaking, a person who has given valid
consent to a seizure may withdraw that consent by requesting the article's return." *Lee*
*v. City of Chicago*, 330 F.3d 456, 464 (7th Cir. 2003). Each time Casellas was told
by Agent Gruel that the car would not be returned to him because it had not yet been
searched. Casellas did not, to be sure, demand the return of the car in the face of the
agent's refusal, nor did he explicitly revoke his consent to the search of his car.
However, far from reaffirming Casellas' consent, Casellas' exchanges with Agent
Gruel reflected only "acquiescence to a claim of lawful authority" for the continued

53

possession of his car. An objectively reasonable person, hearing the exchanges between Casellas and Agent Gruel, would have understood that Casellas' consent was at an end.

Additional circumstances as well point to the objective unreasonableness of any continued belief on July 16, 2012, that Casellas continued to consent to the search of his car. While TFO Diaz insisted that they were still investigating a carjacking at the time of the search, App:469, 473, and federal agents maintained that the fact that the search took place two days after the murder of Casellas' wife was simply a coincidence, App:502, 514, Diaz, who remained a Puerto Rico police officer, had spoken to Ricardo Costales, another Puerto Rico police officer who had decided on the day of the carjacking that Casellas was not telling the truth, App:478, 485-92, 1256-57, and Casellas was already a suspect in his wife's murder.

In light of this "overall context" of the July 16, 2012, search, including Casellas' four calls asking for the return of his car, it was objectively unreasonable for agents to believe that Casellas' consent, given 21 days earlier, under very different circumstances, was still effective. The warrantless search of the car was unreasonable under the Fourth Amendment, and all fruits of that search should have been suppressed.

54

**C.    Absent the Information Gleaned During the Unlawful Warrantless Search, the Warrant Failed To Establish Probable Cause for the Search.**

If information obtained during an unlawful search "was presented to the Magistrate and affected his decision to issue the warrant," the search pursuant to the warrant is invalid. *Murray v. United* States, 487 U.S. 533, 542 (1988). In making this determination, courts are to examine "whether the warrant contains sufficient information to establish probable cause after setting aside the tainted information." *United States v. Silva*, 554 F.3d 13, 19 (1st Cir. 2009). *See, e.g., United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005)("when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause"). The averments of the affidavit in this case relating to probable cause to believe that the items sought would be found in the defendant's car rested virtually entirely on the observations made by law enforcement officers during the unlawful July 16, 2012, search. *See* App:1874-75. Absent the information gleaned during the July 16, 2012, search, the affidavit did not demonstrate probable cause to believe that "bullets fired at the victim and the vehicle might be found behind and/or in the dashboard as well as other hard to reach places in the vehicle" and/or evidence containing "the DNA of the alleged perpetrators of the attempted carjacking" would

55

be found in the car. All evidence seized during the August 13, 2012, search should have been suppressed, along with all derivative fruits thereof.

### D. The Error in Denying Casellas' Motion to Suppress Was Not Harmless.

Evidence seized and analyzed during the searches of Casellas' car featured prominently at trial. During the July 16, 2012, search, agents found casings inside the vehicle and observed blood stains on various parts of the car and bullet holes in the car. App:1515-32. During the more invasive search later conducted pursuant to the warrant, the trajectory of the bullets which penetrated the car's interior were analyzed; that analysis, according to the government's expert, showed that some of the trajectories were consistent with having been fired from inside the car, App:1536-52, facts inconsistent with Casellas' description of the carjacking. Evidence was also introduced regarding forensic analysis of casings and projectiles recovered from the car, which indicated that they were fired from weapons seized from Casellas' home on July 14, 2012. App:1622-26, 1637. Given the powerful nature of this evidence – all of which should have been excluded as obtained in violation of the Fourth Amendment – it cannot be said "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Green*, 698 F.3d 48, 53 (1st Cir. 2012).

56

## CONCLUSION

The district court erred in denying Casellas' motion for change of venue, and Casellas is entitled to a new trial in a venue untainted by prejudicial pretrial publicity and jurors' knowledge that Casellas had been convicted of murdering his wife. Alternatively, Casellas is entitled to a new trial in Puerto Rico at which appropriate jury selection safeguards are utilized to ensure that Casellas is not judged by jurors who already knew that he had been convicted of murdering his wife. Finally, Casellas is entitled to a new trial from which all evidence derived from the unlawful searches of his car is excluded.

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-8616 (Telephone)
(617) 338-9538 (Fax)
homanlaw@aol.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

**/s/ Francisco Rebollo-Casalduc**
Francisco Rebollo-Casalduc
P.O. Box 195571
San Juan, Puerto Rico 00919
(787) 765-0505 (Telephone)
rebollolaw@gmail.com

No. 14-1933

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

UNITED STATES OF AMERICA

*Appellee*

v.

PABLO CASELLAS-TORO,

*Defendant- Appellant*

_____

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE
AND LENGTH LIMITATIONS**

_____

This brief has been prepared using:

14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below:

WordPerfect Office X4, 14-point Times New Roman

EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, appellant's Brief contains, in total:

13,963 words.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line printout.

**/s/ Kimberly Homan**

Kimberly Homan

58

## CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 11th day of March, 2015, I caused one copy of the Brief of Appellant Pablo Casellas-Toro to be served on all parties of record via this Court's ECF system. I further caused one copy of the Appendix to be served by first-class mail, postage prepaid, on Kirby Heller, United States Department of Justice, Criminal Division, 950 Pennsylvania Ave, NW, Room 1264, Washington, DC 20530-0001.

**/s/ Kimberly Homan**

Kimberly Homan

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Judgment, Dkt. 155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Memorandum, Order and Opinion, Goodwin, J., 3/06/2014, Dkt. 67 . . . . . . . .   6

Oral Ruling on Motion to Suppress, 3/24/2014 . . . . . . . . . . . . . . . . . . . . . . . . .   17

Oral Ruling on Motion for Change of Venue, 4/07/2014 . . . . . . . . . . . . . . . . .   23

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
            Sheet 1

# UNITED STATES DISTRICT COURT

## JUDICIAL DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| PABLO CASELLAS-TORO | Case Number: 3:13 CR. 0201-01 (JRG) |
| | USM Number: 43712-069 |
| | FRANCISCO REBOLLO, ESQ. |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____

   which was accepted by the court.   Counts One, Two and Three by a jury on May 1, 2014. Defendant moved for aquittal pursuant to F.R.C.P. 29(a) on Counts One and Two. The Court granted the motions pursuant to Memorandum Opinions and Orders entered May 12,

☑ was found guilty on count(s)   2014 and June 4, 2014, respectively. Count Three remains for defendant's adjudication of guilt and sentencing.

   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1001(a)(2) | False statement | 06-17-2012 | Three (3) |
| | | | |
| | | | |

   The defendant is sentenced as provided in pages 2 through _____5_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   One pursuant to a Memorandum Opinion and Order of aquittal entered May 12, 2014 and Count Two pursuant to a Memorandum Opinion and Order of acquittal entered June 4, 2014, both acquittals pursuant to Rule 29, Federal Rules of Criminal Procedure.

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

August 11, 2014
_____
Date of Imposition of Judgment

S/   Joseph R. Goodwin
_____
Signature of Judge

Joseph R. Goodwin       U.S. District Judge
_____
Name and Title of Judge

August 11, 2014
_____
Date

1

AO 245B    (Rev. 09/11) Judgment in Criminal Case
          Sheet 2 — Imprisonment

| | Judgment — Page | 2 | of | 5 |

DEFENDANT:  PABLO CASELLAS-TORO
CASE NUMBER:  3:13 CR. 0201-01 (JRG)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

Twenty-one (21) months, to be served concurrently with any other sentence he's currently serving at the local level.

☐  The court makes the following recommendations to the Bureau of Prisons:

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ ☐ a.m.  ☐ p.m.   on _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment—Page _3_ of _5_ |
|---|---|

DEFENDANT:     PABLO CASELLAS-TORO
CASE NUMBER:   3:13 CR. 0201-01 (JRG)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

Three (3) years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑  The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐  The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐  The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B     (Rev. 09/11) Judgment in a Criminal Case
                Sheet 3A — Supervised Release

| | Judgment—Page   4   of   5 |
|---|---|

DEFENDANT:    PABLO CASELLAS-TORO
CASE NUMBER:    3:13 CR. 0201-01 (JRG)

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant shall not commit another Federal, state, or local crime, and shall observe the standard conditions of supervised release recommended by the United States Sentencing Commission and adopted by this Court.

The defendant shall not unlawfully possess controlled substances.

The defendant shall refrain from possessing firearms, destructive devices, and other dangerous weapons.

The defendant shall refrain from the unlawful use of controlled substances and submit to a drug test within fifteen (15) days of release; thereafter, submit to random drug testing, no less than three (3) samples during the supervision period and not to exceed 104 samples per year accordance with the Drug Aftercare Program Policy of the U.S. Probation Office approved by this Court. If any such samples detect substance abuse, the defendant shall participate in an in-patient or out-patient substance abuse treatment program for evaluation and/or treatment, as arranged by the U.S. Probation Officer until duly discharged. The defendant is required to contribute to the cost of services rendered (co-payment) in an amount arranged by the U.S. Probation Officer based on the ability to pay or availability of third party payment.

Having considered Mr. Casellas-Toro's financial condition, a fine in the amount of 5,000 is imposed and to be paid forthwith.

A special monetary assessment in the amount of $100 is imposed, as required by law and to be paid forthwith.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties

| | | | Judgment — Page 5 of 5 |

DEFENDANT: PABLO CASELLAS-TORO
CASE NUMBER: 3:13 CR. 0201-01 (JRG)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 5,000.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

　　　　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　CRIMINAL ACTION NO. 13-cr-201

PABLO CASELLAS TORO,

　　　　　　　　Defendant.

## MEMORANDUM OPINION & ORDER

　　　Before the court is Defendant Pablo Casellas Toro's Motion for Change of Venue [Docket 58]. For the reasons stated below, I **RESERVE** ruling on the motion at this time. The parties are **DIRECTED** to consult in good faith and submit a joint proposed juror questionnaire of no longer than **five pages** to the court by **Friday, March 14, 2014**.

## I. Procedural Background

　　　In late January 2014, Pablo Casellas Toro was convicted in a court in the Commonwealth of Puerto Rico for the murder of his wife, Carmen Paredes-Cintrón, along with other charges. Shortly thereafter, the federal government unsealed an indictment charging Mr. Casellas with three counts of making false statements to the United States Marshal Service and the Federal Bureau of Investigation in contravention of 18 U.S.C. § 1001(a)(2). (*See* Indictment [Docket 3]).

The alleged false statements were made in connection with the federal government's investigation of Mrs. Paredes-Cintrón's death.

In the instant motion, Mr. Casellas requests a change of venue pursuant to Federal Rule of Criminal Procedure 21(a). Mr. Casellas argues that the extensive media coverage of his commonwealth murder trial and the instant federal charges have made it impossible to obtain an impartial jury within the District of Puerto Rico. Mr. Casellas asks that his case be tried in, and a jury picked from, a "neutral location, such as the United States District Court for the District of Massachusetts sitting at Boston, Massachusetts." (Def. Pablo Casellas Toro's Mot. for Change of Venue and Incorporated Mem. of Law [Docket 58] ("Def.'s Mot."), at 1). The government does not oppose a venue change, and the government is amenable to trying the case in Boston.

## II. Publicity Surrounding the Casellas Case

In order to fully explain the basis for the instant motion, I must briefly lay out the relevant facts as presented in Mr. Casellas's motion. Hours after the discovery of Mrs. Paredes-Cintrón's body, "just about every" news media outlet in Puerto Rico descended upon Mr. Casellas's home and remained there for the day. (Def.'s Mot. at 1-2). Several tabloid news programs immediately made the murder investigation the main focus of their programming. (*Id.* at 2). Television, radio, internet, and print media outlets in Puerto Rico "have continuously, intensely and uninterruptedly covered the Casellas case virtually on a daily basis." (*Id.*).

Many facts about the murder investigation were leaked to the media, including the substance of Mr. Casellas's interview with police and the condition of the victim's body at the crime scene. (*Id.* at 3-4). The media published and broadcast a number of allegedly false rumors about Mr. Casellas, including that he was a drug user, that he threatened people with firearms, that he was involved in a hit-and-run vehicle accident, and that he drunkenly bragged about

2

assassinating the then-governor of Puerto Rico. (*See id.* at 4-5).

Although local authorities summoned Mr. Casellas to the Bayamon courthouse for the filing of charges, he was intercepted outside the courthouse, arrested, and Mirandized in public in view of media personnel who broadcast the event live. (*Id.* at 7). Members of the media "covered every minute of every day" of the commonwealth trial, which ran from December 10, 2013, to January 22, 2014. (*Id.* at 11). Many reporters tweeted the trial testimony verbatim. (*Id.*). Cameras followed the defendant, his family, and his lawyers during breaks. (*Id.* at 12).

Citizens celebrated outside the courthouse and an entire stadium of people attending a baseball game erupted into cheers upon news of the guilty verdict in the commonwealth case. (*See id.* at 13-14). Television coverage of the Casellas verdict received the top Nielsen rating for that month. (*Id.* at 15 n.31). The Supreme Court of Puerto Rico permitted the media to broadcast Mr. Casellas's sentencing live on television, internet, and radio. (*Id.* at 15).

Adding to the sensational nature of the Casellas murder case is the fact that the defendant's father is a United States District Judge. The media scrutinized Judge Casellas for appearing at the scene of the crime on the morning of the murder, and some local attorneys called for Judge Casellas's resignation. (*Id.* at 5).

Mr. Casellas asserts that media coverage has continued unabated since the unsealing of the instant federal charges.

### III. Legal Analysis

The United States Constitution guarantees every criminal defendant a right to trial by an impartial jury. *See* U.S. Const. amend. VI; *Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896, 2912, 2913 (2010) ("The Sixth Amendment secures to criminal defendants the right to a trial by an impartial jury."). Criminal defendants are also entitled to be tried in the "state and district wherein

3

the crime shall have been committed." U.S. Const. amend. VI; *cf. United States v. Cabrales*, 524 U.S. 1, 6 (1998) ("The Constitution twice safeguards the defendant's venue right[.]"). Rule 18 of the Federal Rules of Criminal Procedure reinforces this directive by providing that "the government must prosecute an offense in a district where the offense was committed."

Nonetheless, the venue right is subject to waiver at the defendant's request. Under Federal Rule of Criminal Procedure 21(a), a defendant may move for a change of venue for reason of prejudice:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a). Rule 21(a) "is intended for cases in which prejudice in the community will make it difficult or impossible to select a fair and impartial jury." 2 Charles Alan Wright & Peter J. Henning, *Federal Practice & Procedure* § 343 (4th ed. 2014).

Although the Constitution guarantees the right to an impartial jury that is not *actually* prejudiced against the defendant, district courts may *presume* such prejudice in advance of a trial "in the rare case in which the community is overwrought with inundations of highly inflammatory publicity." *United States v. Dubon-Otero*, 76 F. Supp. 2d 161, 164 (D.P.R. 1999) (citing *United States v. Moreno Morales*, 815 F.2d 725, 734 (1st Cir. 1987)). To presume prejudice, a district court must consider "whether the degree of inflammatory publicity [has] so saturated the community such as to make it virtually impossible to obtain an impartial jury." *United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007) (quotations omitted).

However, the constitutional right to an impartial jury does not necessitate a jury wholly ignorant of the defendant's case. *See Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896, 2902

(2010) ("[J]uror *impartiality* . . . does not require *ignorance*.") (emphasis in original); *Murphy v. Florida*, 421 U.S. 794, 799 (1975) ("[J]uror exposure to information about a state defendant's prior convictions or to news accounts of the crime" does not "presumptively deprive[] the defendant of due process.").

Whether to grant a motion for change of venue is committed to the "sound discretion of the trial court." *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) (citing *Patriarca v. United States*, 402 F.2d 314, 317-18 (1st Cir. 1968)); *see also United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (district court's denial of motion to change venue reviewed for abuse of discretion). Relief under a Rule 21(a) motion is rare and reserved for exceptional cases. Wright & Henning, *supra*, § 343; *see Dubon-Otero*, 76 F. Supp. 2d at 164 ("[I]t is a rare case that necessitates transfer to avoid prejudice within the district."); *United States v. Mandel*, 431 F. Supp. 90, 100 (D. Md. 1977) ("Absent extraordinary circumstances . . . the trial court will be compelled to transfer a case only when it finds actual prejudice (in voir dire) of the prospective jury pool to such an extent that it would be impossible to find an impartial jury panel."); *see also Skilling*, 130 S. Ct. at 2902 ("A presumption of prejudice [from pretrial publicity] attends only the extreme case.").

Here, the government has not opposed the defendant's request for a venue change. But that fact does not relieve me of the obligation to make an independent determination about whether publicity has been so inflammatory that it is virtually impossible to pick a jury. Under Rule 21(a), I must be "satisfied that so great a prejudice against the defendant exists . . . that the defendant cannot obtain a fair and impartial trial" in his district. The defendant is not entitled to a venue change simply because the government consents. *See United States v. Moody*, 762 F. Supp. 1485, 1488 n.3 (N.D. Ga. 1991) (conducting Rule 21(a) analysis even though government withdrew its objection to defendant's transfer motion).

5

The last time the Supreme Court overturned a conviction solely because pretrial publicity caused the community to become presumptively prejudiced was in 1963 in *Rideau v. Louisiana*, 373 U.S. 723 (1963).[1] In *Rideau*, the Court held it reversible error to deny a request to change venue when the defendant's surreptitiously taped confession was repeatedly broadcast on television to the community. *See* 373 U.S. 723, 725-26. The Court found that the broadcast confession was "in a very real sense . . . Rideau's trial—at which he pleaded guilty to murder." *Id.* at 726. Therefore, without reviewing the record of the voir dire proceedings to gauge the actual prejudice of the jurors, the Court held "that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.'" *Id.* at 727.

This case is easily distinguishable from *Rideau*. Mr. Casellas has not confessed to any crime. In fact, he has steadfastly maintained his innocence. During his sentencing, Mr. Casellas reiterated that his conviction was an "injustice," a scene that was televised and broadcast throughout Puerto Rico. As far as I can tell, the media attention for this case is not unusual for a high-profile case. Cases involving O.J. Simpson, Michael Jackson, Robert Blake, Timothy McVeigh,[2] Aaron Burr,[3] and the Watergate defendants all involved heavy pretrial publicity. None of the media attention in this case is of the type that jurors cannot reasonably be expected to put aside.

---

[1] I note that the Supreme Court overturned convictions in *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). However, rather than turning on pretrial publicity, "those cases involved media interference with courtroom proceedings *during* trial." *Skilling*, 130 S. Ct. at 2915 n. 14.

[2] Although the trial in *McVeigh* was moved from Oklahoma City to Denver, the case nonetheless received intense pretrial publicity in Denver and nationally. In fact, the national and Denver media reported that Mr. McVeigh had confessed to his lawyers. *See United States v. McVeigh*, 153 F.3d 1166, 1180 (10th Cir. 1998).

[3] The United States Supreme Court later noted that "[f]ew people in the area of Virginia from which jurors were drawn had not formed some opinions concerning Mr. Burr or the case, from newspaper accounts and heightened discussion both private and public." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 548 (1976).

6

Since *Rideau v. Louisiana*, the Supreme Court has moved away from making presumptions of juror prejudice and towards allowing trial courts to conduct voir dire to discern the actual prejudices of jurors. For example, in *Murphy v. Florida*, the defendant's arrest for robbery and assault received significant press coverage because he had become notorious for his part in an earlier heist of the Star of India sapphire from a New York museum, and the media dubbed him "Murph the Surf." 421 U.S. 794, 795 (1975). Within a year of his trial, he was separately convicted of murder and pleaded guilty to transporting stolen securities. *Id.* at 796. The Court upheld the robbery and assault convictions. It stated that

> [t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.
>
> At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.

*Id.* at 800 (quotations omitted). Although each of the jurors "had some knowledge of [the defendant's] past crimes," voir dire revealed that no juror believed the defendant's past crimes were relevant to the case at hand. *Id.* at 800-01. Therefore, the Court declined to find that the jury panel was inherently or actually prejudiced. *Id.* at 803.

Similarly, in *Skilling v. United States*, the Court's most recent decision regarding venue changes in criminal cases, the Court upheld the conviction of the former chief executive officer of Enron Corporation despite intense pretrial outrage and publicity about the case. The Court noted that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected

7

to shut from sight." *Skilling*, 130 S. Ct. at 2916. This was in stark contrast from Rideau's broadcast confession of guilt. *See id.* The Court then analyzed the trial court's extensive voir dire proceedings and concluded that no actual bias infected the jury. *Id.* at 2917-25.

Although the Supreme Court has trended away from presuming prejudice as a result of pretrial publicity, Mr. Casellas argues that the *Skilling* case nonetheless supports finding a presumption of prejudice in this case. As previously noted, the Court contrasted the pretrial publicity in that case with Rideau's broadcast confession of guilt. Here, too, the pretrial publicity did not contain a "confession or other blatantly prejudicial information" that jurors cannot be expected to set aside. *Id.* at 2916. The Court also considered the "size and characteristics of the community in which the crime occurred." *Id.* at 2915. As Mr. Casellas states, Puerto Rico is a "compact" and "insular community . . . highly susceptible to the impact of local media." *United States v. Moreno Morales*, 815 F.2d 725, 734 (1st Cir. 1987). However, more than 3 million people live in Puerto Rico, mitigating the potential for prejudice among the jurors ultimately selected. *See Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (potential for prejudice lessened in "metropolitan Washington statistical area, which has a population of over 3 million"). The commonwealth court in Mr. Casellas's murder trial picked a jury. It would be strange for me to *presume*—before reviewing juror questionnaires or conducting any voir dire—that Puerto Ricans are unfit to serve on a jury in this case.

The Court in *Skilling* also considered the length of time between the pretrial publicity and the actual trial. *See Skilling*, 130 S. Ct. at 2916. This factor weighs in favor of changing venue because the intense publicity following Mr. Casellas's murder conviction is relatively recent. But that fact, alone, does not convince me that I must presume prejudice in this case.

8

Rule 21(a) literally requires me to consider only the prejudice to the defendant, but I am also conscious of the public's interest in having this case tried in the locality in which the crime occurred. The public's vicinage right is not expressly grounded in the text of the Constitution, but several courts and commentators have acknowledged its importance. *See, e.g.*, *United States v. Dubon-Otero*, 76 F. Supp. 2d 161, 165 (D.P.R. 1999) ("To this day, the interest of a community in trying those who violate its laws remains a central tenet of our judicial system."); *United States v. Means*, 409 F. Supp. 115, 117 (D.N.D. 1976) ("The interest of a community that those charged with violations of its laws, be tried in that community, is not a matter to be cast aside lightly."); Steven A. Engel, *The Public's Vicinage Right: A Constitutional Argument*, 75 N.Y.U. L. Rev. 1658 (2000); *but see United States v. W.R. Grace*, 408 F. Supp. 2d 998, 1020-21 (D. Mont. 2006) ("I do not believe community interests warrant separate consideration beyond the application of the Ninth Circuit's presumption against transfer of venue based on presumed prejudice."). The United States Supreme Court has indicated that "[c]ommunity participation in the administration of the criminal law . . . is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). Not only is community participation important, but "[l]ocal jurors will tend to render more accurate verdicts than foreign ones, for they are most familiar with the context in which the crime took place." Engel, *supra*, at 1692. This is the case because "[j]urors drawn from the vicinage would be familiar with the character of both the accused and the witnesses, and so would be able to best make determinations of the credibility of eyewitness testimony." *Id.*

In any event, I cannot make a determination about the prejudices of potential jurors this far in advance of trial. I cannot confidently presume that it will be "virtually impossible" for Mr. Casellas to obtain a fair trial. Simply because the media may have formed opinions about Mr.

9

Casellas does not mean that jurors cannot make up their own minds based on the evidence at trial. "A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded. *United States v. Chagra*, 669 F.2d 241, 252 n.11 (5th Cir. 1982).

At most, the defendant's motion and memorandum show that the Puerto Rican public is well aware of the Casellas murder investigation and trial. But this awareness does not require me to find that the community is presumptively prejudiced against Mr. Casellas. The defendant has not, at this time, demonstrated that that the public is so completely poisoned against Mr. Casellas that he cannot receive a fair trial by an impartial jury. I **RESERVE** ruling on the defendant's motion to change venue until I have more information about the prospective jurors.

In order to accurately gauge the presumptive prejudice of the venire in this case, I **DIRECT** the parties to consult with each other in good faith and submit to the court by **Friday, March 14, 2014**, a joint proposed juror questionnaire. The joint proposed questionnaire must be no longer than **five pages**. The parties are to use their best efforts to jointly propose questions, but in the event that they cannot, in good faith, agree on particular questions, they may submit those additional questions to the court separately. I will then review the parties' submission, and the parties will have an opportunity to object to the final questionnaire before it is mailed to the jury pool.

### IV. Conclusion

For the reasons stated above, I **RESERVE** ruling on the defendant's motion to change venue. The parties are **DIRECTED** to consult in good faith and submit a joint proposed juror questionnaire of no longer than **five pages** to the court by **Friday, March 14, 2014**.

10

The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:     March 6, 2014

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

11

1    the next day with more red than black.  Red being source of

2    knowledge for this fact, I still need to know this, I still

3    need to know this other thing.  She demanded that probable

4    cause be apparent in the affidavit, and that's the way it

5    should be.

6         Judge, here a magistrate judge will take an

7    affidavit, sign it the same date without making any additional

8    requests on this skeleton of an affidavit, this bare bones

9    affidavit in which only one paragraph, which the government

10   did not address in his turn, could conceivably be considered

11   to be remotely addressing probable cause.  And it still fell

12   short.

13        Thank you, sir.

14        THE COURT:  Thank you.  We'll start with the motion

15   to suppress the search on July 16, 2012.  The Fourth Amendment

16   protects the rights of the people to be secure in their

17   persons, houses, papers and effects against unreasonable

18   search and seizures.  The right is preserved by the

19   Constitution, by the requirement that the government searches

20   be conducted pursuant to a warrant issued by a neutral and

21   detached judicial officer.

22        However, a warrant is not required when the

23   government obtains consent to conduct the search.  It is

24   certainly correct that the citizens have more power, to answer

25   your question, Mr. Rebollo, than does a judge to regulate

 1  their conduct.  And I hope that remains the case.

 2          Where there is a consent to conduct a search, the

 3  government doesn't need a warrant.  They may rely on the

 4  consent, but they have no more authority than has apparently

 5  been given by the consent.  You can't go beyond the scope of

 6  the consent.  That's why law enforcement looks to a search

 7  warrant if they're going to do a destructive search, as

 8  counsel for the defendant mentioned in argument.

 9          The standard for measuring the scope of a suspect's

10  consent under the Fourth Amendment is that of objective

11  reasonableness.  What would the typical reasonable person have

12  understood by the exchange between the person and the officer?

13          In determining the scope of a defendant's consent,

14  courts look beyond the language of the consent itself to, as

15  defendant suggests in his argument, the overall context which

16  necessarily encompasses contemporaneous police statements and

17  actions.  Courts look beyond the formal wording of the consent

18  to the totality of the circumstances that informs the words in

19  the consent.

20          It is undisputed here by counsel that the defendant's

21  consent was knowing, that the consent was voluntary.  In

22  essence, the defendant argues that the FBI's July 16, 2012,

23  search exceeded the scope of his consent or that it was -- his

24  consent was effectively revoked in some fashion.

25          The defendant gave written consent for a complete

```
1    search of his vehicle on June 25th, 2012, and he did not
2    revoke that consent.  In fact, it was reaffirmed in
3    conversations as testified to by the supervisory agent.
4           The consent form did not specify a time limit for the
5    search.  The defendant's calls indicated he was wondering if
6    the search had been concluded.  I think the first one was so
7    an insurance adjuster could take a look at it.  The defendant
8    understood that the vehicle was to be -- was to be impounded
9    pending the FBI's investigation.
10          A reasonable person would have understood, by signing
11   the consent form, that he was consenting to allow the FBI to
12   conduct a search in the ordinary course of their business, in
13   the ordinary fashion in which they did things.  A reasonable
14   person would have known such an endeavor would not be
15   conducted momentarily, but would take some time, especially
16   when the alleged assailants of the car and the defendant were
17   at large.
18          I find that the FBI searched the car within a
19   reasonable time for a carjacking, and for the violent crime
20   statute, which was also mentioned, involving guns.  This
21   wasn't according to the search later.  Just a carjacking.  I
22   think there was an allegation, I'll look for it in a minute,
23   about a gun crime as well.
24          MR. GILFARB:  That's correct, in the affidavit in
25   support of the warrant.
```

```
 1              THE COURT:  Yes.  Defendant argues and does an
 2     articulate job of arguing that a change in circumstances,
 3     namely the FBI's alleged suspicions of the defendant after his
 4     wife was killed, and apparently it was given great publicity,
 5     rendered the July 16 search somehow outside the scope of his
 6     consent.
 7              Quite simply, the defendant consented to have his car
 8     searched in relation to his own accusations that he had been
 9     attacked by people wielding gunfire and that had carjacked his
10     car.  He never revoked that consent after his wife was killed.
11              The car remained in the FBI's custody.  Even assuming
12     that the FBI suspected that defendant staged the carjacking,
13     that in my opinion does not render the July 16 search outside
14     the scope of the consent.  The fact that a defendant, and this
15     is part of my reasoning, that a defendant may have been under
16     suspicion doesn't change the defendant's status enough to
17     undercut his consent.
18              I find that the July 16 search did not exceed the
19     scope of the consent.  I deny the motion to suppress evidence
20     seized in that search.
21              Let's turn to the August 13th search.  I find that
22     that search was legal, and the motion to suppress should be
23     denied.  It was conducted pursuant to a warrant issued by a
24     magistrate judge.  The defendant basically argues that the
25     affidavit did not contain sufficient facts to establish
```

1    probable cause.  The Fourth Circuit -- or the Fourth Circuit.

2    You can tell where I come from.

3         The Fourth Amendment demands that search warrants

4    issue only upon probable cause.  To achieve this benchmark,

5    there must be both probable cause to believe that a crime has

6    been or is being committed, and probable cause to believe that

7    evidence of the crime can likely be found at a described locus

8    at the time of the search.  Therefore, the issuing magistrate

9    must be supplied with information to establish that.

10        Here, the magistrate was furnished with an affidavit

11   in support of the search warrant, which this Court finds

12   contains sufficient information to establish probable cause.

13   The warrant states that the FBI was investigating potential

14   violations of 18 United States Code Section 2119, which

15   provides penalties for carjacking, and 18 United States Code

16   Section 924(c)(1)(A), which provides penalties for violent

17   crimes committed with firearms.

18        According to the affidavit, the defendant told law

19   enforcement that he was returning from a firing range; that

20   his vehicle was intercepted by, quote, individuals who shot at

21   him and his vehicle, and took his vehicle through the use of

22   force and violence, unquote.

23        The affidavit further states that the defendant

24   sustained a gunshot to his right arm, and two of his firearms

25   were stolen from his vehicle.

```
 1            The affidavit further states that as a result of the

 2    earlier July 16 search, the FBI believed it would find bullets

 3    lodged in the dashboard and other parts of the vehicle, and

 4    items which might contain DNA evidence.

 5            This factual recitation provides probable cause to

 6    believe that the defendant was carjacked or that there was a

 7    violent crime committed with firearms based on the reference

 8    to the defendant's own statements.  I deny the motion to

 9    suppress the evidence seized during the August 13th, 2000,

10    (sic) search.

11            Anything further to come before the Court?  I do want

12    to talk to you about the April 7th matter.  Anything else?

13            MR. GILFARB:  No, Your Honor.  You indicated you were

14    going to mull over the motions to dismiss and the motion in

15    limine.

16            THE COURT:  Yes.

17            MR. GILFARB:  Okay.  So no, nothing currently

18    pending.

19            THE COURT:  You can expect to hear from me quickly on

20    that.

21            MR. GILFARB:  Very well, Your Honor.

22            MR. REBOLLO CASALDUC:  Nothing from us, Your Honor.

23            THE COURT:  All right.  So I'm going to need to set

24    voir dire for April 7.  I will need to pick a new trial date

25    of some sort.  I think I can -- I think I can say that it will
```

22

```
 1              Now, we'll never know which facts are, because it's
 2   impossible to know which facts the jurors were leaning to
 3   before they came in to believe.  So in that sense, there is
 4   that particular prejudice that he suffers that he shouldn't
 5   have to.
 6              Secondly, Judge, even if Your Honor qualifies some
 7   jurors of the ones we've seen, they're still close calls.  I
 8   don't think -- even giving the Government the benefit of the
 9   doubt, I don't think there were any clear cut qualified jurors
10   here.
11              And then, like I said this morning, what happens now
12   until April 28, if the publicity increases and then they go
13   over the line, we will never know.  And that is a risk that my
14   client would have to assume here that he shouldn't have to.
15              So on that basis, too, I think it is a dangerous path
16   for the Court to take to, on these close calls, empanel a jury
17   to try this case when this is -- granted, when the option --
18   granted there are some constitutional problems, but with my
19   client's rights, there should be no concern about costs when
20   we're deciding whether to honor them or protect them.
21              So with those two points, I'd be happy to go through
22   each one of the strikes for cause.
23              THE COURT:  I certainly agree that we don't know yet
24   if we can get a jury.  All we know right now or at least it's
25   the opinion of the Court all I know now is there is a
```

```
 1    sufficient possibility that we can get a jury, that I am going
 2    to deny the motion for change of venue at this time.  I will,
 3    if the entire process goes south for want of a better phrase,
 4    accept a renewed motion.  I don't -- I just think we've got to
 5    get on with this process.  And I've delayed as long as I could
 6    until my memory is running short on the faces and answers of
 7    the jurors.
 8          I have got to start dealing with these jurors.  I
 9    don't think it's proper for me to do that until I rule on the
10    motion.  So I'm going to have it both ways.  I'm going to deny
11    the motion, and there's always an opportunity to bring the
12    motion again should events warrant it.
13          So let's go through the -- let's go through the
14    lists.
15          MR. GILFARB:  How would you like to proceed, Judge?
16    Alternating or just as they --
17          THE COURT:  Well, I have a feeling that defendant is
18    going to be the one having the most strikes for cause, so we
19    might as well let him go first.
20          MR. GILFARB:  Okay.
21          MR. REBOLLO CASALDUC:  Do you want to go from the
22    first juror on?
23          THE COURT:  Yes.  Sure.
24          MR. REBOLLO CASALDUC:  If I may have a second, Judge?
25          THE COURT:  It's Rebecca -- I don't know how you say
```

24