No. 14-1933

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

—————————

UNITED STATES OF AMERICA,
Appellee,

v.

PABLO CASELLAS-TORO,
Defendant-Appellant.

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

—————————

**BRIEF FOR THE UNITED STATES**

—————————

WIFREDO A. FERRER
  United States Attorney
  Southern District of Florida

MICHAEL E. GILFARB
ANDY R. CAMACHO
  Assistant U.S. Attorneys
  Southern District of Florida

LESLIE R. CALDWELL
  Assistant Attorney General

SUNG-HEE SUH
  Deputy Assistant Attorney General

KIRBY A. HELLER
  Attorney, Appellate Section
  Criminal Division
  U.S. Department of Justice
  950 Pennsylvania Ave., NW Rm. 1264
  Washington, DC 20530
  (202) 307-0085
  kirby.heller@usdoj.gov

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ............................................................... 2

    A.    Procedural History .................................................................... 2

    B.    Relevant Facts .......................................................................... 3

        1.    Casellas Claims that He Was The Victim Of An Armed Carjacking ............................................................... 3

        2.    Casellas's Carjacking Story Does Not Hold Up ................... 5

    C.    Rulings Under Review ............................................................... 6

SUMMARY OF ARGUMENT .............................................................. 6

ARGUMENT ...................................................................................... 9

    I.    The District Court Did Not Abuse Its Discretion In Denying Casellas's Motions For A Change Of Venue .............................. 9

        A.    Background ..................................................................... 9

        B.    Standard Of Review ...................................................... 15

        C.    Casellas Was Tried Before A Panel Of Unbiased Jurors Capable Of Deciding The Case On The Evidence Presented In Court ........................................................ 16

            1.    Casellas has failed to establish a presumption of prejudice .............................................................. 17

            2.    A presumption of prejudice may be rebutted ........... 27

i

3. Casellas has not shown actual prejudice................... 28

II. The District Court Correctly Denied The Motion To Suppress Evidence Seized From Casellas's Car ........................................ 36

    A. Background ................................................................ 36

    B. Standard Of Review ..................................................... 39

    C. Casellas Did Not Withdraw His Consent To Search ....... 39

    D. The District Court Correctly Concluded That The Search Conducted Pursuant To The Search Warrant Was Lawful ............................................................... 42

CONCLUSION................................................................... 43

CERTIFICATE OF COMPLIANCE ........................................... 44

CERTIFICATE OF SERVICE ................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Coleman v. Kemp,*
    778 F.2d 1487 (11th Cir. 1985) ............................................................. 27

*Connors v. United States,*
    158 U.S. 408 (1895) ............................................................................ 28

*Delaney v. United States,*
    199 F.2d 107 (1st Cir. 1952) ............................................................... 19

*Dobbert v. Florida,*
    432 U.S. 282 (1977) ............................................................................ 17

*Estes v. Texas,*
    381 U.S. 532 (1965) ............................................................................ 18

*Florida v. Jimeno,*
    500 U.S. 248 (1991) ............................................................................ 41

*Gideon v. Wainwright,*
    372 U.S. 335 (1963) ............................................................................ 27

*In re Tsarnaev,*
    780 F.3d 14 (1st Cir. 2015) .................................................20, 21, 24, 29

*Irvin v. Dowd,*
    366 U.S. 717 (1961) .................................................................. 18, 23, 29

*Marshall v. United States,*
    360 U.S. 310 (1959) ............................................................................ 23

*Mu'Min v. Virginia,*
    500 U.S. 415 (1991) ........................................................................23, 31

*Murphy v. Florida,*
    421 U.S. 794 (1975) .................................................................. 18, 21, 25

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) .................................................................. 16

*Neder v. United States*,
  527 U.S. 1 (1999) ...................................................................... 27

*Patton v. Yount*,
  467 U.S. 1025 (1984) ................................................... 18, 23, 24

*Rideau v. Louisiana*,
  373 U.S. 723 (1963) ........................................................... 17, 18

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973) .................................................................. 39

*Sheppard v. Maxwell*,
  384 U.S. 333 (1966) .................................................................. 18

*Skilling v. United States*,
  561 U.S. 358 (2010) ..........................................................*passim*

*Sullivan v. Louisiana*,
  508 U.S. 275 (1993) .................................................................. 28

*Tumey v. Ohio*,
  273 U.S. 510 (1927) .................................................................. 27

*United States v. $304,980 in Currency*,
  732 F.3d 812 (7th Cir. 2013) ............................................. 39, 40

*United States v. Alfaro*,
  935 F.2d 64 (5th Cir. 1991) ..................................................... 40

*United States v. Angiulo*,
  897 F.2d 1169 (1st Cir. 1990) ...................................... 21, 24, 29

*United States v. Brandon*,
  17 F.3d 409 (1st Cir. 1994) ..................................................... 15

*United States v. Brown*,
   345 F.3d 574 (8th Cir. 2003) ..................................................... 40

*United States v. Brown*,
   621 F.3d 48 (1st Cir. 2010) ....................................................... 39

*United States v. Brown*,
   938 F.2d 1482 (1st Cir. 1991) .................................................. 16

*United States v. Chagra*,
   669 F.2d 241 (5th Cir. 1982) ................................................... 22

*United States v. Drougas*,
   748 F.2d 8 (1st Cir. 1984)......................................................... 23

*United States v. Fermin*,
   771 F.3d 71 (1st Cir. 2014) ...................................................... 39

*United States v. Garcia*,
   604 F.3d 186 (5th Cir. 2010) ................................................... 41

*United States v. Gonzalez-Lopez*,
   548 U.S. 140 (2006) ..........................................................27, 28

*United States v. Gonzalez-Soberal*,
   109 F.3d 64 (1st Cir. 1997)...................................................... 15

*United States v. Innamorati*,
   996 F.2d 456 (1st Cir. 1993) .................................................... 43

*United States v. Jadlowe*,
   628 F.3d 1 (1st Cir. 2010)......................................................... 42

*United States v. Keating*,
   147 F.3d 895 (9th Cir. 1998) ................................................... 23

*United States v. Marshall*,
   348 F.3d 281 (1st Cir. 2003) .................................................... 39

*United States v. Misla-Aldarondo,*
    478 F.3d 52 (1st Cir. 2007) ................................................................ *passim*

*United States v. Moreno Morales,*
    815 F.2d 725 (1st Cir. 1987) ............................................................... *passim*

*United States v. Parker,*
    412 F.3d 1000 (8th Cir. 2005) ................................................................ 40

*United States v. Quiles-Olivo,*
    684 F.3d 177 (1st Cir. 2012) ....................................................... 16, 17, 29

*United States v. Rivera-Rosario,*
    300 F.3d 1 (1st Cir. 2002) ...................................................................... 31

*United States v. Rodriguez-Cardona,*
    924 F.2d 1148 (1st Cir. 1991) ................................................................ 17

*United States v. Weidul,*
    325 F.3d 50 (1st Cir. 2003) .................................................................... 39

*Vasquez v. Hillery,*
    474 U.S. 254 (1986) .............................................................................. 27

## STATUTES AND RULES

18 U.S.C. § 1001(a)(2) ................................................................................. 2

18 U.S.C. § 3231 ......................................................................................... 1

18 U.S.C. § 2119 ....................................................................................... 38

28 U.S.C. § 1291 ......................................................................................... 1

Fed. R. App. P. 32(a)(7)(b)(i) ..................................................................... 44

Fed. R. App. P. 4(b)(1)(A)(i) ....................................................................... 1

Fed. R. Crim. P. 29(b)..................................................................... 26

## MISCELLANEOUS

Wayne R. LaFave,
4 *Search and Seizure* § 8.1(c)(5th ed)............................................. 41

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of conviction in a criminal case. The district court (Hon. Joseph R. Goodwin), which had jurisdiction under 18 U.S.C. § 3231, entered judgment against Pablo Casellas-Toro on August 11, 2014. Add. 1-5.[1] Casellas filed a timely notice of appeal on August 20, 2014. DE 156; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in denying Casellas's motions for a change of venue.

2. Whether the district court clearly erred by concluding that Casellas did not withdraw his consent to search his vehicle, and if it did, whether the search warrant affidavit established probable cause when the information learned during the consent search is excised from the affidavit.

---

[1] "Add." refers to the addendum attached to defendant's opening brief.  "App." refers to the defendant's appendix. "DE" refers to the docket entry in the district court.

## STATEMENT OF THE CASE

A.    Procedural History

A federal grand jury in the District of Puerto Rico returned a three-count indictment charging Casellas with making false statements to a federal officer, in violation of 18 U.S.C. § 1001(a)(2), in connection with Casellas's claim that he had been the victim of a carjacking. App. 20-24. Count One charged that Casellas falsely stated that he went to a shooting range for target practice to create the false impression that he had been the victim of a crime; Count Two charged that Casellas falsely stated that a person caused him to stop his vehicle; and Count Three charged that Casellas falsely stated that he was forced at gunpoint to move from the driver's seat to the front passenger seat. App. 22-24.

A jury convicted Casellas on all counts, but the district court granted Casellas's motion for a judgment of acquittal on Counts One and Two. App. 1853-70. Casellas was sentenced to 21 months of imprisonment, to run concurrently with his undischarged Commonwealth of Puerto Rico court sentence, and to be followed by three years of supervised release. Add. 2-3. This appeal followed.

B.    Relevant Facts

When viewed in the light most favorable to the verdict, the evidence established the following.

1.     Casellas Claims That He Was The Victim Of An Armed
       Carjacking.

On June 17, 2012, at about 9:15 am, Casellas approached three bicyclists on the access road to the Club Metropolitano de Tiro shooting club. App. 1155, 1159-60. Casellas claimed that he was the victim of an armed carjacking and that one of the assailants had shot him in the arm. App. 1161, 1166, 1175. He explained that he had managed to escape and hid in the brush on the side of the road until the assailants left with his car. App. 1166-67, 1171, 1174, 1176.

The police responded to the scene, App. 1212, and Casellas provided two different versions of the crime. He first stated that, as he was entering the target range area, he heard shots that hit the rear window of his car, and he abandoned the vehicle and "took off running." App. 1218. An individual wearing a black stocking over his face came out of the bushes, pointed a black pistol at Casellas's head, and told Casellas to hand over his belongings. App. 1218-20. As Casellas was taking off his watch, the assailant shot him in the right arm and ordered Casellas to move to the passenger side. App. 1220. When the officer started to question Casellas about "why he was ordered to move to the passenger seat when he had left the car behind," Casellas changed his story and no longer claimed that he had abandoned the car when the carjacker first accosted him. App. 1220. In the next telling, Casellas stated that the individual with the black pistol approached the driver's side of the car, pointed the gun at Casellas's head,

and told him to move to the passenger seat. App. 1220-21. The assailant then entered the car and shot Casellas. App. 1221. Casellas escaped through the shattered window on the passenger side. App. 1221-22.

Casellas also explained that he was a member of the shooting club, that he was on his way to the range to practice, and that a bag containing two firearms had been in the car. App. 1228, 1232. The car was found about 1000 feet from the front entrance to the shooting range, but the guns were no longer inside it. App. 1222-23, 1232.

Rafael Diaz, a Federal Bureau of Investigation (FBI) Task Force officer, interviewed Casellas the next day. App. 1411, 1416. Casellas recounted that, upon arriving at the shooting range gate, he heard shots and saw that his car's back window was broken and two men were running behind the car. App. 1421, 1426. Almost immediately thereafter, a third individual approached the driver's side window and ordered Casellas to move to the passenger seat.[2] App. 1421, 1427. After Casellas turned over his watch and his wallet, the man shot Casellas in the right arm. App. 1421. Casellas escaped through the broken window on the passenger side and hid in the shrubbery. App. 1422. In response to Agent

---

[2] Casellas's statement to Agent Diaz that the assailant ordered Casellas to move to the passenger seat is the basis for the count of conviction.

4

Diaz's question, Casellas described the make and serial numbers of the firearms that had been stolen from his car. App. 1428-29.

2.      Casellas's Carjacking Story Does Not Hold Up.

From the beginning, there were reasons to question Casellas's story. His descriptions of the crime to the officer at the scene were inconsistent, and he changed his version of events only when the officer pointed out the anomalies. App. 1220-21. Casellas's explanation for his presence at the gun club also was suspect. App. 1228-29. The club, as always, was closed on June 17 for Father's Day, and Casellas had received and opened an email from the club president notifying him of the closure. App. 1340-41, 1349-52, 1382-85. His claim that he was on his way to target practice was further belied by the fact that the club did not permit target shooting with the types of firearms (*i.e.,* rifles and pistols) that Casellas had purportedly brought with him, and Casellas was well aware of the club's policy. App. 1354-58.

The crime scene also did not support his account. App. 1256. Although there were shards of broken glass where the car was found, no glass was found anywhere else, including the area where Casellas claimed the shooting took place. App. 1222-23, 1226. Similarly, bullet casings and projectiles were found at the car's location, although the shooting purportedly took place elsewhere. App. 1230-31, 1294, 1306.

Almost a month later, on July 14, 2012, Casellas consented to a search of a locked room adjacent to his garage. App. 1480-81, 1483. There were guns and ammunition all over the floor, including one of the firearms that Casellas had reported as stolen during the carjacking. App. 1485, 1493. The second "stolen" firearm was also at the house that day. App. 1497. Two other firearms – a Ruger .380 pistol and a Walter .22 long rifle – were registered to Casellas, never reported as stolen, and fired the casings and projectiles that were recovered from the car and its surroundings. App. 1495-97, 1622, 1624-27. In addition, the findings from a trajectory analysis, which measured the angle of the bullets as they entered the car, were inconsistent with Casellas's description of the shooting. App. 1536-37, 1546-48.

C.    Rulings Under Review

The rulings under review are the district court's denials of Casellas's motions to change venue and strike nine jurors for cause, Add. 6-16, 23-24; App. 1089-90, and the court's denial of Casellas's motion to suppress evidence seized from his car, Add. 17-22.

## SUMMARY OF ARGUMENT

1. The district court did not abuse its discretion in denying Casellas's motions for a change of venue. Casellas's central contention is that the degree and nature of the pretrial publicity about his wife's murder and his conviction of

6

that crime in the Commonwealth court gave rise to an irrebuttable presumption of prejudice among the entire venire. But the Supreme Court's cases have established that adverse media coverage, including reports about a defendant's prior convictions, do not require applying the presumption, and the effect of negative publicity is best addressed through a careful jury selection process. Similarly, this Court has never applied a presumption of prejudice, including in cases with notorious defendants and equally adverse publicity. The presumption is especially inappropriate in this case because the publicity about the federal charges was primarily factual, and the fact of Casellas's conviction for murder did not presuppose his guilt on the false statement charges in the federal indictment.

Even if Casellas has established a presumption of prejudice, the presumption may be rebutted. The Supreme Court has required automatic reversal without an inquiry into actual prejudice in only a few instances in which the effect of the error cannot be ascertained. Because the district court can determine whether the empaneled jury has been prejudiced by adverse pretrial publicity, there is no reason to automatically reverse the conviction without examining the voir dire.

An examination of the voir dire demonstrates that the jurors were not actually prejudiced. The district court's careful jury selection procedure, which

involved interviewing jurors individually and probing for bias, produced an unbiased jury. Although the selected jurors knew something about Casellas's state case, they stated that they had not prejudged Casellas's guilt and could decide the federal case solely on the evidence presented in court. There is no basis to second guess the district court's determinations that the jurors would be impartial. For the same reasons, even if the Court concludes that Casellas has raised a presumption of prejudice, the government has rebutted it.

2. The district court did not clearly err by concluding that Casellas did not withdraw his consent to search his vehicle. He did not limit his consent to search to a particular time frame, and a reasonable officer would not have construed Casellas's requests to the FBI for the return of his car for an insurance inspection as a revocation of his consent. In addition, the timing of the search – two days after Casellas's wife was murdered – is irrelevant because the search was scheduled before the murder and the officers' subjective views concerning Casellas's responsibility for the murder have no bearing on whether a reasonable officer would have understood that Casellas had withdrawn his consent.

Even if the consent search were illegal, the untainted portions of the affidavit for the subsequent search still established probable cause. The affidavit explained that the FBI was investigating a supposed carjacking during which the perpetrators had shot at the vehicle and at Casellas. As a result, there was

probable cause to believe that the agents would find casings, projectiles, and DNA that were evidence of the carjacking.

Finally, even if the district court erred in admitting the evidence, the error was harmless because overwhelming evidence established that Casellas lied to Agent Diaz when he stated that an assailant ordered him to move to the passenger seat.

## ARGUMENT

I.    The District Court Did Not Abuse Its Discretion In Denying Casellas's Motions For A Change Of Venue.

Casellas argues (Br. 21-50) that he could not – and did not – receive a fair trial in Puerto Rico in light of the publicity surrounding his conviction and sentence for the first-degree murder of his wife. He urges reversal, claiming both presumptive prejudice from pretrial publicity and actual prejudice in the jury empaneled for his trial. The district court did not abuse its discretion in denying Casellas's motions for a change of venue.

A.    Background

On February 27, 2014, Casellas filed a motion for a change of venue, arguing that the pretrial publicity and prejudice flowing from his recent conviction and sentence for first-degree murder created a presumption that he would be prejudiced if tried in the District of Puerto Rico. App. 25-46. In support of that motion, Casellas filed 38 exhibits containing an analysis of the publicity

9

about the murder case that he commissioned as well as a sampling of newspaper articles, videos, and online blogs. App. 47-368. The government did not oppose the motion. App. 369-70.[3]

On March 6, 2014, the district court issued a written order, reserving its ruling on Casellas's motion. Add. 6-16. The court explained that district courts may presume prejudice from pretrial publicity only in the rare case in which "the degree of inflammatory publicity [has] so saturated the community such as to make it virtually impossible to obtain an impartial jury." Add. 9 (quoting *United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007)). It additionally noted that "an impartial jury does not necessitate a jury wholly ignorant of the defendant's case," Add. 9 (citing *Skilling v. United States*, 561 U.S. 358 (2010)), and that the Supreme Court "has trended away from presuming prejudice as a result of pretrial publicity," Add. 13. Accordingly, it concluded that it could not "confidently presume" "this far in advance of trial" that it would be "virtually impossible for Mr. Casellas to obtain a fair trial." Add. 14 (internal quotation marks omitted). It then directed the parties to submit a proposed juror questionnaire. Add. 15.

---

[3] The government subsequently explained that it did not oppose the motion because the murder case was "sensational" and the pretrial publicity was "massive." App. 409, 411; *see also* App. 669 (agreeing that Casellas had made a "prima facie showing" of the pervasive coverage of the murder case).

The parties submitted separate proposals and their objections to specific questions requested by the other. App. 383-93. Although the court initially believed that a questionnaire would assist it in determining whether to grant Casellas's change-of-venue motion, it decided that voir dire is "where [the court] . . . need[ed] to head" and that "the questionnaire would simply prolong without having anything on the record or under oath." App. 430. Casellas did not object to the court's revised plan.

Jury selection began on April 7, 2014. App. 548. About 160 jurors were present, and more were summoned for the next day. App. 550. The court explained that it would ask the group whether anyone had heard of Casellas and then individually question the jurors who stated that they had. App. 550. The court assured the attorneys that they would have the opportunity to suggest additional questions. App. 557. If 38 qualified jurors could be identified, the parties would exercise their peremptory challenges from that group. App. 551-54. Casellas was "fine with picking 38." App. 555.

The court then described the procedure to the jury pool. App. 564-68. It cautioned the jurors that they should not discuss the case "from this moment on." App. 564-65, 577. After the jurors were sworn to tell the truth, the court reiterated its earlier admonition that "truthful and forthright answers are essential." App. 565-67.

11

In response to the court's preliminary question whether anyone had "heard anything, seen anything, or read anything about Mr. Casellas or about the case," almost all the jurors raised their hands. App. 576, 610, 653-54. For the rest of the day and the next, the court questioned those jurors individually as they sat around a table in the jury room. App. 550, 578. The court followed a scenario that was designed to put the jurors at ease and maximize their willingness to be candid and forthcoming. App. 708-09. For the most part, it asked each juror to pretend that the judge was a friend or relative from elsewhere (*e.g.*, Canada) and to tell him what the juror knew about Casellas. *E.g.*, App. 601, 709, 722, 727, 733, 764, 786. The court then asked a series of follow-up questions that probed the juror's recollections, the source of the juror's information, and whether the juror could put aside what he or she knew and decide the case solely on the evidence at trial. *E.g.*, App. 590-94, 637-39, 646-48, 717-19, 830-36. It emphasized that there were no right or wrong answers and that it was "okay" to have an opinion. *E.g.*, App. 598, 634, 695, 738, 754, 764, 880.

The court kept an open mind on whether it could seat an impartial jury. After interviewing the first five jurors, it believed that it would be "really hard to get a jury" and that jurors' "mere assurances" that they could set aside their previous opinions were "not enough." App. 605, 608; *see also* App. 610 (same;

the court was "going to have to make a call based on my overall impression"). The court interviewed a few more jurors, noted that it was an "uphill battle," and decided to "keep going for a while" before "ma[king] up [its] mind." App. 636. Finally, following its questioning of an additional seven jurors, the court concluded that "there is a sufficient possibility that we can get a jury" and denied the change-of-venue motion "at this time." App. 672-73. It stated, however, that "there's always an opportunity to bring the motion again should events warrant it." App. 673.

Casellas believed that any juror who knew about his murder conviction could not be fair, and he challenged all but two jurors for cause. App. 665, 704, 995. Eleven of the jurors were excused primarily because of language difficulties, App. 645, 696, 719-20, 726, 730, 755, 809, 863-64, 904, 920, and 14 were excused because of hardship or other reasons unrelated to the case, App. 747, 763, 781-82, 786, 795, 798, 800, 850. The court excused another 60 jurors, in many cases by common consent, because they had views about Casellas's guilt or admitted disqualifying opinions, *e.g.*, App. 603, 624, 629, 632-33, 724, 736, 807, 816, 840-41, 845, 873, 911, 935, 981; they knew too much about the murder or the state case, *e.g.*, App. 677, 691-92, 700, 808, 1007; or the court did not believe them, *e.g.*, App. 675-77, 680-81, 685, 687-88, 712, 716, 838, 878, 924, 966, 979, 1000, 1043. Of the 93 jurors who were able to complete the interview,

13

about 26 knew of the separate federal charges from outside sources, App. 588, 623-24, 626, 632, 648, 705, 714-15, 764, 766, 787, 865, 883, 902-03, 907, 910-11, 915, 931, 941, 961-62, 967, 996-97, 1010, 1019, 1028, 1032, 1034-35, and another 13 mentioned hearing something about false statements or lies, App. 602, 629, 634, 731, 734, 807, 816, 879, 889, 891-92, 905-06, 954, 1045, 1051. Approximately 48 jurors knew something about the carjacking, but fewer than one-third of them were aware of the details. App. 586, 588-89, 613, 626, 629, 632, 634, 697, 705, 715, 718, 723, 734, 742, 756, 764, 766, 788, 812, 816, 818-19, 825, 832, 840, 852-53, 858-59, 865, 881, 884, 888, 891-92, 900, 903, 907-08, 910-11, 923, 930, 942, 945-46, 961-63, 967, 972, 977, 984, 1006, 1016, 1018, 1034-35, 1044-45, 1051. Many jurors also expressed skepticism about what they read or heard in the media. *E.g.*, App. 631, 646-47, 714-15, 813, 934, 951, 984, 1013, 1020, 1028, 1041.

Near the end of the second day of voir dire, the court had qualified 35 jurors, and, after questioning them further to determine whether there were other bases for challenging them (*e.g.*, ties to law enforcement, involvement in civil or criminal cases, ability to follow the court's instructions), the court told the group to return on April 28 when the attorneys would select the final jury panel and the trial would begin. App. 1054-60, 1078. The court ordered the jurors not to read, watch, or listen to anything about the case nor discuss it "by

any means of communication." App. 1078; *see* also App. 1078-79 ("Right now you have blinders on and earmuffs on when it comes to anything related to this case."); App. 1079 ("There is no more important instruction I will give you.").

When the proceedings resumed on April 28, Casellas objected to the "entire process" and moved to strike the venire. App. 1087. He also asked for additional peremptory challenges. App. 1088-89. The court denied the motions. App. 1089, 1091. Although acknowledging that the jurors had heard about the well-publicized murder case, the court stated that it had pursued the subject of potential prejudice with "pointed" questions until it was satisfied that the juror should be either excused for cause or qualified. App. 1089.

B.    Standard Of Review

The decision to transfer venue is "within the sound discretion of the trial court and is reviewed for abuse of discretion." *United States v. Brandon*, 17 F.3d 409, 441 (1st Cir. 1994). A trial court's assessment of potential jurors' ability to be impartial may be set aside only for "manifest error." *United States v. Moreno Morales*, 815 F.2d 725, 733 (1st Cir. 1987); *see also United States v. Gonzalez-Soberal*, 109 F.3d 64, 69-70 (1st Cir. 1997) ("There are few aspects of a jury trial where [the Court] would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury.") (internal quotation marks and citation omitted). In addition, "[b]ecause

15

voir dire determinations 'rely largely on . . . immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire.'" *United States v. Brown*, 938 F.2d 1482, 1485 (1st Cir. 1991) (quoting *Rosales-López v. United States*, 451 U.S. 182, 189 (1981) (plurality)).

> C.    Casellas Was Tried Before A Panel Of Unbiased Jurors Capable Of Deciding The Case On The Evidence Presented In Court.

"[P]retrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the extreme case, however, "where extraordinary local prejudice will prevent a fair trial," a change of venue to a district other than where the crime was committed is proper. *Skilling v. United States*, 561 U.S. 358, 378 (2010). This Court has explained that pretrial publicity requires a change of venue in two circumstances: when the publicity is of such a nature that impartiality is impossible and prejudice must be presumed; and when voir dire discloses actual prejudice resulting from the publicity. *See*, *e.g.*, *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007). Casellas was not entitled to a change of venue under either standard.

1.    Casellas has failed to establish a presumption of prejudice.

A presumption of prejudice is reserved for the rare case where "pervasive pretrial publicity has inflamed passions in the host community past the breaking point." *Quiles-Olivo*, 684 F.3d at 182 (citations, internal quotation marks, and alteration omitted); *see also*, *e.g.*, *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (a court may presume prejudice only when the "trial atmosphere [is] utterly corrupted by press coverage"). To raise the presumption, a defendant must show that "(a) inflammatory publicity about a case has so saturated a community that it is almost impossible to draw an impartial jury from that community, or (b) so many jurors admit to a disqualifying prejudice that the trial court may legitimately doubt the avowals of impartiality made by the remaining jurors." *United States v. Rodriguez-Cardona*, 924 F.2d 1148, 1158 (1st Cir. 1991) (internal quotation marks and citation omitted).

The only decision in which the Supreme Court has presumed juror prejudice based solely on pretrial publicity is *Rideau v. Louisiana*, 373 U.S. 723 (1963), and that case turned on the unique circumstance that the defendant's uncounseled jailhouse confession to kidnapping and murder was repeatedly televised in a small community shortly before the trial. *Id.* at 723-27. In light of

the televised confession, the Court characterized the ensuing trial as a "kangaroo court proceeding[ ]" that violated due process. *Id.* at 726.[4]

Given its unique facts, *Rideau* does not establish a general rule that courts may presume bias among all potential jurors whenever a particular community is exposed to heavy and adverse media coverage of events related to a crime. Indeed, the Court has yet to find a parallel to *Rideau* in the 50 years since it was decided. Instead, in cases involving claims of unfair prejudice from pretrial publicity, including those cited by Casellas in support of his presumption of prejudice argument, the Court has reviewed the voir dire to determine whether there was actual prejudice. *See Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *Murphy*, 421 U.S. at 800-02; *Patton v. Yount*, 467 U.S. 1025, 1038-40 (1984).

Similarly, this Court has never reversed a conviction on the ground that pretrial publicity so infected a community that it could not be addressed through voir dire, including in cases involving high-profile defendants or sensational

---

[4] In *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court presumed prejudice and reversed the convictions because the media interfered with the courtroom proceedings themselves. *See Murphy v. Florida*, 421 U.S. 794, 799 (1975) ("The proceedings in [*Estes* and *Sheppard*] were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob."). Casellas does not claim that the media interfered with the federal courtroom proceedings.

criminal activity.[5] In *Misla-Aldarondo*, for example, the defendant, a former Speaker of the Puerto Rico House of Representatives, was charged with extortion, money laundering, and witness tampering, and the case, as well as unrelated charges against him for sexual assault on a minor, generated extensive publicity. *Misla-Aldarondo*, 478 F.3d at 57-59 (describing pretrial publicity, including posters put up throughout San Juan with defendant's photograph and over 180 articles). Despite the prominence of the defendant and the inflammatory publicity, this Court held that the district court did not abuse its discretion in denying the motion for a change of venue, "especially given the success of the voir dire." *Id.* at 59.

In *Moreno Morales*, the police officer defendants were charged with murdering members of the Puerto Rico independence movement, and the political overtones of the case led to televised hearings and "almost universal" public exposure of "the details and personalities" of the case. *Moreno Morales,* 815 F.2d at 729-30. On appeal, defendants challenged the district court's denial

---

[5] In *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), the Court reversed a conviction based on the adverse publicity generated by a Congressional hearing that took place shortly before trial. In ruling that the district court abused its discretion in denying the defendant's motion for a continuance, the Court relied on its "supervisory power for 'establishing and maintaining civilized standards of procedure and evidence' in the federal courts." *Moreno Morales*, 815 F.2d at 738 (quoting *Delaney*, 199 F.2d at 113).

of their second motion for a continuance (they did not seek a change of venue), claiming that public attention had escalated as a result of the recent gubernatorial election. The Court acknowledged that the case "involv[ed] a publicity issue of unusual seriousness, presenting as it did charges of cold-blooded murder and police corruption that became *causes celebres* throughout Puerto Rico." *Id.* at 734. It nonetheless found no basis to presume prejudice on the part of the seated jurors. *Id.* at 734-37; *see also id.* at 735 (stating that it could not "conclude from the approximately one-quarter of the venire here who admitted to believing in appellants' guilt that the community as a whole was so prejudiced against defendants by inflammatory pretrial publicity as to call into question the seated jurors' assertions of impartiality"). And, most recently, this Court concluded that the defendant charged in connection with the Boston Marathon bombing "ha[d] not demonstrated a clear and indisputable right to [mandamus] relief based on a presumption of prejudice from pretrial publicity." *In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015).

The same result is warranted here. To be sure, as the government acknowledged below, the pretrial publicity surrounding the state murder case was both "massive" and "sensational."[6] App. 409, 411. But, as the government

---

[6] Contrary to Casellas's contention, however, the government did not concede that a presumption of prejudice should apply. While it agreed that Casellas had made a "prima facie showing" of the pervasive coverage of the murder case,

also explained, the nature and extent of the media coverage tell "only half the story." App. 409. That is so because unfavorable publicity and jurors' knowledge of a defendant's prior convictions are not dispositive of whether the presumption applies. *See Murphy*, 421 U.S. at 799 (*Rideau*, *Estes*, and *Sheppard* "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process"); *United States v. Angiulo*, 897 F.2d 1169, 1182 (1st Cir. 1990) ("Mere knowledge or awareness of a defendant's past, however, is not sufficient to presume prejudice."); *see also*, *e.g.*, *Skilling*, 561 U.S. at 381; *In re Tsarnaev*, 780 F.3d at 25, 28; *Moreno Morales*, 815 F.2d at 734. "More must be shown, such as the actual existence of a present predisposition against defendants for the crimes currently charged." *Angiulo*, 897 F.2d at 1182.

Casellas has not made that showing. The federal case did not generate the same type of attention as the state case did, and the articles mentioning the federal case were factual in nature. *See* App. 340-41, 344-48, *see also*, *e.g.*, *In re Tsarnaev*, 780 F.3d at 22 (emphasizing factual nature of reporting in determining

---

App. 669, it nonetheless believed that the court should proceed with voir dire to see if it could identify jurors who could put aside what they had learned about Casellas, App. 409-15.

whether there is a presumption of prejudice); *Misla-Aldarondo*, 478 F.3d at 58 (same). The jurors' responses during voir dire reflected the difference in coverage between the two cases: while almost all the jurors were aware of the murder case, fewer than 30% of the jurors who were able to complete voir dire knew about the federal charges. And, even if the jurors assumed that the cases were related, the discrete federal charges were easy to distinguish. Nor did Casellas's murder conviction presuppose that he made the specific statements charged in the federal case, that the statements were material, or that Casellas lied. Finally, unlike the situation in *Rideau*, where the petitioner's confession to murder and kidnapping was aired shortly before trial, Casellas "steadfastly maintained his innocence." Add. 11; *see also United States v. Chagra*, 669 F.2d 241, 251-52 n.11 (5th Cir. 1982) ("A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well founded.") (cited in *Skilling*, 561 U.S. at 383), *abrogated in part on other grounds by Garrett v. United States*, 471 U.S. 773, 105 (1985).

In pressing his claim, Casellas repeatedly refers (Br. 21-22, 34-35, 40-41, 47) to the so-called "anomaly" between the district court's ruling that precluded admission of evidence of the murder as unfairly prejudicial and a finding that jurors who were aware of the same information could still be fair. The critical

question in determining whether jurors are impartial is not whether they have acquired information outside of court, but whether they can put aside any preconceived notions and "render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723; *see also* page 29 *infra*. Thus, even in cases in which a defendant's inadmissible confession has been publicized, the Supreme Court has not presumed prejudice but instead has considered whether the reports caused actual prejudice to a defendant's fair trial rights. *See Mu'Min v. Virginia*, 500 U.S. 415, 418 (1991) (holding that the jury was impartial despite damaging pretrial publicity, including "indications that Mu'Min had confessed to killing" the victim); *Yount*, 467 U.S. at 1029 (refusing to presume prejudice even though "publicity revealed Yount's prior conviction for murder, his confession, and his prior plea of temporary insanity, information not admitted into evidence at trial"); *see also United States v. Drougas*, 748 F.2d 8, 30 (1st Cir. 1984) (rejecting defendants' claim that media coverage that included reports about the discovery of evidence that was later deemed inadmissible at trial was inherently prejudicial because jurors may have "subconscious preconceptions"). *Marshall v. United States*, 360 U.S. 310 (1959), also does not help Casellas (Br. 29) because the case involved neither pretrial publicity nor a presumption of prejudice. Rather, the Court relied on its supervisory power to hold that jurors' exposure to newspaper articles during the trial prejudiced the defendant. *Id.* at 312-13; *see United States*

23

*v. Keating*, 147 F.3d 895, 899 (9th Cir. 1998) ("juror exposure to extrinsic evidence during trial implicates wholly different concerns than those at issue in pretrial knowledge cases").

There was also no reason for the district court to presume prejudice because it would be unable to identify jurors whose "avowals of impartiality," *Angiulo*, 897 F.2d at 1181-82, were insincere. In fact, the district court dismissed at least 14 jurors who professed to be impartial but whom the court did not believe. *See* page 13 *supra*. This Court should not question the district court's credibility findings simply because the pretrial publicity exceeded a certain threshold. *See In re Tsarnaev*, 780 F.3d at 23 (stating that "it is the judge who is best situated to determine competency to service impartially" and that "[t]his admonition undercuts petitioner's key argument that poll percentages and jury questionnaire answers decide the question of a presumption of prejudice") (internal quotation marks and citation omitted).[7]

---

[7] Casellas also relies (Br. 31-32) on social science research to argue that voir dire and instructions are ineffective to counter the effects of negative pretrial publicity. Whatever the merits of those researchers' views, the law remains settled that except in rare cases, voir dire, not the opinions of social scientists, is the means by which courts determine whether a jury is impartial. *See Yount*, 467 U.S. at 1038 & n.13 ("[V]oir dire has long been recognized as an effective method of rooting out such [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner.") (internal quotation marks and citation omitted).

Casellas argues (Br. 32-37), as he did below, that *Skilling* supports his claim because the factors the Supreme Court considered in distinguishing petitioner's case from *Rideau*, *Estes*, and *Sheppard* favor applying a presumption of juror prejudice here. As an initial matter, *Skilling* cannot be read as holding that the presence of these factors alone means that prejudice should be presumed. *See Skilling*, 561 U.S. at 439 (noting that inquiry as to whether prejudice should be presumed is "necessarily case specific"); *Murphy*, 421 U.S. at 799 (in deciding whether a presumption of prejudice is warranted, court must examine "any indications in the totality of circumstances that . . . trial was not fundamentally fair"). In any event, the district court correctly rejected Casellas's contention. Given the population of Puerto Rico – "more than 3 million people," according to the district court – the potential for prejudice among the jurors ultimately selected was lessened. *See* Add. 13.[8] Unlike the situation in

---

[8] Casellas suggests (Br. 34-35) that the district judge was not in a position to judge the effect of the publicity on the jury pool because he did not sit in Puerto Rico. Citing a 1987 case, however, the district court assumed that "Puerto Rico is a 'compact' and 'insular community . . . highly susceptible to the impact of local media.'" Add. 13 (quoting *Moreno Morales*, 815 F.2d at 734); *see also* App. 404. Because the public now receives its news via cable stations, the internet, social media, and the like, the *Moreno Morales* description is probably less true today than it was in 1987. *See* App. 26 (Casellas acknowledges in his change-of-venue motion that "[i]n Puerto Rico, social media like Facebook, YouTube, Instagram and Twitter, among others, have a heavy and active presence").

*Rideau*, "the pretrial publicity did not contain a 'confession or other blatantly prejudicial information' that jurors [could not] be expected to set aside." Add. 13 (quoting *Skilling*, 561 U.S. at 382). Although the length of time between the pretrial publicity and the federal trial was relatively short, Casellas never asked for a continuance and even opposed the government's two-month request. DE 44.

Casellas further contends (Br. 36-37) that, unlike in *Skilling*, the jury's bias was reflected in its verdict. It is true that the jury convicted him on two counts that the district court later dismissed pursuant to Fed. R. Crim. P. 29(b), but there is a more likely explanation for the discrepancy than bias from pretrial publicity. Based on its scrutiny of Agent Diaz's testimony, the district court found that the witness did not explicitly state that Casellas made the statements at issue, and it rejected the government's argument that the jury could have inferred the missing facts.[9] App. 1859-61, 1868-70. Casellas, however, did not make the same argument to the jury; instead, he argued that the government did not prove that Casellas had lied. App. 1804-1813, 1819-22. Without some direction from the defense to examine Agent Diaz's testimony word-for-word,

---

[9] Even the district court first denied Casellas's Rule 29 motion as to Count 2 and only later changed its mind. App. 1862-70.

the jury could not have been expected to parse the testimony, as the district court did, to determine whether Casellas even made the charged statements.

2.    A presumption of prejudice may be rebutted.

Even if this Court concludes that Casellas has raised a presumption of prejudice, that presumption is not irrebutable. Although this Court has not decided the issue, it has cited with approval the Eleventh Circuit's statement that "*Rideau* may allow the presumption of prejudice to be rebutted by a showing of impartiality in the voir dire testimony." *Moreno Morales*, 815 F.2d at 739 n.18 (citing *Coleman v. Kemp*, 778 F.2d 1487, 1541 n.25 (11th Cir. 1985)).

Casellas's claim that reversal is automatic in cases of exposure to high levels of pretrial publicity conflicts with the Supreme Court's "structural error" doctrine. A rule of "automatic reversal," without an inquiry into actual prejudice, is appropriate "only in a very limited class of cases." *Neder v. United States*, 527 U.S. 1, 8 (1999) (internal quotation marks and citations omitted). That category is characterized by cases in which the effect of a serious error cannot be ascertained or isolated, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-50 & n.4 (2006), and the Supreme Court has identified only a handful of defects that qualify. *See Gideon v. Wainwright*, 372 U.S. 335 (1963) (total deprivation of the right to counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927) (a biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254 (1986) (the race-based exclusion of

grand jurors); *Sullivan v. Louisiana*, 508 U.S. 275 (1993) (an incorrect reasonable doubt instruction); *Gonzalez-Lopez*, 548 U.S. at 149 (denial of the right to be represented by retained counsel of choice).

Exposure of potential jurors to intense pretrial publicity does not qualify as a "structural error" under this framework because the effects of that error can be ascertained. That is the purpose of voir dire – "to *ascertain* whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Connors v. United States*, 158 U.S. 408, 413 (1895) (emphasis added). Using the many tools at its disposal, the district court can insulate the trial from the improper influence of media coverage by ensuring – as the district court did in this case through its individual voir dire – that individuals actually selected for the jury lack bias from the problematic publicity.[10]

3.    Casellas has not shown actual prejudice.

Casellas also has failed to establish that any juror who decided his case was actually biased. To prevail on a claim of actual prejudice, Casellas must

---

[10] Casellas also argues (Br. 38) that, even if the voir dire could have identified jurors who did not know that Casellas was convicted of murdering his wife, that panel of "extreme[ly] reclusive[ ]" jurors would not have constituted a "representative cross-section of the community." There is no merit to that claim because its premise – that an unbiased juror must know nothing about the prior case – is wrong. *See* page 29 *infra*.

show that "the contagious seeds of partiality had taken root within the jury's mind," and he must offer something more than "bald speculation." *Quiles-Olivo*, 684 F.3d at 183 (internal quotation marks and citation omitted); *see also Angiulo*, 897 F.2d at 1183 (to justify disregarding the jurors' assurances of impartiality, "there must be solid evidence of distinct bias"). A potential juror's exposure to publicity, knowledge of the facts, and even "preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723; *see also*, *e.g.*, *Skilling*, 561 U.S. at 381 ("Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*.") (emphasis in original); *In re Tsarnaev*, 780 F.3d at 28 (same). Instead, the analysis "hinges on whether the jurors . . . were incapable of setting aside" their "actual partiality." *Quiles-Olivo*, at 183. "A guiding beacon in this analysis is the trial judge," who is best situated to make the assessment through the "question-and-answer process" of voir dire." *Ibid.*; *see also Skilling*, 561 U.S. at 396 ("In reviewing claims of [juror bias], the deference due to district courts is at its pinnacle.").

The district court's selection process resulted in the seating of a fair and impartial jury. As described above, after determining that most of the jurors had heard something about Casellas, the court interviewed each juror individually to inquire into and prevent juror bias. It asked virtually every potential juror to

describe in detail his exposure to the publicity surrounding Casellas, and it probed the juror's ability to put aside any preconceived opinions and decide the federal case solely on the evidence. *See* App. 970 ("Just so the record is clear, . . . I'm going well beyond just saying could you follow my instructions. I'm leaning in the early inquiries about feelings and so forth."). The court went to great lengths to make each juror feel comfortable and truthfully respond to the questions, *e.g.*, App. 590, 811, 962, 971, 988, and it assured the jurors that there were no "right or wrong" answers to its questions, *e.g.*, App. 565, 598, 601, 617, 629, 634, 695, 738, 754, 764, 880; *see Skilling*, 561 U.S. at 389. It struck jurors whose credibility it questioned, *see* page 13 *supra*, and it gave Casellas the benefit of "close calls." *See* App. 680, 687, 952-53, 966, 1039.

Casellas's criticisms of the jury selection process are unavailing. He faults the court for not using a questionnaire, but he does not explain why a questionnaire, not completed under oath, would elicit "more honest, considered, and self-aware responses," Br. 48, than a face-to-face interview.[11]

---

[11] Casellas's proposed jury questionnaire inappropriately incorporated references to the murder and related facts within the question. The court elicited the same information during voir dire, albeit in a more open-ended fashion. *See* App. 419 (Casellas agreed at pretrial conference that questions that ask what the juror knows and do not mention the word "murder" "would achieve the same objective"). The only question on Casellas's proposed jury questionnaire that the court did not explicitly cover was whether the juror knew about Casellas's

*See Mu'Min*, 500 U.S. at 425 (observing that written answers to questionnaires "would not give counsel or the court any exposure to the demeanor of the juror in the course of answering the content questions"). In fact, a written questionnaire may have been particularly ill-suited as a screening device in this case because prospective jurors may have been unable to fully express their views in English. *See* App. 417-420 (discussing jurors' knowledge of English); *cf. United States v. Rivera-Rosario*, 300 F.3d 1, 20 (1st Cir. 2002) (recognizing that "most jurors . . . in Puerto Rico may be more comfortable speaking in Spanish than in English"). In any event, "[j]ury selection . . . is particularly within the province of the trial judge." *Skilling*, 561 U.S. at 386.

Casellas also contends (Br. 48-49) that the "relatively brief," two-day voir dire was insufficient to determine whether a juror was biased. He has not identified any additional questions that would have elicited more telling responses, and the length of voir dire, by itself, is insignificant. *See Skilling*, 561 U.S. at 387-89 (rejecting claim that five-hour jury selection was insufficient); *see also Mu'Min*, 500 U.S. at 417 (upholding the sufficiency of a voir dire in which the trial court asked whether the prospective jurors had been exposed to any publicity, whether they had formed any opinion based on the publicity, and

bail status and whether the juror believed Casellas was entitled to bail. App. 388-89.

whether they could set aside any such opinion and determine the defendant's guilt or innocence based solely on the evidence presented at trial). Casellas's contention is especially misplaced because he had the opportunity to suggest questions, *e.g.*, App. 597-600, 640, 648-49, 711, 716, 827, 886-87, 900-01, and, in response to the court's inquiry, frequently had nothing to add, *e.g.*, App. 604, 615, 630, 703, 764, 813, 855, 867, 890.

In a related claim, Casellas contends (Br. 39-47) that the district court abused its discretion in denying his for-cause challenges to nine of the 12 seated jurors. Although he pays lip service to the Supreme Court's admonition that "juror impartiality . . . does not require ignorance," *Skilling*, 561 U.S. at 381, his claims of error are premised, in whole or in large part, on the assumption that knowledge of the murder conviction was enough to disqualify the juror. As discussed above, his premise is wrong and his contentions are meritless.

Casellas argues that Jurors 27, 36, 56, 86, 88, and 93 should have been disqualified solely because they knew about the murder case. He fails to mention, however, that each of those jurors proclaimed their impartiality. *See* App. 706-07 (Juror 27 stated that he had no opinion about Casellas's guilt and could put aside his knowledge of the conviction and decide the federal case solely on the evidence); App. 738 (Juror 36 understood that the federal case was "different than the first one" and that the juror did not "feel bias" with Casellas);

App. 866-67 (Juror 56 stated that the federal case is "different" from the murder trial and that he would judge it with an "open mind" based on the evidence); App. 956-57 (Juror 86 knew little about the case, understood that "everyone is innocent until something different is proved," and could decide the federal case "on the evidence and the law"); App. 777-79 (Juror 88 did not follow the news or have an opinion about Casellas's guilt); App. 984-85 (Juror 93 stated that he had no opinion about whether Casellas was guilty because he hadn't seen the evidence and could decide the case solely on the evidence). Casellas also believed Jurors 88 and 93 were not candid, but the district court credited their responses, App. 780-81, 987, and this Court should not "second-guess" the district court's appraisals. *Skilling*, 561 U.S. at 386.

As to the other jurors, Casellas repeats his claim that knowledge of the state case is disqualifying and also emphasizes (Br. 41-47) certain comments that, in his view, establish actual bias. That effort, however, relies on a selective and incomplete characterization of the record and fails to acknowledge that jurors "cannot be expected invariably to express themselves carefully or even consistently." *Skilling*, 561 U.S. at 397 (internal quotations marks and citation omitted). An examination of the jurors' responses, when viewed as a whole, reveals that the district court did not commit "manifest error," *id.* at 396, in determining that the challenged jurors were impartial.

Juror 5 "persuade[d]" the court that she was "being honest when she said she wouldn't have any difficulty sitting on the case, and that everybody should be judged fairly." App. 678. Although "it bothered" the court that she knew that Casellas "[threw] something into the bushes," App. 679, she "emphasized she hadn't seen the evidence," and she had no opinion as a result, App. 593, 678-79.

Juror 9 did not know "the details of this story regarding [Casellas's] other case," could not judge Casellas's guilt on the murder charge because she "didn't hear or read the people that went there to testify," and stated that, as jurors in the federal case, "we need to be open to hear the truth, not what the news or anybody else said." App. 618. She further explained that she had no feelings about the case without knowing Casellas's "story." App. 618-69. Casellas admitted that "she [gave] the right answers," but challenged her for cause based on her use of burden-shifting language. App. 681. The district court believed that she understood that the government had the burden to prove its case and that she would follow the court's instruction in that regard. App. 682.

In challenging Juror 89, Casellas relies on her statement that she "[didn't] know" whether she could put aside her knowledge of Casellas's guilt in the state case in deciding the federal case. App. 968. But she subsequently explained that she could not have an opinion before the evidence was presented and that she

34

could decide the federal case based on the evidence at trial. App. 968-69. The district court credited her "straight answers." App. 970.

Casellas's complaint that the district court should have granted him additional peremptory challenges also rings hollow. Casellas agreed that the parties would exercise their peremptory challenges from a group of 38 jurors, App. 554-55, and he did not formally request additional peremptory challenges until the court had completed its voir dire and the jury pool had been excused. App. 1088-89.[12] To the extent that his argument is "a roundabout attempt to challenge [the court's] for-cause denials," it fails for the reasons stated above. *Misla-Aldarondo*, 478 F.3d at 61.

In short, Casellas has not shown that the jury that heard his case was biased. Although the jurors knew about the state case, none harbored an opinion about Casellas's guilt on the federal charges, and they all assured the court that they could decide the case solely on the evidence. The court's individual voir dire, along with its readiness to excuse those jurors who knew too many details

---

[12] Near the end of the second day of voir dire and after the district court had denied his challenges for cause, Casellas stated that "I'm going to be asking for about 30 peremptories" and added that "[m]aybe the Government will give me theirs." App. 975. The court's response – "They probably will," App. 975 – indicates that it did not take Casellas's request as serious. The court ended up picking a group of 35 rather than 38 prospective jurors, and Casellas did not object to the reduced size of the group. App. 1054, 1076-77.

about Casellas or whose assurances of impartiality were not credible, ensured that the selected jurors could judge the case fairly.[13] Accordingly, the district court did not abuse its discretion in denying Casellas's motions for a change of venue and his challenges for cause.

## II.    The District Court Correctly Denied The Motion To Suppress Evidence Seized From Casellas's Car.

Casellas contends (Br. 50-56) that he implicitly revoked his consent to search his vehicle when the agents failed to promptly conduct the search and return the vehicle and that the subsequent search warrant affidavit lacks probable cause when the results of the consent search are deleted from the affidavit. Those claims lack merit.

### A.    Background

On June 25, 2012, Agent Diaz asked Casellas whether he would consent to a search of the van involved in the carjacking. App. 462-63. Casellas agreed and signed a written consent form. App. 463-64, 1871. The van had remained in FBI custody since the date of the reported crime, and Agent Diaz notified the head of the FBI's evidence team, Agent Ruben Marchand, that he had obtained Casellas's consent for the search. App. 465-67. On July 9, Agent Diaz submitted

---

[13] For the same reasons, if the Court finds that Casellas has raised a presumption of prejudice, the government has rebutted it.

the required written request for the forensic examination to Agent Marchand; on July 11, Agent Marchand scheduled the search for July 16; and the search took place on that date as planned. App. 511-16. Agent Marchand could not search the vehicle any sooner because other matters had precedence. App. 514-15.

Casellas telephoned Agent Gregory Gruel, the Task Force supervisor, approximately four times to check on the status of the search. App. 494-96. The first call was about four days after Casellas had consented to the search, and he asked if the FBI could return the car because insurance adjustors needed to inspect it. App. 495-97. Agent Gruel explained that he could not return the car because it had not yet been searched but that the insurance adjustors could inspect the car at the FBI garage. App. 497. Agent Gruel also told Casellas to call back in a week or so to check on the status of the search. App. 497-98. The substance of Casellas's subsequent calls was "basically the same": Casellas asked "Have you done the search, can I have my car back?" and Agent Gruel "advised no, we hadn't." App. 498. Casellas never revoked his consent nor asked for the car's return in light of the delay. App. 498.

Agent Diaz obtained a search warrant for the vehicle on August 6. App. 472. The affidavit stated that the FBI was investigating the carjacking and that Casellas had reported that "he was intercepted by individuals who shot at him

and his vehicle, and took his vehicle through the use of force and violence." App. 1874. Based on the FBI's examination of the car pursuant to Casellas's consent, Agent Diaz believed that bullets fired at the victim and the car might be found behind the dashboard and other hard-to-reach places. App. 1875. He also believed that the personal items found in the car might contain DNA that could help identify the perpetrators. App. 1874-75. In requesting a warrant for firearms, ammunition, casings, and personal items, Agent Diaz stated that there was probable cause to believe that violations of 18 U.S.C. §§ 2119 and 924(c)(1)(A) had taken place. App. 1875.

Casellas moved to suppress the evidence seized during the two searches, and the court denied the motion. DE 72; Add. 18-22. As to the consent search, the court stated that Casellas did not impose any time limit on the search and that his calls to Agent Gruel "reaffirmed" his consent. Add. 19. The court also found that the FBI conducted the search within a reasonable time and that a reasonable person would have understood that the search "would not be conducted momentarily, but would take some time." Add. 19. The court also rejected Casellas's argument that the changed circumstances – "namely, the FBI's alleged suspicions of the defendant after his wife was killed" – did not render the July 16 search outside the scope of Casellas's consent. Add. 20.

As to the warrant-authorized search, the court concluded that the affidavit established probable cause. Add. 21-22.

B.    Standard Of Review

This Court reviews the district court's findings of fact for clear error and its legal conclusions *de novo. United States v. Fermin*, 771 F.3d 71, 76 (1st Cir. 2014). A factual finding is clearly erroneous "only if, after considering all the evidence, [the Court is] left with a definite and firm conviction that a mistake has been made." *United States v. Brown*, 621 F.3d 48, 55 (1st Cir. 2010) (quotation marks and citation omitted). Accordingly, "[a] district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous." *United States v. Weidul*, 325 F.3d 50, 53 (1st Cir. 2003).

Whether a defendant withdrew his consent is a question of fact. *United States v. $304,980 in Currency*, 732 F.3d 812, 820 (7th Cir. 2013).

C.    Casellas Did Not Withdraw His Consent To Search.

A search based on consent is a reasonable search within the meaning of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Although an individual may, of course, withdraw his consent, the test is an objective one – whether a reasonable officer would have understood the exchange as a revocation of consent. *Cf. United States v. Marshall*, 348 F.3d 281, 287 (1st Cir. 2003). Courts therefore have required that defendants act

39

unequivocally to communicate their intent to revoke their prior consent. *See, e.g.*, *$304,980 in Currency*, 732 F.3d at 820-21; *United States v. Parker*, 412 F.3d 1000, 1002 (8th Cir. 2005); *United States v. Alfaro*, 935 F.2d 64, 67 (5th Cir. 1991).

The district court did not clearly err by concluding that a reasonable officer would not have understood that Casellas withdrew his consent when he inquired about the return of his car. As the court explained, Casellas's initial consent was unlimited in duration, and his telephone calls to Agent Gruel did not suggest, let alone unequivocally convey, that he was withdrawing his consent. The purpose of Casellas's first phone call was to determine whether the car could be returned for the sake of an insurance inspection, and it was Agent Gruel who recommended that Casellas call again to check on the status of the search. Although is true that Casellas requested the car's return on several occasions, that request could not be reasonably interpreted as a change of heart, but instead as Casellas's interest in scheduling the insurance inspection once the FBI completed its own inspection. Far from indicating a revocation of consent, Casellas's calls showed that he expected that the search still would take place.

There is no support in the record for Casellas's claim that he merely "acquiesce[d] to a claim of unlawful authority" (Br. 53) when he did not demand the car's return. Nor did the number of calls by itself signify that Casellas intended to revoke his consent, as Casellas argues. *Cf. United States v. Brown*, 345

F.3d 574, 581 & n.3 (8th Cir. 2003) (stating that "[a]n expression of impatience does not establish an intent to revoke consent" and quoting Phaedrus for the maxim "[e]veryone ought to bear patiently the results of his own conduct").

Finally, Casellas claims (Br. 54) that the agents could not reasonably believe that Casellas's consent was still valid when they conducted the search two days after Casellas's wife was murdered and when he was already a suspect. Casellas is wrong on both the facts and the law. Agent Marchand explained that he scheduled the search before the murder of Casellas's wife, App. 513-14, and nothing in the record contradicts that testimony. Agent Diaz also testified that the FBI was still investigating the carjacking at the time of the search and that the murder did not change the investigation's scope. App. 469-70. And, even if the murder affected the agents' subjective beliefs about the carjacking, those views had no bearing on whether there was an objective basis to believe that Casellas had revoked his consent. *Cf. United States v. Garcia*, 604 F.3d 186, 190 (5th Cir. 2010) ("The scope of consent is determined by objective reasonableness – what a reasonable person would have understood from the exchange between the officer and searched party-and not the subjective intent of the parties.") (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Nor is a consent to search terminated "merely by a worsening of the consenting party's position." Wayne R. LaFave, 4 *Search and Seizure* § 8.1(c) (5th ed.).

41

D.    The District Court Correctly Concluded That The Search Conducted Pursuant To The Search Warrant Was Lawful.

Casellas's sole challenge (Br. 55-56) to the search conducted pursuant to the warrant is that the affidavit does not establish probable cause when the illegal observations from the consent search are excised. Because the consent search was lawful, that claim is meritless.

Even if the search warrant affidavit were purged of the information that was derived from the consent search, the remaining paragraphs contain sufficient facts to support probable cause. The untainted information indicated that the vehicle was involved in a carjacking and that the armed carjackers had shot at the vehicle and at Casellas, hit Casellas in the right arm, and taken the vehicle. App. 1874. Taken together, that information proved that it was more likely than not that the car contained casings, projectiles, and DNA of the perpetrators that were evidence of the carjacking and firearms offense.[14]

Finally, contrary to Casellas's claim (Br. 56), any error in admitting the evidence seized pursuant to the warrant was harmless beyond a reasonable doubt. Other legitimate evidence, including Casellas's incredible story and the

---

[14] To determine whether evidence is admissible under the independent source doctrine, this Court also considers whether the police would have sought the warrant even if they had not known the results of the illegal search. *See, e.g.*, *United States v. Jadlowe*, 628 F.3d 1, 9 (1st Cir. 2010). Casellas does not argue that this prong of the independent source doctrine was not met.

physical evidence that refuted it, "unquestionably assured the jury's verdict of conviction." *United States v. Innamorati*, 996 F.2d 456, 475 (1st Cir. 1993); *see* pages 5-6 *supra* (summarizing evidence). Even the forensic evidence was not based solely on the second search because some of the casings and projectiles that were linked to the firearms found at Casellas's house were seized at the scene of the alleged carjacking. *See* App. 1617, 1621-25.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

WIFREDO A. FERRER
United States Attorney
Southern District of Florida

LESLIE R. CALDWELL
Assistant Attorney General
Criminal Division

MICHAEL E. GILFARB
ANDY R. CAMACHO
Assistant U.S. Attorneys
Southern District of Florida

SUNG-HEE SUH
Deputy Assistant Attorney General
Criminal Division

s/ Kirby A. Heller
KIRBY A. HELLER
Attorney
Appellate Section, Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Room 1264
Washington, DC  20530
(202) 307-0085
kirby.heller@usdoj.gov

April 29, 2015

CERTIFICATE OF COMPLIANCE WITH
TYPEFACE AND LENGTH LIMITATIONS

This brief has been prepared using a 14-point, proportionally spaced typeface: Microsoft Office Word 2013, Calisto MT.

Exclusive of the table of contents, table of citations, certificate of service, and signature block, the brief contains 10,277 words and complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b)(i).

I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions. If the Court so directs, I will provide a copy of the word or line print-out.


s/ Kirby A. Heller
KIRBY A. HELLER
Attorney
U.S. Department of Justice

CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2015, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following counsel of record are registered as ECF filers and that they will be served by the CM/ECF system: Martin G. Weinberg and Kimberly Homan, 20 Park Plaza, Suite 1000, Boston, MA 02116; Francisco Rebollo-Casalduc, P.O. Box 195571, San Juan, Puerto Rico 00919.

s/ Kirby A. Heller
KIRBY A. HELLER
Attorney
U.S. Department of Justice