No. 14-1933

---

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

———————————

**UNITED STATES OF AMERICA**
*Appellee*

**v.**

**PABLO CASELLAS-TORO,**
*Defendant- Appellant*

———————————

**On Appeal from a Judgment of Conviction in the
United States District Court for the District of Puerto Rico**

———————————

**REPLY BRIEF OF APPELLANT PABLO CASELLAS-TORO**

———————————

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-8616 (Telephone)**
**(617) 338-9538 (Fax)**
**homanlaw@aol.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

**FRANCISCO REBOLLO-
CASALDUC**
**P.O. Box 195571**
**San Juan, Puerto Rico 00919**
**(787) 765-0505 (Telephone)**
**rebollolaw@gmail.com**

# TABLE OF CONTENTS

I.    THE DENIAL OF CASELLAS' MOTION FOR CHANGE OF
      VENUE DENIED HIM A FAIR TRIAL BY AN IMPARTIAL
      JURY IN VIOLATION OF THE FIFTH AND SIXTH
      AMENDMENTS TO THE UNITED STATES CONSTITUTION
      AND FED. R. CRIM. P. 21(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

      A.    This Case Required A Presumption of Prejudice . . . . . . . . .    1

      B.    *Skilling* Supports Applying a Presumption of Prejudice . . . .    13

      C.    The Presumption of Prejudice Cannot Be Rebutted . . . . . . .    16

II.   THE JURY SELECTION PROCEDURES ADOPTED BY
      THE DISTRICT COURT DID NOT SUFFICE TO ENSURE
      THE SELECTION OF AN IMPARTIAL JURY AS
      GUARANTEED BY THE SIXTH AMENDMENT OR TO
      SAFEGUARD THE PRESUMPTION OF INNOCENCE . . . . . . .    19

      A.    The Jury Selection Procedures Adopted by the District
            Court Were Insufficient to Adequately Test Jurors'
            Assurances That They Could Put Aside Their Knowledge
            of Casellas' Conviction for Murdering his Wife . . . . . . . . .    19

      B.    The District Court's Denial of Challenges for Cause of
            Jurors Who Knew That Casellas Had Been Convicted of
            Murdering his Wife Denied Casellas His Sixth Amendment
            Right to Trial By an Impartial Jury . . . . . . . . . . . . . . . . . . . .    21

III.  THE DISTRICT COURT ERRED IN DENYING CASELLAS'
      MOTION TO SUPPRESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

## TABLE OF AUTHORITIES

### Cases

*Bumper v. North Carolina*, 391 U.S. 543 (1968) . . . . . . . . . . . . . . . . . . 24

*Chapman v. California*, 386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . . 18

*Florida v. Jimeno*, 500 U.S. 248 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Mu'Min v. Virginia*, 500 U.S. 415 (1991) . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

*Murphy v. Florida*, 421 U.S. 794 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 13

*Owens v. United States*, 483 F.3d 48 (1st Cir. 2007) . . . . . . . . . . . . . . . . 18

*Patton v. Yount*, 467 U.S. 1025 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Rideau v. Louisiana*, 373 U.S. 723 (1963) . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 16, 17

*Skilling v. United States*, 561 U.S. 358 (2010) . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 8, 12, 13, 14

*Sullivan v. Louisiana,* 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . 18

*Tumey v. Ohio*, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. $340,980 in United States Currency*,
    732 F.3d 812 (7th Cir.  2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Agosto-Vega*, 617 F.3d 541 (1st Cir. 2010) . . . . . . . . . . 18

*United States v. Alfaro*, 935 F.2d 64  (5th Cir. 1991) . . . . . . . . . . . . . . . . 23

*United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990) . . . . . . . . . . . . . . 10, 12

*United States v. Blair*, 886 F.2d 477 (1st Cir. 1989) . . . . . . . . . . . . . . . . .   16

*United States v. Brown*, 345 F.3d 574 (8th Cir.  2003) . . . . . . . . . . . . . . .   24

*United States v. Dessesaure*, 429 F.3d 359 (1st Cir. 2005) . . . . . . . . . . . .   24

*United States v. Drougas*, 748 F.2d 8 (1st Cir. 1984) . . . . . . . . . . . . . . . .   11

*United States v. Gonzalez,* 214 F.3d 1109 (9th Cir.2000) . . . . . . . . . . . . .   21

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) . . . . . . . . . . . . . .   17, 18

*United States v. Lanham*, 617 F.3d 873 (6th Cir. 2010) . . . . . . . . . . . . . .   22

*United States v. Marshall*, 348 F.3d 281 (1st Cir. 2003) . . . . . . . . . . . . . .   23

*United States v. Misla-Aldorando*, 478 F.3d 52 (1st Cir. 2007) . . . . . . . . . .5, 12, 21

*United States v. Mitchell*, 690 F.3d 137 (3d Cir. 2012) . . . . . . . . . . . . . . .   21

*United States v. Moreno Morales*, 815 F.2d 725 (1st Cir. 1987) . . . . . . . . .6, 7, 8, 14, 15

*United States v. Parker*, 412 F.3d 1000 (8th Cir.  2005) . . . . . . . . . . . . . .   23

*United States v. Quiles-Olivo*, 684 F.3d 177 (1st Cir. 2012) . . . . . . . . . . . . 3, 4, 5

*United States v. Siciliano*, 578 F.3d 61 (1st Cir. 2009) . . . . . . . . . . . . . . .   24

**Constitutional Provisions**

Sixth Amendment, United States Constitution . . . . . . . . . . . . . . . . . . . . . . .  1, 19

**Statutes**

18 U.S.C. §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 16

## I. THE DENIAL OF CASELLAS' MOTION FOR CHANGE OF VENUE DENIED HIM A FAIR TRIAL BY AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND FED. R. CRIM. P. 21(a).

### A. This Case Required A Presumption of Prejudice.

The government's brief is perhaps most noteworthy for its almost exclusive – and entirely too restrictive – focus on the publicity surrounding the carjacking itself and what prospective jurors knew about the narrow and, in contrast to his state murder conviction, relatively modest federal charges for which Casellas was on trial. *See, e.g.,* Brief for the United States ("GB") at 14, 21, 22. In so doing, the government artificially divides the indivisible. The publicity relating specifically to the federal charges cannot be analytically segregated from the unrelenting saturation publicity regarding Casellas and the murder of his wife which blanketed the island for almost two years prior to the trial of this case or the public celebrations which erupted when Casellas was convicted of murdering his wife just two-and-a-half short months before voir dire in this case or the publicly-televised spectacle of Casellas, shackled and wearing a yellow jumpsuit, being sentenced to 109 years for that crime only two months prior to voir dire. Indeed, in seeking to introduce evidence related to the murder at the trial of this case, the government itself stressed the interrelationship between the reported carjacking, along with  the attendant false statements, and the murder, positing that the plan to fabricate a carjacking and report guns stolen was an

integral, antecedent part of Casellas' plan to murder his wife. *See* Brief of Appellant Pablo Casellas-Toro ("CB") at 12; App:372-73. Articles regarding the federal case may have been largely "factual in nature," GB:21,[1] but the overall publicity that had inundated the island for almost two years was not. It was lurid, sensationalistic, virulent, and overarchingly pervasive and produced potential jurors virtually all of whom knew that Casellas had just been convicted of murdering his wife – the very information which the court had already ruled would unfairly prejudice Casellas' right to a fair trial were any express reference to the murder made during Casellas' trial. The question of whether there should have been a presumption of prejudice in this case must be evaluated in light of *all* the publicity and private communications to which jurors were exposed, not just a small, sanitized subset.

According to the government's characterization of this Court's change-of-venue standard, absolute impossibility of juror impartiality is the standard for applying a presumption of prejudice. *See* GB:16. To the contrary, however, venue

---

[1] Even that "factual" coverage regarding the federal case linked the federal charges with the murder of Casellas' wife. *See* App:340-41, 345. That coverage also demonstrates that media and public focus on Casellas continued unabated. Forty press passes were issued for Casellas' initial appearance in the federal case, and a tent was set up on courthouse grounds for the use of photojournalists who were not permitted inside the courtroom. *See* App:346. The media bemoaned the prohibition on cell phones in the courtroom, which would prevent instantaneous communication of everything that occurred. *See* App:340.

change is "appropriate where there is an *ever-prevalent risk* that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial." *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012)(emphasis added). *See* CB:25-26. A presumption of prejudice is called for "in extreme cases where publicity is both extensive and sensational in nature." *Id.* at 182. Such a risk was manifestly present in this case – *a case so extreme that the government did not oppose Casellas' change-of-venue motion*.

The government suggests that *Rideau v. Louisiana*, 373 U.S. 723 (1963), was *sui generis*, limited to its own unique facts. *See* GB:17. The Supreme Court's analysis in *Skilling v. United States*, 561 U.S. 358 (2010), however, while concluding that a presumption of prejudice was not warranted based on the particular circumstances of that case, leaves no doubt that the presumption-of-prejudice concept retains full vitality as a determinant of whether a change of venue is constitutionally required. As addressed in Casellas' opening brief at page 35, this case is, in its own unique way, as extreme as *Rideau*. The Puerto Rican public may not have been treated to a televised confession, but they were confronted for almost two years with an incessant barrage of sensationalistic publicity surrounding Casellas and the murder of his wife, of which offense Casellas had just been convicted by a jury comprised of citizens just like themselves and for which he had just been sentenced by the state court to 109

3

years in prison.[2] Given that conviction and 109-year sentence, jurors would have readily – and directly – associated it with the federal false statement charges, believing that Casellas had lied about the carjacking in order to further his bigger lie about having murdered his wife – a lie which the state jury had publicly rejected by convicting him of the murder.

The Supreme Court may have reviewed the voir dire to determine if actual prejudice had been shown in a particular case, *see* GB:18, but *Skilling* demonstrates that an actual prejudice inquiry, in which the record of the jury selection process is examined, is necessary only if the court first concludes that a presumption of prejudice is unwarranted. *See Skilling*, 561 U.S. at 385 (Court states, after rejecting presumption of prejudice, that "[w]e *next* consider whether actual prejudice infected Skilling's jury" (emphasis added)); *see also Quiles-Olivo*, 684 F.3d at 182-83 (Court states, after rejecting presumption of prejudice in case where there had been "limited-to-no media coverage," that "[w]e continue in our prejudice analysis and turn to actual prejudice"). As Casellas has demonstrated in his opening brief at pages 32-37, an assessment of the factors which the Supreme Court identified in *Skilling* as

---

[2] As this Court noted in *In re Tsarnaev*, in *Rideau*, 50,000 people out of a population of 150,000 – 1/3 of the population – saw the defendant's televised confession. *Tsarnaev*, 780 F.3d 14, 21 (1st Cir. 2015). Here, virtually everyone in Puerto Rico knew of Casellas' conviction for the murder of his wife.

relevant to the presumption-of-prejudice inquiry supports the application of a presumption of prejudice in this case.

This Court may never have "reversed a conviction on the ground that pretrial publicity so infected a community that it could not be addressed through voir dire," GB:18, but it has never before been presented on direct appeal with a case so extreme as this one.[3] *United States v. Misla-Aldorando*, 478 F.3d 52 (1st Cir. 2007), on which the government relies, GB:18-19, was decided before *Skilling*, and merged the two separate inquiries – presumption of prejudice and actual prejudice – into a single actual prejudice inquiry inconsistent with the bifurcated analysis prescribed in *Skilling* and, following *Skilling*, by this Court in *Quiles-Olivo*. *Misla-Aldorando* contains no analysis of the *Skilling* factors and is silent on such matters as the nature of the extensive publicity and its temporal relationship to the time of trial. Even if, however, it were appropriate to consider the voir dire process as part of the presumptive prejudice analysis, the five-day voir dire conducted in *Misla-Aldorando* was considerably more probing and extensive than that conducted here; each juror

---

[3] *Tsarnaev* was before the Court on a petition for a writ of mandamus – a "drastic remedy" with "stringent requirements" which employs "an extraordinarily deferential form of review" and which imposes on the petitioner a considerably more exacting burden than that applicable on direct appeal. *Tsarnaev*, 780 F.3d at 17, 19, 20-21. *Tsarnaev* is also completely distinguishable on its facts for the reasons discussed at CB:21, 24 & n.8, 33 & n.15, 33-35, 36, 48-49.

was asked more than 50 questions, covering such subjects as "the jurors' own beliefs in Misla's guilt or innocence; which newspapers they read, radio stations they listened to, and television stations they watched; whether they had read particular newspaper articles or columns; whether they had listened to the comments of the Secretary of Justice; whether they had participated in, or listened to the results of, any radio polls; whether they had discussions with others about the case; whether they were members of a political party; and whether they had views about the corruption of politicians in general, and Misla and his party in particular." *Id.* at 59. Voir dire resulted in only 15% of the venire being excused for possible bias and the seating of only one juror whom the defendant had challenged for cause. *See id.* at 58-59. Here, in sharp contrast, *fully two-thirds of the prospective jurors were excused for cause*, and nine of the twelve jurors who decided Casellas' fate had been challenged by Casellas for cause.

United States v. Moreno Morales, 815 F.2d 725 (1st Cir. 1987), on which the government also relies, GB:19-20, also predated *Skilling*. The Court held that the district court had not abused its discretion in declining to grant a second trial continuance, one lengthy continuance having already been granted to allow pretrial publicity to dissipate. *Moreno Morales* is a very different case for a number of reasons. First, unlike Casellas, the *Moreno Morales* defendants did not request a

6

change of venue, which "would have ensured a trial before jurors without previous knowledge of the Cerro Maravilla affair." *Id.* at 737. The Court's discussion of the issue strongly suggests that it believed that the appropriate remedy would have been a change of venue had the defendants requested one. Where the defendant expressly declines to seek a venue change, the Court stated, "we think he carries a significantly heavier burden to show that widespread community publicity concerning the crimes of which he is charged render his trial presumptively unfair." *Id.* at 739. On the contrary, however, "[i]f an accused in a situation such as the present seeks a change of venue, judicial fairness may require that it be granted." *Id.* It so required in this case.

Second, the *Moreno Morales* Court found it significant that, because the defendants were police officers and the murder victims were terrorists, "the charged conduct, violent and brutal though it was, would not cause appellants to be seen in black and white terms by all members of the community equally." *Id.* at 736. No such divided opinion would attach to murder of Casellas' wife; it was a crime "the community could only view with total abhorrence." *Id.*

Third, while publicity had continued up to the time of the trial, the *Moreno Morales* Court noted that much of the worst of the public focus on the defendants and their crimes occurred two years before trial, "suggest[ing] that the overwhelming

lynch-mob atmosphere described in *Rideau* was not present." *Id.* at 736. Here, that lynch-mob mentality was evident just a few short months before the trial of this case, with citizens celebrating Casellas' conviction of the murder of his wife into the early morning hours, applauding his conviction so vigorously as to bring a major sporting event to a halt, and television stations broadcasting Casellas' sentencing live in a judicial system which generally does not permit cameras in the courtroom.

Fourth, the *Moreno Morales* Court "assume[d] that the judge, herself a resident of Puerto Rico and the same judge who had continued the case earlier after making extensive findings as to the atmosphere then, felt that the climate had sufficiently improved to permit a fair trial." *Id.* at 731. Here, the trial judge had no such first-hand familiarity with the history of the case and the saturation publicity which had long surrounded it. Fifth, unlike this case in which a jury was selected in only two days, the district court conducted an extensive voir dire spanning 17 days. *Id.* at 732.

In *Murphy v. Florida*, 421 U.S. 794 (1975), another case relied on by the government, GB:21, voir dire "revealed no great hostility" toward the defendant, some of the jurors had "a vague recollection" of the robbery with which he was charged, *none* of the prospective jurors believed there to be a connection between the crime charged and the defendant's past crime, *see Skilling*, 561 U.S. at 380 n.12, the publicity was largely factual, and only 20 of 78 potential jurors were excused for

8

cause. *See Murphy*, 421 U.S. at 802-03. Here, in sharp contrast, voir dire revealed a great deal of animus against Casellas and a general belief that he was a murderer, some of the prospective jurors believed that the murder and the carjacking were linked (the very link which counsel, in advocating a change of venue, argued that jurors would inevitably make, *see* App:426, 666, 671), and fully two-thirds of the prospective jurors were excused for cause. *Murphy* provides no support for the denial of a change of venue in this case. Moreover, in cases such as *Murphy* and other cases in which the pretrial publicity concerned unrelated prior crimes by the defendant, jurors' extrinsic knowledge of that prior bad act might affect their evaluation of the defendant's character but would not necessarily, as here, compromise jurors' ability to impartially assess the merits of the charges actually before them.[4]

---

[4] The issue in *Mu'Min v. Virginia*, 500 U.S. 415 (1991), on which the government also relies, GB:23, was not change of venue or presumption of prejudice but instead the adequacy of the trial court voir dire. The publicity in *Mu'Min* was considerably less extensive, less virulent, and, most importantly, considerably less widely disseminated in the metropolitan Washington area than was the case here, in which the publicity permeated every corner of the island. Notably, the *Mu'Min* Court stated that, had the trial court "been confronted with the wave of public passion engendered by pretrial publicity" similar to that which preceded Irvin's trial, more extensive voir dire procedures might well have been constitutionally required. *Id.* at 429. Such a "wave of public passion" was present here. In *Patton v. Yount*, 467 U.S. 1025 (1984), GB:23, "the extensive adverse publicity and the community's sense of outrage were at their height" four years prior to trial, and when the trial occurred, "prejudicial publicity was greatly diminished and community sentiment had softened." *Id.* at 1032. Here, the prejudicial publicity continued unabated and had reached its crescendo only two short months earlier, with the media frenzy at the time

Contrary to the government's argument, the federal charges were not "discrete" and "easy to distinguish" from the murder and false statement charges of which Casellas has just been convicted. *The false statements alleged in this case had already been featured prominently at the state murder trial*, and, concomitantly, in media reports which blanketed all corners of the island, as the state's theory was that Casellas had faked the carjacking, and reported guns stolen, as part of his plan for his wife's murder, The government advocated the same theory in seeking to admit murder-related evidence in this case. *See* CB:12. If jurors "assumed that the cases were related," GB:22, then Casellas' murder conviction *did* presuppose that he had invented the carjacking and lied about it for the purpose of establishing that the murder-weapon-to-be was not in his possession at the time of the murder. The alleged murder plan – the existence of which jurors would have taken as established by the state court verdicts – provided the very motive for fabricating a carjacking and lying to law enforcement officers about it which was otherwise completely absent from the government's proof.[5]

---

of Casellas' murder trial and sentencing.

[5] Thus, this is not a case like *Murphy* or other cases on which the government relies, in which the prior crimes revealed by the pretrial publicity were unrelated to the offenses for which the defendant was on trial. *See* GB:21. In *United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990), also relied on by the government, GB:21, the Court concluded that a presumption of prejudice was not warranted because

Given the virulent publicity regarding Casellas and the murder of his wife which blanketed the island and the inextricable relationship between the murder and the carjacking, this was not information which jurors could reasonably be expected to put aside when considering charges that Casellas lied about the carjacking. *See* GB:23. It was, moreover, information which, as Casellas argued in his opening brief, the trial judge had already ruled would be unfairly prejudicial to Casellas. Notably, in *United States v. Drougas*, 748 F.2d 8 (1st Cir. 1984), on which the government relies, GB:23, the trial court conducted an extensive five-day voir dire and excluded every single prospective juror who indicated that he or she had read or heard about the evidence which was later excluded at trial on relevance grounds; only one member of the jury which was empaneled had heard anything about the case at all. *Id.* at 30. Here, in sharp contrast, the overwhelming majority of the jurors qualified by the court, including ten of the twelve jurors who sat on Casellas' case, knew that Casellas had been convicted of murdering his wife.

The government argues that "[t]his Court should not question the district

---

"[a]lthough the news coverage was extensive, it largely was factual in nature, summarizing the charges against the defendants and the alleged conduct that underlay the indictment." *Id.* at 1181. The same cannot be said here, where the media coverage was highly sensationalized and extended to matters far outside the charges in the present indictment, precisely "the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." *Id.*

court's credibility findings because pretrial publicity exceeded a certain threshold,"
GB:24, but that is exactly what the Supreme Court has prescribed in cases such as this
one. "[A]dverse pretrial publicity can create such a presumption of prejudice in a
community that the jurors' claims that they can be impartial should not be believed."
*Patton v. Yount*, 467 U.S. 1025, 1031 (1984). *See Misla-Aldarondo*, 478 F.3d at 59
("When a large percentage of the venire is disqualified, this evidence of prejudice in
the community may lead a court to properly question the remaining jurors' avowals
of impartiality" (internal quotation marks omitted)); CB:29-32. The blanket coverage
here was "both extensive *and* sensational in nature," *United States v. Angiulo*, 897
F.2d 1169, 1181 (1st Cir. 1990)(emphasis in original), and contained the kind of
"vivid, unforgettable information [the Supreme Court has] recognized as particularly
likely to produce prejudice." *Skilling*, 561 U.S. at 384. It was precisely the "type of
emotionally charged, inflammatory, sensationalistic coverage needed to support a
presumption of prejudice." *Angiulo*, 897 F.2d at 1181. The impact of the pervasive
and sensational publicity is reflected in the high number of jurors who were
disqualified for cause, either because they voiced a disqualifying bias or because the
district court did not believe their assurances of impartiality. Under such
circumstances, especially where Casellas contended that there were, in addition, a
number of other jurors whose statements as to their impartiality should not be relied

upon, courts should heed the Supreme Court's admonition that "the juror's assurances that he is equal to the task cannot be dispositive of the accused's rights." *Murphy v. Florida*, 421 U.S. 794, 800 (1975).[6]

### B.     *Skilling* **Supports Applying a Presumption of Prejudice.**

Contrary to the government's argument, a "case specific" assessment of the media circus which surrounded Casellas and the murder of his wife and continued unabated for almost two years before the trial of this case in light of the factors identified in *Skilling* as relevant to the presumption-of-prejudice inquiry supports the application of a presumption of prejudice. The government first suggests that the population size of Puerto Rico lessened the potential for prejudice. GB:25. This argument flies in the face of the demonstrated reality that, assuming that the prospective jurors interviewed constituted a representative cross-section of the community, *virtually every adult in Puerto Rico knew about Casellas and the murder of his wife* and had either heard/read media reports or been told about the case by others who had. Puerto Rico may have three million inhabitants, but it remains "a

---

[6] The social science research cited by Casellas is not, as the government suggests, irrelevant. *See* GB:24 n.7. On the contrary, it provides empirical support for the application of a presumption of prejudice in cases such as this one involving massive and sensational publicity by showing, among other things, that exposure to pretrial publicity establishes a matrix through which all other information will be processed and understood, even if jurors are not consciously aware of it. *See* CB:31-32, 40.

compact, insular community, . . . highly susceptible to the impact of local media."

*Moreno Morales*, 815 F.2d at 734.

The government suggests that this Court's observation in *Moreno Morales* "is probably less true today than it was in 1987," given the rise of cable news, the internet, and social media, GB:25 n.8, but the record shows that such sources only exacerbated the reach and virulence of pretrial publicity and pretrial public comment regarding Casellas and the murder of his wife. Internet sources included dedicated links on the homepages of the websites of all the major newspapers through which the public could access coverage of the Casellas case. App:26. In addition, a blog dedicated exclusively to news regarding the murder of Casellas' wife posted hundreds of articles a month, continuing up to the time of the filing of the change-of-venue motion and beyond, as well as public comments "too numerous to count." App:33, 185-221. To the extent that prospective jurors got their news from social media like Facebook, "the most virulent attacks against [Casellas] came from Facebook pages." App:868. Twitter sources included minutely detailed reports tweeted by reporters from inside the courtroom during the murder trial. App:35. Thus, far from dissipating the impact of mainstream media, the advent of new forms of news and commentary dissemination

only magnified the reach and impact of the highly prejudicial publicity.[7]

Next, the government criticizes Casellas for not seeking a continuance, GB:26, but this Court has recognized that "a motion for a change of venue is the preferred remedy where a community has been saturated with publicity adverse to the defendant." *Moreno Morales*, 815 F.2d at 737. Acceding to the government's request for a two-month continuance would have done little or nothing to ameliorate the poisonous atmosphere surrounding Casellas. Moreover, the government's continuance motion, filed and ruled on prior to the filing of Casellas' change-of-venue motion, was predicated in part on the need for additional time to secure the attendance of witnesses if a change of venue were granted, *see* DE:41 at 5, which the government had already indicated that it would likely not oppose. *See* DE:44 at 3.

Finally, the government argues that, absent specific defense argument on the point, "the jury could not have been expected to parse the testimony . . . to determine whether Casellas even made the charged statements." GB:27. However, to convict Casellas of violating 18 U.S.C. §1001 with respect to the charged statements, the very first essential element that the jury had to find beyond a reasonable doubt is that

---

[7] The government seeks to distinguish this case from *Rideau*, GB:25-26, but the reasons why this case presents just as much, if not more, danger of irremediable prejudice have been addressed in Casellas' opening brief at page 35 and at pages 3-4, *supra*.

15

Casellas made the statement at issue. *See United States v. Blair*, 886 F.2d 477, 478 (1st Cir. 1989)("The essential elements which must be proven beyond a reasonable doubt to establish a violation of 18 U.S.C. §1001 are: (1) *that a statement was made*, (2) with specific intent, (3) to falsify, (4) a matter material, (5) to agency jurisdiction" (emphasis added)). The jury was so instructed. App:1836-38. It was the jury's sworn *duty* to determine whether the government had proven beyond a reasonable doubt that Casellas made the statements charged, a duty which it did not discharge. Instead, the verdicts reflect the jury's bias: it convicted Casellas of making all three false statements even though, as the court subsequently ruled, there was insufficient evidence to permit a rational jury to find that he had even made two of them.

### C.    The Presumption of Prejudice Cannot Be Rebutted.

The government has cited no case that has ever held that, once a presumption of prejudice has been established, it may be rebutted by looking to whether there was "impartiality in the voir dire testimony," and, for the reasons addressed in Casellas' opening brief at 37-38, such a conclusion would be completely at odds with the whole point of the presumption: that there are some circumstances in which jurors' affirmations of impartiality just cannot be relied upon to ensure the trial by an impartial jury which criminal defendants are constitutionally guaranteed.

Nothing in *Rideau* suggests that the presumption, once attached, is rebuttable.

16

Instead, the Supreme Court reversed "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury," *Rideau*, 373 U.S. at 727, notwithstanding the fact that the jurors who had seen the televised confession had assured the court that they "could lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court." *Id.* at 732 (Clark, J., dissenting).[8]

Contrary to the government's argument, in cases where a presumption of prejudice has been found warranted based on pervasive and prejudicial pretrial publicity, "the effect of [the] serious error cannot be ascertained and isolated." GB:27. When the community from which jurors are drawn has been sufficiently poisoned by sensational adverse publicity that a presumption of prejudice arises, voir dire *cannot* perform its function to ensure a fair and impartial jury, and jurors' assurances of impartiality cannot be relied upon to guarantee the defendant's right to a fair trial by an impartial jury. Thus, contrary to the government's argument, the effects of the error *cannot* be ascertained. *See* GB:28. These are matters which "affec[t] the framework within which the trial proceeds, and are not simply an error in the trial process itself," *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006)(internal quotation marks

---

[8] In *Rideau*, only three of the jurors who sat on the case had seen the televised confession. *Id.* Here, by contrast, at least ten of the jurors knew that Casellas had been convicted of murdering his wife.

omitted). *See Owens v. United States*, 483 F.3d 48, 64 (1st Cir. 2007)("structural rights are basic protection[s] whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function," *quoting Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993)). The Supreme Court may have never formally labeled errors of this sort as structural error, but its decision in *Rideau* effectively treated the issue as such. Presumptive prejudice from pretrial publicity fits comfortably within the rubric encompassing other structural errors such as trial by a judge with an interest in the outcome, *Tumey v. Ohio*, 273 U.S. 510 (1927), denial of the right to be represented by counsel of choice, *Gonzalez-Lopez*, 548 U.S. at 149, and denial of the right to a public trial, *United States v. Agosto-Vega*, 617 F.3d 541, 542 (1st Cir. 2010).[9]

Here, the district court, despite profound doubts about whether an impartial jury could be empaneled, elected to proceed with voir dire to see if it would be possible. This is precisely the opposite of what the presumption requires: once the presumption has attached, as it did here, a change of venue is required. While the court did manage to find jurors who claimed that they could put what they knew about Casellas out of their minds, such protestations cannot be determinative under the circumstances of this

---

[9] Should the Court decide that the presumption of prejudice is rebuttable, the burden should be on the government to rebut the presumption of prejudice beyond a reasonable doubt, in keeping with the usual practice for errors of constitutional magnitude. *See Chapman v. California*, 386 U.S. 18, 24 (1967).

case, especially in light of the selection procedures adopted by the district court. *See* CB:39-50.

**II.   THE JURY SELECTION PROCEDURES ADOPTED BY THE DISTRICT COURT DID NOT SUFFICE TO ENSURE THE SELECTION OF AN IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AMENDMENT OR TO SAFEGUARD THE PRESUMPTION OF INNOCENCE.**

   **A.   The Jury Selection Procedures Adopted by the District Court Were Insufficient to Adequately Test Jurors' Assurances That They Could Put Aside Their Knowledge of Casellas' Conviction for Murdering his Wife.**

The district court may have told a few prospective jurors that there were no right or wrong answers to its questions, *see* GB:30, but jurors had already received instructions regarding their duties and responsibilities, including the presumption of innocence and the duty to decide the case based solely on the evidence adduced in court, *see* App:577, 622, 771, and thus knew that there were, in fact, "wrong" answers, *i.e.*, answers inconsistent with their responsibilities as jurors. Indeed, the court remarked that it was "hearing much more civic minded talk" from prospective jurors than it was accustomed to, App:781, an indication that jurors' answers may have been guided more by what they believed they needed to say to remain on the jury than what they actually believed, which they would have understood would have led to their exclusion.

19

There was no reason why juror questionnaires could not have been completed under oath, *see* GB:30, as the court's initial proposal, inexplicably abandoned, was to summon jurors to the courthouse to complete the questionnaires.[10] App:416-23. A number of prospective jurors were made nervous by the individual voir dire, something which could have been alleviated by their answering questionnaires privately, with no time or situational pressure, and free from the influence of instructions regarding their duties as jurors, a process more adapted to producing candid and unmediated responses.[11] There would have been more than sufficient opportunity to evaluate the prospective jurors' demeanor on subsequent individual voir dire of those whose questionnaires were not facially disqualifying.[12]

---

[10] Casellas may not have objected to the court's decision to reject use of a juror questionnaire, *see* GB:11, but he was confronted with a fait accompli. *See* App:429 ("I made a decision about how I'm going to proceed"). He at all times maintained his position that only a change of venue could secure his right to trial by an impartial jury and that voir dire would not and did not produce a panel of impartial jurors.

[11] Voir dire in *Skilling* may have only taken five hours, GB:31, but, unlike this case, it had been preceded by an "extensive screening questionnaire." 561 U.S. at 384. The holding in *Mu'Min*, on which the government also relies, GB:31-32, was limited to whether the defendant had a constitutional right to have jurors specifically questioned regarding the content of what they had read or heard about the case. 500 U.S. at 431.

[12] The government argues that Puerto Rican jurors would be more comfortable expressing themselves in Spanish, GB:31, which is quite beside the point. Whether interviewed via written questionnaire or oral question-and-answer, jurors were required to express themselves in English.

20

Casellas' twice-repeated requests for additional peremptory challenges were absolutely serious, whether the district court regarded them as such or not. *See* GB:35 & n.12. Nor were those requests "a roundabout attempt to challenge [the court's] for-cause denials." GB:35, *quoting Misla-Aldarondo*, 478 F.3d at 61. Those requests were a genuine attempt to obtain a fair trial by an impartial jury for Casellas by challenging additional jurors who had prejudicial knowledge of Casellas' conviction for the murder of his wife and who Casellas believed had not satisfactorily shown that they could and would put that knowledge completely aside when considering the charges in this case.

**B.    The District Court's Denial of Challenges for Cause of Jurors Who Knew That Casellas Had Been Convicted of Murdering his Wife Denied Casellas His Sixth Amendment Right to Trial By an Impartial Jury.**

The district court found Juror #5 qualified notwithstanding its expressed concerns. *See* CB:41. Such doubts "must be resolved against the juror," *United States v. Mitchell*, 690 F.3d 137, 143 (3d Cir. 2012), *quoting United States v. Gonzalez,* 214 F.3d 1109, 1114 (9th Cir.2000), particularly where, as here, the juror had sufficiently detailed knowledge of the murder as to remember that Casellas had thrown something away  – which the court believed she knew was the murder weapon – creating an obvious link between the murder and this case.

21

With respect to Juror #9, the government has not refuted Casellas' argument. *See* CB:42-43. Regardless of what the district court may have said, GB:34, Juror #9 did not say that she would need to hear *the evidence*, but that she wanted to hear *Casellas' story*. At no time did the juror make "an affirmative promise of impartiality . . . [which is] believable in light of what the juror has revealed and the context of the case," *United States v. Lanham*, 617 F.3d 873, 882 (6th Cir. 2010), or commit to honoring Casellas' right to silence and the presumption of innocence.

As for the remaining jurors challenged by Casellas, Casellas relies on the arguments set forth in Section II(A) of his opening brief.

## III. THE DISTRICT COURT ERRED IN DENYING CASELLAS' MOTION TO SUPPRESS.

Casellas did not call Agent Gruel to "check on the status of the search." GB:37. Casellas  called four times *to request the return of his car*, and on each occasion he was told that he could not have his car back because the search had not yet been conducted. App:495-98, 500. The cases on which the government relies are uniformly inapposite, involving as they did immediate searches conducted in the presence of the defendant. In *United States v. $340,980 in United States Currency*, 732 F.3d 812 (7th Cir. 2013), the defendant, although writing "under protest" on the consent form (which the searching officers did not notice until several days later), readily agreed to permit

22

the search of his truck even after he was told that the officers were searching for drugs and even opened the locked passenger compartment for them; at no point did the defendant say anything orally to indicate that he had an objection to the search or its scope. *Id.* at 820-21. In *United States v. Parker*, 412 F.3d 1000 (8th Cir. 2005), the defendant consented to the officers' entry and search and did not say anything about a search warrant until after the evidence had already been found; indeed, the defendant affirmatively facilitated the search by telling the officers where additional weapons could be found. *Id.* at 1002. In *United States v. Alfaro*, 935 F.2d 64 (5th Cir. 1991), the defendant had agreed, as part of his employment agreement, to consent to search by his employer; as an initial matter, the Court questioned whether he could withdraw his consent in light of his employment agreement other than by quitting his job. In any event, the defendant did not refuse to be searched or otherwise protest. *Id.* at 67.

It does not appear that this Court has ever adopted a requirement of unequivocal withdrawal of consent. The standard for evaluating the scope and duration of a defendant's consent is one of "objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). *See, e.g., United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003). The government's argument to the contrary notwithstanding, GB:40-41, when Casellas was told four times that he could

not have his car back, he simply "acquiesce[d] to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968). Any objectively reasonable citizen confronted with a refusal by a law enforcement officer to return his property would believe that he was powerless to effect any change in the status quo and that the car would be returned to him only when the officers were ready to do so.[13]

The government references the independent source doctrine (which it did not argue below and on which the district court made no findings), GB:42 n.14, which is, however, entirely inapplicable here. "Where, as here, a search warrant is supported by an affidavit containing unlawfully obtained information, the independence of the search depends on two factors:  (1) whether the agents' decision to seek the warrant was prompted by what they had seen during their initial entry, and (2) whether the affidavit contained sufficient facts to support probable cause when the offending facts were excised." *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009), *quoting United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005). Here, the officers' decision to conduct a more invasive search requiring a warrant was plainly prompted

---

[13] In *United States v. Brown*, 345 F.3d 574 (8th Cir.  2003), like the other cases on which the government relies, the search of the defendant's vehicle took place immediately in the defendant's presence. While the defendant did express impatience with how long the search was taking, he did not seek to halt the ongoing search, and at some point in the process the officers developed probable cause to search, and a withdrawal of consent was no longer possible. *See id.* at 580-81.

24

by their observations during the earlier warrantless search.[14] Thus, the first requirement for the application of the independent source doctrine is not satisfied. In addition, for the reasons addressed in Section III(C) of Casellas' opening brief, once the illegally-acquired information was excised from the search warrant affidavit, the affidavit did not establish probable cause for the search. Thus, the independent source doctrine cannot be applied here.

For all the reasons addressed in Section III(D) of Casellas' opening brief, the admission of the illegally-obtained evidence was not harmless.

---

[14] Moreover, by the time of the warrantless search, Casellas was the only suspect in his wife's murder. *See* CB:54.

## CONCLUSION

The district court erred in denying Casellas' motion for change of venue, and Casellas is entitled to a new trial in a venue untainted by prejudicial pretrial publicity and jurors' knowledge that Casellas had been convicted of murdering his wife. Alternatively, Casellas is entitled to a new trial in Puerto Rico at which appropriate jury selection safeguards are utilized to ensure that Casellas is not judged by jurors who already knew that he had been convicted of murdering his wife. Finally, Casellas is entitled to a new trial from which all evidence derived from the unlawful searches of his car is excluded.

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-8616 (Telephone)
(617) 338-9538 (Fax)
homanlaw@aol.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

**/s/ Francisco Rebollo-Casalduc**
Francisco Rebollo-Casalduc
P.O. Box 195571
San Juan, Puerto Rico 00919
(787) 765-0505 (Telephone)
rebollolaw@gmail.com

26

No. 14-1933

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

UNITED STATES OF AMERICA
*Appellee*
v.
PABLO CASELLAS-TORO,
*Defendant- Appellant*

_____

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE
AND LENGTH LIMITATIONS**

_____

This brief has been prepared using:

> 14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below:
>
> WordPerfect Office X4, 14-point Times New Roman

EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, and signature blocks appellant's Reply Brief contains, in total:

> 6,458 words.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line printout.

**/s/ Kimberly Homan**
Kimberly Homan

27

## CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 18th day of May, 2015, I caused one copy of the Reply Brief of Appellant Pablo Casellas-Toro to be served on all parties of record via this Court's ECF system.

**/s/ Kimberly Homan**
Kimberly Homan